**03 CV 2175**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LIBERTY MEDIA CORPORATION, LMC
CAPITAL LLC, LIBERTY PROGRAMMING
COMPANY LLC, LMC USA VI, INC., LMC USA
VII, INC., LMC USA VIII, INC., LMC USA X,
INC., and LIBERTY HSN LLC HOLDINGS, INC.,
and LIBERTY MEDIA INTERNATIONAL, INC.

    Plaintiffs,

    v.

VIVENDI UNIVERSAL S.A., JEAN-MARIE
MESSIER, GUILLAUME HANNEZO, and
UNIVERSAL STUDIOS, INC.

    Defendants.

---

C.A. No. _____

JURY TRIAL DEMANDED



**COMPLAINT**
**FOR INJUNCTIVE,**
**DECLARATORY AND**
**MONETARY RELIEF**

---

      Plaintiffs Liberty Media Corporation, LMC Capital LLC, Liberty Programming

Company LLC, LMC USA VI, Inc., LMC USA VII, Inc., LMC USA VIII, Inc., LMC USA X,

Inc., Liberty HSN LLC Holdings, Inc., and Liberty Media International, Inc. (collectively "the

Plaintiffs"), for their claims against Vivendi Universal S.A., Jean-Marie Messier, Guillaume

Hannezo, and Universal Studios, Inc. (collectively "the Defendants") allege as follows:

## NATURE OF THE ACTION

      1.    This is an action by Liberty Media Corporation and certain of its

subsidiaries ("Liberty Media") for damages and equitable relief arising from an Agreement and

Plan of Merger and Exchange ("the Merger Agreement") that was entered into as the result of

violations of federal securities laws and fraud by Vivendi Universal S.A. ("Vivendi") and two of

its former officers. At the time of the Merger Agreement, Vivendi faced a massive and crippling

liquidity crisis, but Defendants – through outright fraud, misrepresentation, and concealment –

hid the material facts concerning Vivendi's liquidity crisis from Liberty Media (and the investing public at large), and thereby caused Plaintiffs to exchange, among other things, their shares of USA Networks, Inc. for shares of Vivendi. Plaintiffs seek monetary damages for breach of contract, common law fraud, fraudulent concealment, unjust enrichment, and securities fraud, as well as such equitable relief as the Court may deem appropriate, including, without limitation, rescission of the Merger Agreement.

**JURISDICTION AND VENUE**

2.      Subject matter jurisdiction over the securities fraud claims is conferred on this Court by 28 U.S.C. § 1331 in that this action arises under the laws of the United States, and this Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

3.      In the Merger Agreement, the parties "irrevocably submit[ted] to the exclusive jurisdiction of . . . the United States District Court for the Southern District of New York, for the purposes of any suit, action or other proceeding" arising from the Merger Agreement.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (d).

**PARTIES AND OTHER RELEVANT ENTITIES**

5.      Plaintiff Liberty Media Corporation is a Delaware corporation, with its principal place of business at 12300 Liberty Boulevard, Englewood, Colorado. Liberty Media owns interests in a broad range of video programming, communications, and internet businesses in the United States, Europe, South America, and Asia.

6.      Each of Plaintiffs LMC Capital LLC and Liberty Programming Company LLC is a Delaware limited liability corporation, with its principal place of business at 12300

Liberty Boulevard, Englewood, Colorado. LMC Capital LLC is wholly owned by Liberty Media, and Liberty Programming Company LLC is, in turn, wholly owned by LMC Capital LLC. Plaintiff Liberty HSN LLC Holdings, Inc., also a Delaware corporation with its principal place of business at 12300 Liberty Boulevard, Englewood, Colorado, is wholly owned by Liberty HSN, Inc., which is, in turn, wholly owned by Liberty Programming Company LLC.

7.      Each of Plaintiffs LMC USA VI, Inc., LMC USA VII, Inc., LMC USA VIII, Inc., and LMC USA X, Inc. is a Delaware corporation, with its principal place of business at 12300 Liberty Boulevard, Englewood, Colorado. Each of those Plaintiffs is an indirect wholly-owned subsidiary of Liberty Media that held certain shares of, and other equity interests in, USA Networks, Inc. prior to the conduct that gives rise to this action. Plaintiff Liberty Media International, Inc. is a Delaware corporation with its principal place of business at 12300 Liberty Boulevard, Englewood, Colorado. Prior to the conduct giving rise to this action, Liberty Media International indirectly held a 27.4% interest in a French société anonyme, multiThématiques, S.A.

8.      Defendant Vivendi Universal S.A. is a société anonyme organized under the laws of France with its principal place of business at 42 Avenue de Friedland 75380, Paris, Cedex 08, France. Vivendi is engaged in, among other things, the media and communications business.

9.      Defendant Jean-Marie Messier is, upon information and belief, a citizen and domiciliary of France. During the times relevant to this Complaint, Mr. Messier was chief executive officer and chairman of Vivendi, and a "controlling person" within the meaning of Section 20(a) of the Securities and Exchange Act of 1934.

10.     Defendant Guillaume Hannezo is, upon information and belief, a citizen and domiciliary of France. During the times relevant to this Complaint, Mr. Hannezo was chief financial officer of Vivendi and a "controlling person" within the meaning of Section 20(a) of the Securities and Exchange Act of 1934.

11.     Defendant Universal Studios, Inc. ("Universal Studios") is a Delaware corporation with its principal place of business at 100 Universal City Plaza, Universal City, California 91608. Universal Studios was a party to the Merger Agreement and, at the time of the Liberty Media-Vivendi transactions at issue in this action, Universal Studios was a subsidiary of Vivendi, which produced and distributed motion pictures worldwide, participated in the music business, and owned and operated theme parks, entertainment complexes, and specialty retail stores. Universal Studios also is the subsidiary through which Vivendi held its equity interest in USA Networks.

12.     USA Interactive, f.k.a. USA Networks, Inc. ("USAI" or "USA Networks") is a Delaware corporation with its principal place of business at 152 West 57th Street, New York, New York 10019. At the time of the Liberty Media-Vivendi transactions at issue in this action, USAI was organized into two groups, the Interactive Group and the Entertainment Group. The Interactive Group included companies such as Home Shopping Network, Ticketmaster, and Expedia. The Entertainment Group consisted of USA Cable, Studios USA, and USA Films.

13.     Vivendi Universal Entertainment LLLP ("VUE") is a limited liability limited partnership organized under the laws of Delaware. Following the Liberty Media-Vivendi transactions that are at issue in this action, Vivendi caused USA Networks to transfer all of its entertainment assets and businesses to VUE, which became Vivendi's U.S.-based film,

television, and recreation arm. Upon information and belief, Vivendi holds some or all of its interest in VUE through Universal Studios.

## BACKGROUND FACTS

### Liberty Media's Role in the Formation of USA Networks, Inc.

14.     Liberty Media, through a variety of subsidiary organizations, has long been an investor in USAI and its predecessors. In 1993, Liberty Media purchased a controlling interest in the Home Shopping Network and obtained an option to purchase a controlling interest in Silver King Communications ("Silver King"). Two years later, in 1995, at which time Liberty Media was exercising its option to acquire a controlling interest in Silver King, Liberty Media entered into agreements with Barry Diller, whereby Mr. Diller purchased common stock and was granted stock options for Silver King. Pursuant to those agreements, Mr. Diller also became chairman of Silver King's board of directors and received a proxy to vote all of Liberty Media's shares of Silver King, subject only to Liberty Media's veto power over certain "fundamental matters," such as mergers, the incurring of debt above specified amounts, and other significant corporate transactions. Subsequently, Silver King and Home Shopping Network were combined, as part of a stock-for-stock merger, to form a new entity, HSN, Inc. ("HSN"). At that time, Liberty Media's voting proxy in favor of Mr. Diller became applicable to Liberty Media's shares in HSN.

15.     In 1997, Liberty Media, HSN, Universal Studios and The Seagram Company Ltd. ("Seagrams") entered into a series of contractual arrangements, pursuant to which Universal Studios and Seagrams (collectively "Universal") contributed certain cable television and studio assets to HSN in exchange for an equity stake in HSN and a subsidiary of HSN. Upon receiving Liberty Media's consent to the transaction, Universal became the largest

shareholder in HSN (on a common-stock equivalence basis), which was renamed "USA Networks Inc." upon the closing of the transaction. Mr. Diller continued to serve as chairman of the board of the newly created USA Networks. Liberty Media, Universal, and Mr. Diller entered into several agreements pursuant to which, among other things, Universal granted Mr. Diller a proxy to vote all of its shares of USA Networks, subject to a right to consent to certain types of transactions, similar to the right possessed by Liberty Media.

16.     Due to regulatory restrictions that applied to Universal's and Liberty Media's ownership interests in the newly formed USA Networks, certain of the equity interests in USA Networks held by Liberty Media and Universal took the form of exchangeable securities issued by subsidiaries of USA Networks, including USANi LLC ("USANi"), a Delaware limited liability company owned by USA Networks, Liberty Media and Vivendi. These securities were exchangeable for common stock and high-vote Class B common stock of USA Networks upon either a change in the regulatory status of these parties or a change in the laws or regulations governing their ownership of USA Networks.

17.     As the result of the above-described transactions, Liberty Media, through its subsidiaries, owned outright approximately 24,838,738 common shares and 756,644 Class B shares of USA Networks. Liberty Media and its subsidiaries further held approximately 45,774,708 shares of USANi, exchangeable for common shares of USA Networks, and HSN shares exchangeable for 31,620,063 Class A shares of USA Networks and 1,596,544 Class B shares of USA Networks. BDTV entities, 99% owned by Liberty Media but controlled by Mr. Diller, owned 44 Class A shares of USA Networks and 48,846,808 Class B shares of USA Networks.

**Vivendi Seeks To Acquire A Substantial Part of Liberty Media's USA Networks Holdings**

18.     Defendant Vivendi was the brainchild and pet project of Defendant Jean-Marie Messier. It was Mr. Messier's ambition to convert Vivendi S.A., a French water utility, into a global entertainment powerhouse. In order to accomplish his dreams, Mr. Messier took Vivendi S.A. on an acquisition binge. Defendant Vivendi was created in 2000 as the result of a merger of Vivendi S.A., Seagrams (which owned Universal Studios), and a French satellite-cable provider, Canal Plus S.A. As a result of the merger, Vivendi became the beneficial owner of Universal's equity interest in USA Networks and succeeded to Universal's rights under the governance agreements with Mr. Diller and Liberty Media. Following the merger, Defendant Jean-Marie Messier became chairman and chief executive officer of Vivendi.

19.     Mr. Messier's dream to become the king of this entertainment empire, however, came at a price. Under Mr. Messier's leadership, Defendant Vivendi, according to published reports, amassed approximately $19 billion in debt — the largest debt load in French history. In 2001, Mr. Messier apparently set his sights on acquiring USA Networks, at least in part as a means to improve Vivendi's undisclosed cash-flow difficulties. As demonstrated below, in order to reach this next step – as well as to maintain relationships with existing and prospective investors – Defendants orchestrated a scheme to conceal the severity of Vivendi's liquidity problems stemming from the massive debt load incurred as a result of the Seagrams/Canal Plus, as well as other, transactions.

20.     In or about November 2001, Liberty Media learned that Vivendi was considering a transaction involving USA Networks and Mr. Diller, through which it was proposed that USA Networks' entertainment assets and certain entertainment assets of Vivendi would be contributed to a newly formed partnership (which ultimately became VUE). Liberty

Media subsequently learned that, under the proposed transaction, USA Networks would transfer all of its entertainment assets, including the USA Network cable programming service, the Sci-Fi Channel, and Studios USA to VUE in exchange for partnership interests and cash, and Vivendi would transfer its studio and theme park assets to VUE.

21.      Pursuant to the governance agreements with Mr. Diller and Universal (Vivendi's predecessor), Liberty Media's consent was required for the proposed Vivendi-USA Networks transaction to proceed. On or about November 9, 2001, Mr. Messier met with Robert Bennett and John Malone of Liberty Media in Colorado to explain the proposed transaction between Vivendi and USA Networks and to persuade Liberty Media to give its consent for the transaction to proceed. In this meeting, Vivendi conveyed to Liberty Media the broad contours of the proposed transaction with Universal. The prospect of a transaction between Liberty Media and Vivendi involving Liberty Media's shares of USA Networks was not contemplated, much less discussed, at the time of the November 9, 2001 meeting.

22.      As the structure of the proposed Vivendi-USA transaction was refined, Vivendi determined that the purchase of a portion of Liberty Media's USA Network shares was advantageous to it from a tax standpoint. Moreover, Vivendi realized that if it were able to convince Liberty Media to accept Vivendi shares instead of cash for a portion of Liberty Media's USA Network shares, it could stave off the liquidity crisis that it had been hiding from the public for an additional period of time. Thus, in December 2001, Vivendi offered to acquire a portion of Liberty Media's USA Network shares in exchange for American Depository Shares ("ADSs") that would represent Vivendi ordinary shares. (As discussions proceeded, Vivendi agreed also to acquire Liberty Media's entire interest in another corporation – multiThématiques, S.A. – as part of the transaction.) The exchange ratio proposed by Vivendi and agreed to by Liberty Media

was based upon the relative market prices of the Vivendi shares and the USA Network shares. Unbeknownst to Liberty Media, Vivendi was actively purchasing its own shares in the market while making brash public statements concerning Vivendi's future that it knew were false in order to inflate the value of the Vivendi shares during this critical measurement period.

23.     The discussions concerning Vivendi's proposal to Liberty Media occurred mostly by way of telephone conversations between Mr. Bennett of Liberty Media and Messrs. Hannezo or Messier of Vivendi. Defendants were aware, as the result of these discussions, that Liberty Media was interested in pursuing this arrangement, in part, because Liberty Media viewed the publicly traded Vivendi shares to be a more liquid asset than were the USA Networks shares then held by Liberty Media. Defendants were further aware that, in assessing the viability of the proposed Liberty Media-Vivendi transaction, Liberty Media was relying upon the understanding that the market price of Vivendi shares fairly approximated the value of such shares, as the result of Vivendi's honest public reporting of its financial status, in accordance with applicable accounting practices and securities laws and regulations. Defendants also knew that in considering the proposed agreement with Vivendi, Liberty Media was relying upon the accuracy and completeness of the publicly available information concerning Vivendi's financial status in order to assess the fairness of the proposed exchange.

24.     During the discussions between Vivendi and Liberty Media in December 2001, Defendants never alerted Liberty Media to (i) issues concerning Vivendi's liquidity, (ii) credit ratings clauses that could impact the availability of credit lines and accelerate certain maturity dates, or (iii) the existence and/or accounting of sold put options on Vivendi's ordinary shares. Vivendi's filings with the Securities and Exchange Commission, including its Form 20-F for the year ended December 31, 2000, filed on July 2, 2001, and subsequent Form 6-Ks through

the date of the Liberty/Vivendi transaction on December 16, 2001, were also silent on these issues – matters that any reasonable investor would consider material when making an investment decision. Instead, Defendants had artificially inflated the price of Vivendi's shares by nondisclosure of critical information concerning Vivendi's liquidity, by exaggerated and overly optimistic public statements about Vivendi's overall financial condition, and by engaging in a massive repurchase of Vivendi shares in late 2001, which Defendants did not disclose to Liberty Media.

25.     Defendants publicly touted Vivendi's financial position throughout 2001, with no mention of its looming financial problems. Guidance provided prior to the execution of the Merger Agreement indicated good operating results and strong forecasts. Forecasts indicated expected revenue growth of 10% and EBITDA (earnings before interest, taxes, depreciation, and amortization) growth of 35% in 2001 and 2002. (See, e.g., Vivendi's Form 6-K dated October 17, 2001.)

26.     Vivendi's monthly press releases in 2001 also consistently portrayed Vivendi's financial health in glowing terms. For example, on March 9, 2001, Vivendi reported "better than expected" fourth quarter and 2000 results, claiming 7.2 billion euros in EBITDA for the period ended December 31, 2000, which Vivendi touted as reflecting "strong performance across the Company's business units." In that press release, Defendant Messier is quoted as having stated:

> The strong results that Vivendi Universal has generated for calendar 2000 provide a very solid foundation for the Company's growth prospects in 2001. The robust performance of Vivendi Universal's business segments clearly reflects the fast pace and clear momentum that we have established as Vivendi Universal enters 2001. . . . I am very confident that, for Media and Communications, we will reach our revenue growth target of 10 percent and our aggressive EBITDA growth target of 35 percent for the

period 2000-2002 and achieve superior returns for Vivendi Universal shareholders.

27.     In April 2001, Vivendi likewise announced "Very Strong" first-quarter 2001 results.  In the April 23, 2001, press release, Vivendi and Mr. Messier continued to tout results as meeting or exceeding operating targets.  Mr. Messier expressed his pleasure that Vivendi delivered "solid first quarter 2001 results in EBITDA, which more than doubled, and by generating double digit revenue growth[.]"  In April, Mr. Messier reiterated his confidence that "we will reach our annual EBITDA and revenue growth targets of 35% and 10% respectively in 2001 and 2002 and achieve superior returns for Vivendi Universal shareholders."  After issuing its results, Vivendi hosted a conference call to discuss the results and its business prospects.  During the call, Mr. Messier and other Vivendi representatives stated that Vivendi's favorable results were due to strength across all business lines, that Vivendi was on track for full-year sales growth of 10%, excluding Universal Studio, and to report earnings per share in excess of $1.22 in 2001 and $1.74 in 2002.  In fact, Vivendi's financial statements were misleading and Defendants' statements were false and misleading because Vivendi was not on track to achieve the earnings growth forecast.  Moreover, Vivendi had billions of dollars of goodwill that was impaired for which Vivendi had not recorded impairment charges.  Vivendi was not nearly as resilient in the face of recession as it had represented and, indeed, would suffer more than its competitors due to its excessive debt levels.

28.     Throughout the summer and fall of 2001, Vivendi continued to make public statements that misleadingly portrayed its financial condition.  On July 22, 2001, Vivendi announced "Very Strong" results for the second quarter of 2001 and proclaimed that it had "achieved three quarters of its full-year target of incremental EBITDA."  Among other things, Mr. Messier was quoted as having stated, "Obviously, our current stock price does not fully

reflect this situation in terms of EBITDA multiples or Enterprise Value to EBITDA to growth. With the highest growth rates of the industry and the lowest multiples, our stock is definitely an attractive investment today." After announcing its results, Vivendi hosted a conference call in which it proclaimed that Vivendi was still on track to achieve strong growth in revenues and earnings in 2001, including EBITDA growth of 35%. In fact, once again Vivendi's financial statements were misleading, and Defendants' statements were false and misleading, as Vivendi was not on track to achieve the EBITDA growth forecast. Vivendi was not nearly as resilient in the face of recession, as it had represented and, indeed, would suffer more than its competitors due to its excessive debt levels.

29.    On September 25, 2001, Vivendi issued a press release over the *Business Wire*, projecting "Strong First Half 2001 Results" and a "Solid Outlook for 2002." Mr. Messier was quoted as having said:

> Despite the current environment, we will reach all our previously stated revenue/EBITDA objectives for the year 2001. I continue to express my confidence in achieving our . . . revenue growth targets for 2001 and our more than 35% EBITDA growth (versus the company's October 2000 guidance) at a constant asset base. This, combined with some extensions in the company's asset base . . . should result in full-year Media and Communications EBITDA slightly north of 5 billion euros. In the current environment, giving a 2002 target would not be meaningful, and we have yet to complete our 2002 budget and plan process. Before the recent tragedy, market consensus for 2002 EBITDA was not far from 6 billion euros. Despite the events, looking at the trends of our businesses and our defensive qualities, we are currently looking very comfortable with this expectation.

The press release proceeded to state that "Vivendi Universal is the right investment case for 2002, not only for media investors, but for all performance and financial value-driven investors," citing low enterprise value and leverage on EBITDA, among other supposedly positive factors.

30.   On October 30, 2001, Vivendi issued another press release over the *Business Wire*, reaffirming Vivendi's "confidence in achieving its growth targets: 10% revenue growth and 35% organic EBITDA growth in 2001." Mr. Messier again touted the strength of Vivendi's financial position:

> Having the highest resiliency and lowest sensitivity to a recessionary environment explains our ability to outperform most of our peers.
>
> Even so, Vivendi Universal's media and communications businesses are not immune to the effects of a recession. But, in challenging and uncertain environments, which can negatively impact businesses in all industries, Vivendi Universal offers within the media and communications industry both the highest potential for growth going forward and the best ability to resist a difficult economic environment.
>
> An early look at the fourth quarter indicates that we are on track to meet our targets.

31.   During a conference call following the October 2001 release, Mr. Messier and others in Vivendi's management stated that Vivendi was able to achieve strong results even in a down market (and was, in fact, gaining market share), and that Vivendi remained on track to achieve strong growth in revenues and earnings in 2001. Based on Defendants' statements, Morgan Stanley issued a report on Vivendi, which among other things, rated Vivendi "OutPerform," forecasting EBITDA for 2001 and 2002 of 8.77 billion euros and 10.1 billion euros, respectively. In fact, Vivendi's financial statements were misleading, and Defendants' statements were false and misleading, as Vivendi was not on track to achieve the earnings growth forecast. Moreover, Vivendi had billions of dollars of goodwill that was impaired for which Vivendi had not recorded impairment charges. Again, Vivendi was not nearly as resilient in the face of recession as it had represented and, indeed, would suffer more than its competitors due to its excessive debt levels.

32.     Based on Defendants' representations, reports, financial statements, and other statements concerning Vivendi's financial viability, Liberty Media and Vivendi entered into an agreement in late 2001, whereby Plaintiffs agreed to transfer 25 million shares of USA Networks common stock, approximately 38.7 million shares of USANi (exchangeable for an equal number of shares of USA Networks common stock), and Liberty Media's approximately 28% interest in multiThématiques to Vivendi in exchange for 37,386,435 Vivendi ADSs. The exchange ratio between USA Networks shares (and share equivalents) and the Vivendi ADSs was based upon the market prices of the Vivendi shares and USA Network common shares for a period leading up to December 16, 2001 – the date the agreement was signed – subject to certain adjustments to be based upon the tax consequences of Vivendi's acquisition of Plaintiffs' shares. In making the decision to enter into a contract to exchange its USA Network shares for Vivendi ADSs, Liberty Media relied upon the representations Defendants made about Vivendi's financial status, and upon the belief that the market prices of Vivendi ADSs and the USA Network shares would approximate the fair value of those shares. As of December 14, 2001, Vivendi ADSs were traded at approximately $50.

33.     Even after the deal was announced, Defendants continued to distort Vivendi's true financial condition. Defendants reported in Vivendi's Form 6-K, dated December 17, 2001, that the acquisition of USA Networks was anticipated to have a positive impact on EBITDA, net income, and free cash flow. The 6-K included statements such as "EBITDA from media activities is expected to increase by more than 600 million euros" and "net income will be increased by approximately 200 million euros and free cash flow by more than 350 million euros." When it agreed to exchange its USA Network shares for Vivendi

ADSs, Liberty Media relied upon such assurances of positive synergy and greater financial returns fraudulently made by the Defendants.

34.    Unfortunately, the financial situation at Vivendi was nothing close to the rosy situation that Defendants had portrayed it to be. Indeed, unbeknown to Liberty Media, on December 13, 2001, just a few days before execution of the deal between Vivendi and Liberty Media, Vivendi had narrowly avoided a downgrade in its investment status by the credit rating agencies, which would have made it difficult for Vivendi to borrow money and plunged the company into a cash crisis. In apparent reaction to this narrow miss, it has been reported that Mr. Hannezo wrote a note to Mr. Messier, stating, "I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns, and that I'm in the death seat." He added, "All I ask is that all of this not end in shame." Defendants failed to disclose this sequence of events to the Plaintiffs, even though it was information that any reasonable investor would deem material when making an investment decision.

35.    Apparently, throughout the contract negotiations with Liberty Media, Defendants had been secretly engaged in a massive effort to prop up its stock prices through the repurchase of 104 million Vivendi shares at a cost of approximately $6.3 billion. Not only did Defendants fail to inform Liberty Media of these actions, but in addition, it has been reported that the scheme was hidden from Vivendi's own board-of-directors. On January 7, 2002, Vivendi sold 55 million shares of treasury stock to Deutsche Bank and Goldman Sachs, even though Vivendi had previously stated that most of these shares would be cancelled. The sale raised $3.3 billion euros of much-needed cash, but unnerved investors and sent the company's share price into a tailspin. Although Mr. Hannezo claims that he and Mr. Messier did not make the decision to sell the treasury stock until January 2002, the bankers involved in the treasury

stock transactions have stated that the placement had been under discussion since December 22, 2001.

36.     Further, to raise cash, Vivendi sold put options to banks that committed Vivendi to repurchase tens of millions of shares of its own stock at fixed prices in the future. These put options put Vivendi at risk, if the stock prices should fall, in an amount of up to $1.4 billion.  According to *The Wall Street Journal*, to date Vivendi has lost approximately $900 million on these options.

37.     On December 28, 2001, just two weeks after expressing his concerns to Mr. Messier about Vivendi's financial viability and approximately one week prior to orchestrating the massive sale of treasury stock, Mr. Hannezo earned 1.3 million euros by exercising stock options.  Mr. Messier and his assistant also exercised options on the same day. Two other Vivendi executives – including Agnes Touraine, head of Vivendi Universal Publishing, and Catherine Gros, chief of Vivendi's communications department – exercised stock options at or around the same time.  The sales prompted a special audit committee set up by Vivendi's post-Messier management team to express concern in an August 1, 2002, memo that "some may wonder whether these . . . people benefited from special information."  The stock option exercises were not discovered until January 2003 because France's stock market overseer, unlike the U.S. Securities and Exchange Commission ("SEC"), does not require publicly-traded companies to disclose insider transactions.  Although Vivendi's stock is traded on the New York Stock Exchange, Vivendi, as a French company, was not required to conform with the SEC's disclosure requirement.  Defendants failed to disclose this sequence of events to the Plaintiffs, even though it was information that any reasonable investor would deem material when making an investment decision.

**Vivendi Continues To Portray Its Financial Strength In a False and Misleading Manner**

38.     Vivendi, Universal Studios, Liberty Media, and certain of their subsidiaries executed the Agreement and Plan of Merger and Exchange that embodied the deal struck between these parties effective December 16, 2001 ("the Merger Agreement").  In the Merger Agreement itself, Vivendi and Universal Studios made a number of untrue representations and warranties with respect to its business, public reports, financial statements, and other matters that would directly affect the value of Vivendi's shares.

a.     In Section 3.07 of the Merger Agreement, titled "Absence of Certain Changes or Events," Vivendi and Universal Studios represented:  "Since December 31, 2000, there has not been any Universal Material Adverse Change."  The terms "Universal Material Adverse Effect" and "Universal Material Adverse Change" were defined as any event or occurrence having

> a material adverse effect on (i) the business, assets, condition (financial or otherwise) or results of operations of Vivendi and its subsidiaries, taken as a whole (other than any such effect arising out of or resulting from general economic conditions, or from changes in or generally affecting the industries in which Vivendi and its subsidiaries operate in general and not having a materially disproportionate effect on such party relative to other industry participants, or as a result of September 11, 2001 terrorist attacks, their aftermath or any similar events) or (ii) the ability of the Universal Parties to perform their obligations under this Agreement or the Transaction Documents or on the ability of the Universal Parties to consummate the Mergers and the other Transactions.

b.     In Section 3.08 of the Merger Agreement, titled "Financial Statements; Contingent Liabilities," Vivendi and Universal Studios represented,

> The audited consolidated financial statements of Vivendi included in the Vivendi SEC Reports comply as to form in all material respects with the applicable accounting requirements and the published rules and regulations of the SEC and with respect thereto, have been prepared in accordance with French generally accepted accounting principles ("French GAAP") applied on a consistent basis (except as may be indicated in the notes thereto) such financial statements present fairly, in all material

respects, the consolidated financial position of Vivendi and its subsidiaries as of the respective dates thereof and for the respective periods covered thereby and the consolidated results of their operations and cash flows for the periods then ended (subject, in the case of unaudited statements to normal year-end adjustments). Since the date of the most recent audited financial statements included in the Vivendi SEC Reports filed and publicly available prior to the date of this Agreement, except as Publicly Disclosed by Vivendi [i.e., disclosed in filings with, among others, the Paris Stock Exchange, the New York Stock Exchange, or the SEC] (including on the most recent consolidated balance sheet and the footnotes thereto included in the Vivendi SEC Reports Publicly Disclosed by Vivendi), Vivendi and its subsidiaries have not incurred any liabilities that are of a nature that would be required to be disclosed on a balance sheet of Vivendi and its subsidiaries or the footnotes thereto prepared in conformity with French GAAP, other than (i) liabilities incurred in the ordinary course of business, (ii) liabilities for Taxes and (iii) liabilities that would not, individually or in the aggregate, have a Universal Material Adverse Effect."

      c.    In Section 3.11 of the Merger Agreement, titled "Reports,"

Vivendi and Universal Studios represented,

Vivendi has filed with the [Paris Stock Exchange, the Conseil de Marches Financiers, and the Comission des Operations de Bourse] true and complete copies of all material forms, reports, schedules, statements and other documents required to be filed by it under applicable French securities laws since December 31, 2000 (such forms, reports, schedules, statements and other documents, including financial statements or other documents, including schedules included therein, are referred to as the "Vivendi Documents"). The Vivendi Documents have been made available to Liberty, and at the time filed, (i) did not contain any misrepresentation of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, and (ii) complied in all material respects with the requirements of applicable French securities laws. Vivendi's Annual Report on Form 20-F for the fiscal year ended December 31, 2000, and each other report filed by Vivendi since December 31, 2000, at the time filed, (i) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, except to the extent revised or superseded by a later filed document, and (ii) complied in all material respects with the applicable requirements of Form 20-F under the Exchange Act.

     d.     In Section 3.12 of the Merger Agreement, titled "Compliance with Laws,"

Vivendi and Universal Studios represented,

> Except as disclosed in the Vivendi SEC Reports, the business of Vivendi
> has been and is presently being conducted in compliance with all
> Applicable Laws, including those relating to the environment, except for
> instances of noncompliance that, individually or in the aggregate, would
> not have a Universal Material Adverse Effect.

     39.     Moreover, between the execution of the Merger Agreement and the May

2002 closing of the transaction, Vivendi and Mr. Messier continued their efforts to proclaim

publicly the financial and operational successes of Vivendi. On February 11, 2002, Vivendi

issued a press release over the *Business Wire*, titled "Vivendi Universal Reports 10% Revenue

Growth For Full Year 2001." The release stated in part:

> Vivendi Universal today announced that the company's Media and
> Communications businesses reported pro forma revenue growth of 9% for
> the year ended December 31, 2001, reaching 28.9 billion euros. Revenue
> growth was 10% using the 2000 perimeter excluding Universal Film,
> exactly in line with management estimates given 12 months ago.

> Jean-Marie Messier, Chairman and CEO of Vivendi Universal, stated, "I
> am pleased that we achieved our ambitious target of 10% organic revenue
> growth in 2001, for the businesses resulting from Vivendi's merger with
> Seagram and Canal+. Organic growth is, more than ever in today's
> markets, the most important strength of Vivendi Universal. Achieving the
> highest level of growth in our industry is a big differentiation of Vivendi
> Universal, and the operating management deserves recognition for
> fulfilling their growth objectives and outperforming their peers in a
> difficult year. Our 2001 results give us confidence that we can achieve
> our growth targets again in 2002."

     40.     A month later, Vivendi released its 2001 results over the *Business Wire*,

and proclaimed that Vivendi's "Operating Free Cash Flow" was "ahead of guidance." A

March 5, 2002 press release made several positive statements about Vivendi's liquidity:

> • For Media and Communications
>    Revenues: – 28.115 billion euros, representing 10% pro forma
>    revenue growth

EBITDA: − 5.036 billion euros, representing 34% pro forma EBITDA growth

- Operating Free Cash Flow of 2.026 billion euros, AHEAD OF GUIDANCE (1.2 to 1.5 billion euros) and up to 2 billion euros over 2000. Synergies for costs alone reached more than 500 MILLION EUROS CASH SAVINGS, AHEAD OF GUIDANCE, including 293 million euros of EBITDA savings, 114 million euros of CAPEX savings both recognized in 2001 and 173 million euros of treasury savings on a 12-month basis

\* \* \*

- Debt
- Debt in French GAAP was 14.6 BILLION EUROS for the Media and Communications activities as of December 31, 2001.
- In U.S. GAAP, it was 19.1 BILLION EUROS at the same time.
- The Company's 2002 goal is to sustain its current triple-B rating of the group − which under U.S. GAAP would be equal to or less than three times EBITDA, and to reach 2.5 times EBITDA ratio by the mid-term.

(Footnotes omitted). As a result of these positive statements, Vivendi's ADRs actually increased in price on March 6, 2002.

41.     After issuing its results, Vivendi held a conference call to minimize the importance of a 13 billion euro write-down of goodwill (which was acknowledged in the press release) and to assure investors that its business remained strong. Lehman Brothers issued a report on March 6, 2002, based in part on the statements made by Vivendi management in this call, stating, among other things: "In its post results conference call, management confirmed that the value adjustments to the US assets . . . reflected largely a change in accounting treatment and did not signal a negative outlook for the US water business." Bear Stearns also issued a report on March 6, 2002, based on the same conference call, which stated, among other things: "The Company disclosed that the EUR 19 billion of net debt has an average maturity of 4-years and an average cost of 4.1%. Management pointed out that the strength of the group's finances is underlined by a recently negotiated 5-year credit facility at 45 basis points over LIBOR." The

Bear Stearns report further noted: "2002 Guidance.  For 02, Management reiterated their guidance of 10% organic sales growth for all the Media Communications businesses.  Vivendi also expects EBITDA of close to EUR 6 billion (pre-USA Networks and pre-Stream)."

> 42.     The Defendants issued similar press releases in April 2002.  On April 29, 2002, for example, Mr. Messier commented on Vivendi's financial picture, as follows:

> > The consolidated financial results for the quarter demonstrate that Vivendi Universal is delivering on the strategy, goals and target that we have articulated to our shareholders in the first quarter of 2002. . . .

> > The Media & Communications financial results released last week, coupled with our consolidated results issued today, are testimony to our ability and conviction to deliver strong results in operations, cash flow, EBITDA and net income.  As I said last week, because of our strong performance in the quarter, we are lowering our estimate of Media & Communications year-end Debt/EBITDA ratio to less than 3x by December 31, 2002.

Mr. Messier further touted the Company's allegedly strong cash flow, stating with respect to Media & Communications, the existence of "a strong surge of operational free cash flow, up 159% to 1.4 billion euros, well ahead of expectations" and representing that net debt "fell from approximately 19 billion euros to approximately 17 billion euros."

**Vivendi's True Financial Picture Begins to Emerge**

> 43.     Soon thereafter, however, the true picture of Vivendi's financial status began to emerge.  Beginning in May 2002 and continuing through the management change in July 2002, public statements regarding financial prospects became progressively worse.  On May 3, 2002 – just four days before Vivendi closed on its deal with Liberty Media, thereby acquiring the fruits of its swindle – Moody's lowered Vivendi's long-term debt rating to Baa3, the lowest investment grade and only one notch above "junk" status.  Moody's stated that this action reflected its continuing concerns that "Vivendi . . . might not be able to reduce debt as

quickly and comprehensively as planned." This downgrade apparently was the result of the emerging facts regarding Vivendi's financial exposure, caused by the put options sold to banks in 2001.

44.    Vivendi waited until its transaction with USA Networks and Liberty Media was officially closed before it reacted publicly to the downgrade of its debt rating and addressed surrounding concerns about its liquidity. Item 5 of Vivendi's Form 20-F, dated May 28, 2002, stated:

> On May 3, 2002, Vivendi Universal was informed of the decision of the Moody's rating agency to downgrade its senior debt ratings from Baa2 with a negative outlook to Baa3 with a stable outlook. On May 6, 2002, S&P lowered its rating of Vivendi Universal's short-term debt from A3 to A2. These decisions have no impact on Vivendi Universal's cash situation. They do not trigger any renegotiation clauses or advance repayments of bank credit lines. In addition, Vivendi Universal's use of commercial paper is covered by back-up, the availability of which will not be affected by the ratings changes. Further downgrades by either S&P or Moody's could result in liquidity problems and could affect our ability to make payments on outstanding debt instruments and to comply with other existing obligations. As of May 28, 2002, we have a BBB rating from S&P and a Baa3 rating from Moody's and are in compliance with all covenants. Other facilities require certain coverage ratios to be met; for example, EBITDA/Net Financial Expense and Debt/EBITDA. The asset securitization programs at Cetegel Group and CANAL+ Group are subject to certain collection requirements and other measurement ratios. If these were to deteriorate, financing could be withdrawn or have to be negotiated.

45.    According to *The Wall Street* Journal, Vivendi hired Goldman Sachs in late May 2002, and by June 24, 2002, the investment bank outlined four scenarios, one of which showed Vivendi having to file for bankruptcy as early as September or October. That day, Vivendi's share price dropped 23%.

46.    Nevertheless, Mr. Messier continued to remain overly optimistic and failed to disclose the true contours of Vivendi's financial crisis. Throughout the month of June 2002, Defendants continued to issue press releases that affirmatively and falsely represented that

Vivendi did not face an immediate and severe cash shortage that threatened Vivendi's viability going forward absent a fire sale of its assets.

47.     On July 2, 2002, it was reported that Vivendi's board of directors had forced Mr. Messier to resign and that he had been replaced by Jean-Rene Fourtou. Vivendi acknowledged that it had "accepted the resignation of Jean-Marie Messier" on July 3, 2002. A *Wall Street Journal* article dated January 2, 2003, reported "Vivendi's board forced Mr. Messier out in July, after realizing that his serial acquisitions and buybacks of billions of euros of stock to prop up the share price had plunged the company into a cash crisis."

48.     It was only after Vivendi's Board removed Mr. Messier that Vivendi's new management disclosed the severity of the crisis, and that Vivendi would have to secure immediately both bridge and long-term financing or default on its largest credit obligations. On July 3, 2002, the new management disclosed in its Form 6-K that Vivendi was facing a short-term liquidity crisis for numerous reasons, including ratings triggers that caused 900 million euros of unused credit lines to mature, and the termination of another credit line of 100 million euros. This acknowledgement flatly contradicts the public statements issued by Defendants immediately following the downgrade by Moody's, in which Messier and Vivendi had stated that Moody's decision would have "no impact on Vivendi Universal's cash situation" and would "not trigger any renegotiation clauses or advance repayments of bank credit lines."

49.     That same day, Vivendi published a press release revealing that Vivendi was required to repay creditors 1.8 billion euros by the end of July 2002 and further disclosed that 3.8 billion euros in credit lines were up for renegotiation. Based on the press release, *The Wall Street Journal* reported that credit analysts "surmised that Vivendi could face a cash

shortfall of 2.7 billion euros by year-end. . . ." According to a statement by Vivendi's new chairman, "if Mr. Messier had stayed, the company would have gone bankrupt within 10 days."

50.     On August 18, 2002, Vivendi disclosed in its Form 6-K that debt had to be reduced by 10 billion euros in order for the company to achieve an acceptable capital structure. And on September 25, 2002, Vivendi cited in its Form 6-K reasons for a "treasury crisis" including a debt payment schedule and debt level that could not be supported by cash flow. These financial problems did not arise overnight. Vivendi's financial crisis was the result of a practice of expansion and extending itself too much too fast that continued over the course of several years, but was fraudulently disguised by Vivendi and Mr. Messier.

51.     On July 10, 2002, *The Wall Street Journal* reported that the Commission des Operations de Bourse (the "COB"), which is France's equivalent of the SEC, raided Vivendi's corporate headquarters in Paris as part of a formal investigation into Vivendi's financial disclosures dating back to the beginning of 2001. The French investigation was opened to look into alleged "publication of false balance sheet for the tax years closing December 31, 2001 and December 31, 2002," and the publication of false and misleading information on its outlook for 2001 and 2002. According to COB authorities in Paris, the purpose of the investigation is to determine whether Vivendi properly, and in a timely manner, disclosed all material information with respect to its finances. According to a report by the Associated Press, on December 12, 2002, French authorities raided Vivendi's headquarters and the home of Mr. Messier to search for information relevant to the investigation. The press also has reported that, in mid-December, the Paris home, office, and country house of Marc Vienot, a Vivendi Board member and former chairman of the audit committee, was raided by police as part of prosecutors' search for internal documents on Vivendi's finances. On December 19, 2002, the

*Wall Street Journal* reported that Mr. Vienot told Dow Jones that he believed as many as ten other executives connected with Vivendi also had their homes and/or offices searched. On January 20, 2003, French magistrates investigating the accounts of Vivendi Universal asked Paris prosecutors for permission to probe suspected influence peddling and intimidation at the company. The magistrates told the prosecutors that they had discovered possible evidence of influence peddling and "threats and acts of intimidation committed against people exercising a public function." The request was based on a September-dated note, discovered in December 2002, in which a Vivendi director worried about repercussions that could result from disclosure that certain investigators working on the Vivendi case have been unduly pressured. In the United States, both the SEC and the United States Attorney's Office for the Southern District of New York have launched investigations to determine whether Vivendi violated U.S. securities laws.

52.     Despite Vivendi's claim throughout the month of June 2002 that it did not face an immediate and severe cash shortage that threatened Vivendi's viability going forward absent "a fire sale of its assets," Vivendi is quickly disposing of its assets in order to pull itself out of debt. Published reports indicate that Vivendi has plans to sell $16 billion in assets by the end of 2004. As of March 7, 2003, Vivendi had sold about half that amount, but its debt has decreased only by $4 billion, because Vivendi increased its stake in Cegetal SA by $4 billion. In a desperate attempt to raise cash, Vivendi has sold assets at less than fair market value, thereby putting the Company's investors at an even greater disadvantage. For example, in December 2002, Vivendi Universal SA agreed to sell its 10% stake in EchoStar Communications Corp. back to the U.S. satellite-television operators for $1.07 billion. Vivendi bought the stake for $1.5 billion less than one year earlier, leaving it with a $434 million capital loss. The sale price was 15% below EchoStar's previous day closing price.

53.    According to published reports, an internal investigation was conducted, following the ouster of Mr. Messier, to assess whether outsiders may have grounds to sue the company. One memo, reportedly removed from the company's headquarters in police raids in December 2002, suggests that Vivendi may deliberately have kept aspects of major deals relating to USA Networks Inc, and Vinci SA off its balance sheet. Another key document seized during the raids was a 12-page memo dated August 1, 2002, written by the legal audit committee, stating that "two communiqués dated June 18 and June 25, 2002 may well have concealed to the public the real state of the company's debt." The memo reportedly states "a liquidity crisis of $5 billion, or even $7 billion may have been concealed" by previous management, led by Messrs. Messier and Hannezo, and that "[t]hese two pieces of incomplete or false information may well be liable under (the law governing) false information." The memo also shows concern about $6 billion in possible purchases by Vivendi of its own shares, which Mr. Messier "seems to have ordered" Mr. Hannezo to undertake at the end of 2001 and in early 2002, in an effort to "support the share price." The memo goes on to ask, "[c]ould one consider that buying at EUR100 what one knows to be only valued at EUR80 constitutes misuse of company funds?" and "[d]oes this practice fall under the (law) on share price manipulation?" The memo discusses several deals in which off-balance-sheet financing may have been employed. One deal reportedly highlighted in the memo is that of USA Networks, Inc. Vivendi bought the entertainment assets of that company in 2001 for $10.3 billion and the memo raises questions about the use of stock options related to the acquisition: "[s]ome might view the agreement to promise stock-options to the seller via an off balance sheet operation as a concealment of commitment by Vivendi Universal." (The memo, however, does not state or imply any wrongdoing by USA Networks' management.) Another deal highlighted by the memo is Vivendi's June 28, 2002 sale of over five million

shares in Vinci, a France-based road builder, for a total of 343.8 million euros, generating a pre-tax, capital gain of 153 million euros. These shares represented a 6.2% stake, all of Vivendi's holding in Vinci. The memo, however, states that "[t]hese shares may have already been sold in February 2002 and these commitments may have been recorded off balance sheet."

54.     Vivendi shares lost nearly 80% of their value in 2002. And, for the second year in a row, Vivendi Universal SA racked up the biggest loss in French corporate history, due mainly to a huge charge reflecting the past year's plunge in the market value of its media assets. Vivendi wrote off approximately $19 billion in goodwill, bringing its 2002 net loss to close to $25 billion. As of the date of the filing of this Complaint, the value of Liberty Media's investment/exchange has dropped to approximately $546 million, a decline of more than 70%.

**Defendants' Public Statements of Financial Results And Specific Representations to Liberty Media Were False and Misleading**

55.     Disclosures made by the company prior to the Vivendi/Liberty Media transaction portrayed financial strength in operating results and condition. Within less than six months of the Vivendi/Liberty Media transaction, it became apparent that the company was facing serious liquidity issues and could not obtain the operating results previously forecast. In a Form 6-K filed by Vivendi on September 25, 2002, the CEO of Vivendi who succeeded Mr. Messier was quoted as saying the Company's forecasts have gone from "hyper-optimistic to hyper-pessimistic." Liberty Media was victimized by its reliance on these false and misleading, "hyper-optimistic" forecasts.

56.     Vivendi's reported financial results concerning revenues and EBITDA during 2001 and the first quarter of 2002 were materially misleading when made. Vivendi's financial statements, included in its Form 6-Ks and Form 20-Fs and in the Company's press

releases, were not a fair presentation of Vivendi's results of operations and financial position and were presented in violation of the principles of fair reporting, as well as U.S. and French Generally Accepted Accounting Principles ("GAAP") and SEC rules and regulations. On information and belief, Vivendi had, in fact, grossly overvalued goodwill on its books – which it subsequently disclosed and attempted to downplay – and had billions of euros in debt that was improperly omitted from Vivendi's balance sheet.

57.    Despite the fact that Vivendi was continuously operating with a working capital deficiency and had debt agreements that included significant credit ratings triggers, Vivendi's Form 20-F, filed July 2, 2001, was misleading in its failure even to mention the substantial liquidity problems faced by Vivendi, including but not limited to the fact that the maturity dates on major loans would accelerate in the event of a downgrade in Vivendi's credit rating. Item 5.B. of the General Instructions to Form 20-F specifically requires foreign private issuers, such as and including Vivendi, among other things, to "[i]nclude a statement by the company that, in its opinion, the working capital is sufficient for the company's present requirements, or, if not, how it proposes to provide the additional working capital needed," "an evaluation of the sources and amounts of the company's cash flows, including the nature and extent of any legal or economic restrictions on the ability of subsidiaries to transfer funds to the company in the form of cash dividends, loans or advances," and "[i]nformation on the level of borrowings at the end of the period under review ... with a description of any restrictions on their use." Vivendi, however, omitted such information from its Form 20-F filings. In fact, the first major disclosure of Vivendi's liquidity problems did not occur until May 28, 2002, shortly after the closing on the Merger Agreement (see Item 5 of Vivendi's Form 20-F for the fiscal year ended December 31, 2001, filed May 28, 2002).

58.     Similarly, Vivendi's Form 6-Ks issued through the date of the Merger Agreement also were misleading in their failure to mention the substantial liquidity problems faced by Vivendi. Part B to the General Instructions of Form 6-K requires timely disclosure by foreign private issuers, such as and including Vivendi, of material information of the issuer concerning: "changes in business; changes in management or control; acquisitions or dispositions of assets; bankruptcy or receivership; changes in registrant's certifying accountants; *the financial condition and results of operations*; material legal proceedings; changes in securities or in the security for registered securities; defaults upon senior securities; material increases or decreases in the amount outstanding of securities or indebtedness; the results of the submission of matters to a vote of securityholders; transactions with directors, officers, or principal securityholders; the granting of options or payment of other compensation to directors or officers; and any other material information which the registrant deems of material importance to securityholders." (Emphasis added). The true state of Vivendi's liquidity situation, however, was not updated during 2001 in its Form 6-K filings to address changes in credit ratings and the potential impact on the company's financial position.

59.     In recent months, Vivendi has cited the put option obligations as a contributing factor leading to the "liquidity crisis." Item 11 of Form 20-F requires qualitative and quantitative disclosure on market risk sensitive instruments, which could include these put option obligations. It does not appear that these put options were disclosed until they were mentioned as a potential problem in a Standard & Poors' report dated May 7, 2002 – the same day the Vivendi-USA Networks-Liberty Media deal officially closed – and subsequently disclosed in the company's Form 20-F on May 28, 2002.

60.    The May 28, 2002, Form 20-F, which also included the December 31, 2001 financial statements, disclosed the sale of put options on 22.8 million ordinary shares as a contingent liability. The Form 20-F indicated that the put options had an average exercise price of 69 euros, were entered into at unspecified dates during 2001, had a disclosed maximum potential obligation of 1.1 billion euros, and matured during 2002 through the first quarter of 2003. These put options were not recorded under French GAAP, and there was no indication of these put options in the US/French GAAP reconciliation footnote. In addition, the initial accounting for these put options appears to be incorrect under US GAAP due to the fact that stockholders' equity per the US GAAP reconciliation in the footnotes to the Form 20-F does not agree with stockholders' equity reported in the comparative December 31, 2001 US GAAP balance sheet, included in Vivendi's Form 6-K, filed June 13, 2002.

61.    Just two weeks later, on June 13, 2002, Vivendi released US GAAP statements in a Form 6-K for the three months ended March 31, 2002, with a comparative balance sheet as of December 31, 2001, which further expanded on the put option obligations. Effectively this represents a "restatement" of the December 31, 2001 US GAAP balance sheet amounts. On June 13, 2002, Vivendi disclosed that the put options have a "potential obligation" of 1.3 billion euros and 1.597 billion euros as of March 31, 2002 and December 31, 2001, respectively. Thus, in just a two week period, the maximum potential obligation of the put options for the period ended December 31, 2001, increased by 497 million euros, or 45% – quite a material difference that would be considered an important part of the mix of information evaluated by investors when making investment decisions.

62.    Finally, in March 2002, Vivendi posted on its Web site Frequently Asked Questions ("FAQs") regarding the put options, along with certain explanations. The FAQs

indicate that the put options were disclosed in Vivendi's 2000 Form 20-F, filed on July 2, 2001 –

the same Form 20-F that Vivendi and Universal Studios expressly warranted to be accurate and

complete in the Merger Agreement.  The referenced page, however, contains no description

regarding the put options – yet another omission on the part of Vivendi.

> 63.    Vivendi's failure to make the required disclosures in a timely manner was

misleading, violated GAAP and the SEC's rules and regulations, and was directly contrary to the

representations and warranties Vivendi made to Liberty Media in the Merger Agreement.

## Defendants Further Lulled Liberty Media Into Closing On The Merger Agreement In May 2002

> 64.    Shortly after the December 16, 2001, execution of the Merger Agreement,

Mr. Messier called Messrs. Bennett and Malone of Liberty Media to offer congratulations on

having reached agreement with respect to the transaction.  During that conversation, Mr. Messier

promised to keep Liberty Media well informed with respect to any important facts about

Vivendi, in recognition of Liberty Media's status as Vivendi's second largest shareholder.

Defendants did not, however, abide by that commitment in any respect.  Instead, throughout the

period leading up to the May 7, 2002 closing on the Vivendi-Liberty Media transaction,

Defendants continued to conceal from Liberty Media the impending liquidity crisis at Vivendi

and, indeed, affirmatively led Liberty Media to believe that the immediate cash flow situation at

Vivendi was sound.

> 65.    In March 2002, Mr. Bennett of Liberty Media had meetings in New York

with Vivendi representatives, including Defendants Messier and Hannezo, to discuss, among

other things, Vivendi's financial condition.  One of the specific issues discussed during Mr.

Bennett's meeting with Mr. Hannezo was Vivendi's available cash flow.  Mr. Hannezo reviewed

the available financials with Mr. Bennett, assuring him that there was no cause for any alarm.  At

no time did anyone from Vivendi disclose to Mr. Bennett the seriousness of the impending liquidity crisis. No mention was made of the credit ratings clauses that could impact the availability of credit lines and accelerate certain maturity dates, or the substantial exposure Vivendi faced as a result of the sold put options on Vivendi's ordinary shares. During the course of the meetings, Mr. Bennett asked about a substantial equity issuance by Vivendi, which had occurred in or about late January 2002 and had dramatically decreased the price of Vivendi's shares. A casual explanation was offered that in no way revealed what now seems apparent – that Vivendi had undertaken the share issuance out of a desperate and immediate need for cash. Had Vivendi provided Liberty Media an honest picture of its liquidity during the March 2002 meetings, Liberty Media would not have closed on the agreement reached in December 2001.

66.    On or about May 6, 2002 – immediately before closing on the Merger Agreement – Mr. Messier again traveled to Colorado and met with Messrs. Malone and Bennett. During the meeting, Mr. Messier yet again failed to disclose the liquidity crisis that was, by that time, looming even larger. Instead, Mr. Messier conveyed a wholly false impression of Vivendi's cash flow, as he detailed a transaction in which Vivendi was purchasing a portion of EchoStar for $1.5 billion. During the course of the meeting, Mr. Messier stated that Vivendi had acquired cash through a sale of B Sky B stock. As it turns out, however, Vivendi had not sold that stock at all; it had borrowed funds using Vivendi's B Sky B stock as collateral. Thus, once again, Vivendi was falsely portraying what was actually proceeds of debt as "available cash."

67.    This deception continued even after the closing on the Vivendi-Liberty Media transaction. On or about June 19, 2002, Mr. Messier met again with Messrs. Malone and Bennett. By that time, Vivendi's liquidity crisis was well known, but, according to Mr. Messier, the crisis had been solved. Mr. Messier outlined for Liberty Media a variety of steps that had

been taken (but not yet announced), including a sale of shares of Vivendi's environmental unit, that had resolved the immediate cash flow problem. No such thing had occurred, however, and the substantial losses incurred by Liberty Media as the direct result of the defendants' fraud remain.

## COUNT I

### Breach of Contract/Breach of Warranty
### (Against Defendants Vivendi and Universal Studios)

68.     The allegations of paragraphs 1 through 67 are re-alleged and incorporated by reference as if fully set forth herein.

69.     Effective December 16, 2001, Liberty Media, Vivendi, and certain subsidiaries entered into the Merger Agreement whereby Plaintiffs agreed to exchange common stock of USA Networks, exchangeable shares of USANi, and their interest in multiThématiques for Vivendi shares.    Plaintiffs adequately performed their obligations under the Merger Agreement.

70.     The Merger Agreement contained express warranties by Vivendi and Universal Studios concerning (i) the absence of any material adverse changes in Vivendi's business, assets, condition or results of operations, and those of its subsidiaries, since December 31, 2000; (ii) the compliance of Vivendi's audited financial statements with the applicable accounting requirements and published rules and regulations of the SEC and French GAAP; (iii) the absence of certain incurred liabilities of a nature that would be required to be disclosed on a balance sheet of Vivendi and its subsidiaries or the footnotes thereto prepared in conformity with French GAAP; (iv) the accuracy and completeness of documents filed with the Paris Stock Exchange and COB since December 31, 2000, and conformance of such documents with all applicable French laws; (v) the accuracy and completeness of Vivendi's Form 20-F for the year

ended December 31, 2000 and all other reports filed by Vivendi since that date, and the compliance of such forms with the requirements of Form 20-F under the Exchange Act; and (vi) the compliance of Vivendi with all applicable laws.

71.    Such express warranties were part of the basis of the bargain made by Plaintiffs, and were breached by Vivendi and Universal Studios.

72.    Plaintiffs suffered substantial damages as the proximate result of Defendants' breach of its express warranties, and Plaintiffs are entitled to compensation for their damages, including consequential damages, in an amount to be proved at trial.

73.    Moreover, as particularized above, the Merger Agreement was induced by Defendants' fraud and fraudulent concealment. As the result of the fraudulent inducement of the Merger Agreement, Plaintiffs are entitled to such equitable relief as may be appropriate, including, without limitation, rescission of the Merger Agreement.

## COUNT II

### Unjust Enrichment
### (Against All Defendants)

74.    The allegations of paragraphs 1 through 73 are re-alleged and incorporated by reference as if fully set forth herein.

75.    As the result of the conduct described above, Defendants have been unjustly enriched at Plaintiffs' expense.

76.    The circumstances of this case are such that equity and good conscience require that Defendants make restitution to Plaintiffs.

## COUNT III

### Fraud And Fraudulent Concealment
### (Against Defendants Vivendi, Messier, and Hannezo)

77.     The allegations of paragraphs 1 through 76 are re-alleged and incorporated by reference as if fully set forth herein.

78.     Defendants induced Plaintiffs to exchange their common stock of USA Networks, exchangeable shares of USANi, and their interest in multiThématiques for Vivendi shares by fraud and fraudulent concealment.

79.     Specifically, as particularized above, Defendants made false representations concerning the financial condition of Vivendi during the negotiations leading up to the 2001 transaction; falsely portrayed financial statements and other publicly-filed documents concerning Vivendi's financial condition as being truthful, accurate and complete; falsely represented that no Universal Material Adverse Change had occurred since December 31, 2000; and falsely stated that Vivendi had complied with all applicable laws.

80.     Defendants knew that the representations were false when made, and intended to defraud Plaintiffs thereby.

81.     Moreover, by virtue of the terms of the Merger Agreement, and in light of the false representations that Defendants made to Plaintiffs, as particularized above, Defendants had a duty to disclose material facts concerning Vivendi's financial condition, statements and reports, and in regard to material adverse changes with respect to the business assets and condition or results of Vivendi's operations. Defendants further had a duty to disclose material facts concerning Vivendi's financial status because Defendants possessed superior knowledge regarding that status, which was not readily available to Plaintiffs as the direct result of

Defendants' failure to disclose the information in Vivendi's contractual representations, financial statements, press statements, and other public filings.

82.     Vivendi failed to disclose such facts, and did so with intent to defraud and/or scienter.

83.     Plaintiffs reasonably relied upon the false representations and half-truths told by Defendants, and would not have exchanged their common stock of USA Networks, exchangeable shares of USANi and their interest in multiThématiques for Vivendi shares, but for the false and misleading nature of Defendants' representations and omissions. Accordingly, by reasonably relying upon Defendants' false statements and omissions, Defendants have suffered specific damages.

84.     As the result of the Defendants' fraud and fraudulent concealment, Plaintiffs are entitled to compensation for the substantial damages that resulted from the wrongs alleged herein in an amount to be proved at trial. Alternatively, Plaintiffs are entitled to rescission of the Merger Agreement.

85.     Defendants aimed their false representations and half-truths at Plaintiffs and the public generally through Defendants' press releases and public financial statements. In making these false representations, Defendants acted with such high moral culpability as to imply a criminal indifference to their civil obligations to tell the truth in their business dealings and public statements.

## COUNT IV

### Negligent Misrepresentation
### (Against All Defendants)

86.     The allegations of paragraphs 1 through 85 are re-alleged and incorporated by reference as if fully set forth herein.

87.     Defendants negligently misrepresented Vivendi's financial condition prior to the execution of the Merger Agreement in December 2001, in representations and warranties made in the Merger Agreement itself, and during the period between the execution of the Merger Agreement and the closing of the agreement in May 2002.

88.     Defendants had a duty to give Plaintiffs correct information because there was privity of contract between the parties.

89.     Moreover, Defendants established a special relationship with Plaintiffs that gave rise to a duty to give correct information. Defendants held special knowledge and expertise concerning Vivendi's financial condition as the result of their access to inside information regarding that condition. Defendants also established a special relationship of trust by vouching for the veracity and completeness of Vivendi's financial statements and promising to keep Plaintiffs informed about material aspects of Vivendi's financial condition, particularly during the period between the execution of the Merger Agreement and closing.

90.     Defendants knew that Plaintiffs were relying on their representations concerning Vivendi's financial status in order to enter into and close the Merger Agreement. Defendants' representations regarding Vivendi's financial condition were not casual statements that a seller would make informally in the course of a day's business, but deliberate representations that gave rise to a duty to give information with care. The December 2001 agreement and the parties' dealings surrounding it established a relationship between the parties that extended beyond the typical arm's-length business transaction – the parties intended to create an ongoing relationship between Vivendi and Liberty Media with Liberty Media becoming the second largest holder of Vivendi shares.

91.    Specifically, as particularized above, Defendants misrepresented the state of Vivendi's liquidity; falsely portrayed financial statements and other publicly-filed documents concerning Vivendi's financial condition as being truthful, accurate and complete; falsely represented that no Universal Material Adverse Change had occurred since December 31, 2000; and falsely stated that Vivendi had complied with applicable laws, regulations and accepted accounting principles.

92.    Defendants knew or should have known that their misrepresentations were incorrect.

93.    Defendants knew that Plaintiffs desired the information regarding Vivendi's financial condition supplied in Defendants' misrepresentations for a serious purpose.

94.    Plaintiffs intended to rely and act upon Defendants' misrepresentations, reasonably relied upon them, and would not have exchanged their common stock of USA Networks, exchangeable shares of USANi, and their interest in multiThématiques for Vivendi shares, but for Defendants' misrepresentations.

95.    Accordingly, by reason of relying on Defendants' negligent misrepresentations, Plaintiffs have suffered damages that they are entitled to recover.

## COUNT V

### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 of The Securities and Exchange Commission
### (Against Defendants Vivendi, Messier, and Hannezo)

96.    The allegations of paragraphs 1 through 95 are re-alleged and incorporated by reference as if fully set forth herein.

97.    Defendants violated the federal securities laws by issuing materially false and misleading statements during the relevant period leading up to and during negotiations with

Liberty Media to acquire Liberty Media's interest in USA Networks. Defendants' false and misleading statements had the effect of artificially inflating the market price of Vivendi's securities.

98.    Defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, practices, and courses of business which operated as a fraud and deceit upon the plaintiffs, and made various deceptive and untrue statements of material facts, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs.

99.    The purpose and effect of Defendants' plan, scheme, and unlawful course of conduct was, among other things, to induce Plaintiffs to purchase Vivendi securities at an artificially inflated price. The Merger Agreement effected a sale of securities within the meaning of Section 10(b) of the Exchange Act and Rule 10b-5 of the SEC.

100.    Defendants, pursuant to their plan, scheme and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, and participated in the preparation and issuance of, deceptive and materially false and misleading statements to Plaintiffs as particularized above.

101.    As a result of the dissemination of the false and misleading statements set forth above, Plaintiffs acquired Vivendi shares at an artificially inflated price. In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by Defendants, Plaintiffs relied, to their detriment, on the integrity of the market price of the stock in acquiring the Vivendi shares. Had they known the truth, Plaintiffs would not have acquired the Vivendi shares for the price paid.

102.   Plaintiffs have suffered irreparable injury and substantial damages as a result of the wrongs alleged herein, and therefore are entitled to damages in an amount to be proved at trial or, in the alternative, to rescission of the Merger Agreement.

103.   By reason of the foregoing, Defendants directly violated Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

### COUNT VI

#### Violation of Section 20(a) of The Exchange Act
#### (Against Defendants Messier and Hannezo)

104.   The allegations of paragraphs 1 through 103 are re-alleged and incorporated by reference as if fully set forth herein.

105.   Messrs. Messier and Hannezo each acted as a controlling person of Vivendi within the meaning of Section 20(a) of the Securities Exchange Act of 1934 as alleged herein.   By virtue of their high-level positions, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the Company's products, sales, accounting, plans, and implementation thereof, Messrs. Messier and Hannezo had the power to influence and control, and did in fact influence and control, directly or indirectly, the decision-making of Vivendi, including the content and dissemination of the various statements the Plaintiffs contend to have been false and misleading.   These defendants were provided with or had unlimited access to copies of Vivendi's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued.   Messrs. Messier and Hannezo further had the ability to prevent the issuance of the statements and/or to cause the statements to be corrected.

106.   For his part, Mr. Messier had direct and supervisory involvement in the day-to-day operations of Vivendi and, therefore, is presumed to have had the power to control or

influence the particular statements giving rise to the securities violations as alleged herein, and to have exercised the same. Indeed, according to numerous press accounts, Mr. Messier did not consult with Vivendi's board of directors or heed the advice of Mr. Hannezo with respect to many decisions and, indeed, affirmatively misled the board of directors with respect to others.

107. By virtue of their positions as controlling persons, Messrs. Messier and Hannezo are liable pursuant to section 20(a) of the Securities and Exchange Act of 1934. As a direct and proximate result of the wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Vivendi shares.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE,** Plaintiffs demand judgment against the Defendants as follows:

A. Awarding Plaintiffs compensatory damages against each Defendant, jointly and severally, in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

B. Awarding Plaintiffs punitive damages against each Defendant, jointly and severally, in an amount to be determined at trial;

C. Granting extraordinary equitable relief and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder, including, without limitation: declaring that the Merger Agreement is void and rescinded, and awarding Plaintiffs any and all damages incurred as the result of the rescission of the Merger Agreement; or attaching, impounding, imposing a constructive trust upon or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiffs have an effective remedy; and

D.    Awarding Plaintiffs the fees and expenses incurred in this action, including reasonable allowance for attorneys' fees and costs;

E.    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs respectfully request a trial by jury with respect to all issues so triable.

Respectfully submitted,

BAKER BOTTS LLP

By: _____
Steven R. Gustavson [SG 2463]
30 Rockefeller Center
New York, New York 10112
Telephone: (212) 408-2500
Facsimile: (212) 408-2501

R. Stan Mortenson
Paul F. Enzinna
Stacy L. Paxson
Evans Rice
1299 Pennsylvania Ave, N.W.
Washington, D.C. 20004-2400
Telephone: (202) 639-7700
Facsimile: (202) 639-7890

ATTORNEYS FOR PLAINTIFFS
LIBERTY MEDIA CORPORATION,
LMC CAPITAL LLC, LIBERTY
PROGRAMMING COMPANY LLC, LMC USA
VI, INC., LMC USA VII, INC., LMC
USA VIII, INC., LMC USA X, INC.,
LIBERTY HSN LLC HOLDINGS, INC.,
and LIBERTY MEDIA INTERNATIONAL, INC.

JUDGE MUKASEY

Liberty Media Corporation, LMC Capital Llc, Liberty
Programming Company LLC, LMC USA VI, Inc., LMC USA
VII, Inc., LMC USA VIII, Inc., LMC USA X, Inc., and Liberty
HSN LLC Holdings, Inc. and Liberty Media International, Inc.

**V.**

Vivendi Universal S.A., Jean Marie Messier, Guillaume
Hannezo, and Universal Studios, Inc.

# SUMMONS IN A CIVIL CASE

CASE NUMBER:

## 03 CV 2175

TO: (Name and address of defendant)

> Vivendi Universal S.A.
> 42 Avenue Di Friedland 65380
> Paris
> Cedex 08
> France

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

> Steven R. Gustavson, Esq.
> BAKER BOTTS LLP
> 30 Rockefeller Plaza
> New York, NY 10112

an answer to the complaint which is herewith served upon you, within _____ days after service of this
summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief
demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after
service.

J. MICHAEL McMAHON

MAR 28 2003

CLERK

(BY) DEPUTY CLERK

DATE

# United States District Court

## JUDGE MUKASEY

DISTRICT OF _____

Liberty Media Corporation, LMC Capital Llc, Liberty
Programming Company LLC, LMC USA VI, Inc., LMC USA
VII, Inc., LMC USA VIII, Inc., LMC USA X, Inc., and Liberty
HSN LLC Holdings, Inc. and Liberty Media International, Inc.

**V.**

Vivendi Universal S.A., Jean Marie Messier, Guillaume
Hannezo, and Universal Studios, Inc.

## SUMMONS IN A CIVIL CASE

CASE NUMBER:

## 03 CV 2175

TO: (Name and address of defendant)

Universal Studios, Inc.
100 Universal City Plaza
Universal City, CA 91608

## YOU ARE HEREBY SUMMONED and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Steven R. Gustavson, Esq.
BAKER BOTTS LLP
30 Rockefeller Plaza
New York, NY 10112

an answer to the complaint which is herewith served upon you, within _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

## J. MICHAEL McMAHON

MAR 28 2003

**CLERK**

_____

**(BY) DEPUTY CLERK**

**DATE**

_____

# United States District Court

**JUDGE MUKASEY**

DISTRICT OF _____

Liberty Media Corporation, LMC Capital Llc, Liberty
Programming Company LLC, LMC USA VI, Inc., LMC USA
VII, Inc., LMC USA VIII, Inc., LMC USA X, Inc., and Liberty
HSN LLC Holdings, Inc. and Liberty Media International, Inc.

**V.**

Vivendi Universal S.A., Jean Marie Messier, Guillaume
Hannezo, and Universal Studios, Inc.

## SUMMONS IN A CIVIL CASE

CASE NUMBER:

**03 CV 2175**

TO: (Name and address of defendant)

> Jean Marie Messier
> c/o Vivendi Universal S.A.
> 42 Avenue Di Friedland 65380
> Paris
> Cedex 08
> FRANCE

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

> Steven R. Gustavson, Esq.
> BAKER BOTTS LLP
> 30 Rockefeller Plaza
> New York, NY 10112

an answer to the complaint which is herewith served upon you, within _____ days after service of this
summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief
demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after
service.

**J. MICHAEL McMAHON**

MAR 2 8 2003

CLERK

(BY) DEPUTY CLERK

DATE

# United States District Court

**JUDGE MUKASEY**

DISTRICT OF _____

Liberty Media Corporation, LMC Capital Llc, Liberty
Programming Company LLC, LMC USA VI, Inc., LMC USA
VII, Inc., LMC USA VIII, Inc., LMC USA X, Inc., and Liberty
HSN LLC Holdings, Inc. and Liberty Media International, Inc.

**V.**

Vivendi Universal S.A., Jean Marie Messier, Guillaume
Hannezo, and Universal Studios, Inc.

## SUMMONS IN A CIVIL CASE

CASE NUMBER:

**03   CV   2175**

TO: (Name and address of defendant)

Guillaume Hannezo
c/o Vivendi Universal S.A.
42 Avenue Di Friedland 65380
Paris
Cedex 08
FRANCE

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Steven R. Gustavson, Esq.
BAKER BOTTS LLP
30 Rockefeller Plaza
New York, NY 10112

an answer to the complaint which is herewith served upon you, within _____ days after service of this
summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief
demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after
service.

J. MICHAEL McMAHON                          MAR 28 2003

CLERK

(BY) DEPUTY CLERK

DATE _____