UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

LIBERTY MEDIA CORPORATION, LMC
CAPITAL LLC, LIBERTY
PROGRAMMING COMPANY LLC, LMC
USA VI, INC., LMC USA VII, INC., LMC
USA VIII, INC., LMC USA X, INC.,
LIBERTY HSN LLC HOLDINGS, INC.,
and LIBERTY MEDIA INTERNATIONAL,
INC.,

**OPINION AND ORDER**

           Plaintiffs,

**03 Civ. 2175 (SAS)**

    - against -

VIVENDI UNIVERSAL, S.A., and
UNIVERSAL STUDIOS, INC.,

          Defendants.

-------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/2/12
```

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

At a conference held on March 13, 2012, I orally ruled on the vast

majority of the parties' motions in limine. This opinion concerns three *Daubert*

motions I orally ruled on at a conference held on March 27, 2012: Defendants'

Motion to Exclude the Testimony of Craig T. Elson, Liberty Media Plaintiffs'

Motion in Limine to Exclude the Testimony of John Coates, and Liberty Media

Plaintiffs' Motion in Limine to Exclude in Part the Testimony of Kenneth Lehn. In

addition to the restrictions on expert testimony described in this opinion, all of my

prior rulings on the motions in limine are equally applicable to the testimony of Elson, Coates, and Lehn.  For example, Coates may not testify about certain clauses that were absent from the merger agreement between Liberty Media and Vivendi (the "Merger Agreement").

## II.   LEGAL STANDARD

The proponent of expert evidence bears the initial burden of establishing admissibility by a "preponderance of proof."[1]  Rule 702 of the Federal Rules of Evidence states the following requirements for the admission of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under Rule 702 and *Daubert*, the district court must determine whether the proposed expert testimony "both rests on a reliable foundation and is relevant to

---

[1]     *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987) (discussing Rule 104(a) of the Federal Rules of Evidence).  *Accord Daubert*, 509 U.S. at 592 & n.10 (1993) (citing *Bourjaily*, 483 U.S. at 175-76, and explaining that the proponent of expert testimony must prove admissibility by a preponderance of proof).

the task at hand."[2]  The district court must act as "'a gatekeeper to exclude invalid and unreliable expert testimony.'"[3]   Additionally, expert testimony may not usurp the role of the court in determining the applicable law.[4]  Although an expert "may opine on an issue of fact," an expert "may not give testimony stating ultimate legal conclusions based on those facts."[5]  Expert testimony is also inadmissible when it addresses "lay matters which [the trier of fact] is capable of understanding and deciding without the expert's help."[6]

However, "the Federal Rules of Evidence favor the admissibility of expert testimony, and [the court's] role as gatekeeper is not intended to serve as a replacement for the adversary system."[7]  In serving its gatekeeping function, the court's focus must be on the principles and methodologies underlying the expert's

---

[2]     509 U.S. at 597.  *Accord Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999).

[3]     *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449 (2d Cir. 1999) (quoting *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 202 (2d Cir. 1999)).  *Accord Louis Vuitton Malletier v. Dooney & Bourke, Inc.* ("*Vuitton IV*"), 525 F. Supp. 2d 558, 561-65 (S.D.N.Y. 2007) (discussing district court's "special obligation" to gatekeep with respect to expert evidence).

[4]     *See United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999).

[5]     *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).

[6]     *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989).

[7]     *Vuitton IV*, 525 F. Supp. 2d at 562 (citation and quotation marks omitted).

conclusions, rather than on the conclusions themselves.[8] In assessing an expert's methodology, courts may consider (1) "whether [the method or theory] can be (and has been) tested," (2) "whether [it] has been subjected to peer review and publication," (3) "the known or potential rate of error [associated with the technique] and the existence and maintenance of standards controlling the technique's operation," and (4) whether the method has achieved "general acceptance" with the relevant community.[9]

The courts' gatekeeping function under *Daubert* applies not only to "scientific" evidence, but also to proffers of "technical, or other specialized knowledge" under Rule 702.[10] The objective of this function is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[11] However, recognizing that "there are many different kinds of experts, and many different kinds of expertise," the Supreme Court has emphasized that the reliability inquiry "is a flexible one."[12] Accordingly, the factors "identified in *Daubert* may or may

---

[8]     *See Daubert*, 509 U.S. at 595.

[9]     *Id.* at 592-95.

[10]    *See Kumho Tire*, 526 U.S. at 141.

[11]    *Id.* at 152.

[12]    *Id.* at 150.

not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[13]  Ultimately, the inquiry "depends upon the particular circumstances of the particular case at issue."[14]  In sum, the trial court has "the same kind of latitude in deciding *how* to test an expert's reliability . . . as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable."[15]

## III.   DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF CRAIG T. ELSON

### A.   Background

As of the date of Elson's report, he was a Senior Managing Director at LECG, a global expert services and consulting firm.[16]  Elson received a bachelor's degree and an MBA from Indiana University and has been providing professional consulting services for approximately twenty-five years.[17]

In Elson's 120-page report, he offers a wide variety of opinions. Initially, he offered an opinion that a material adverse change occurred between

---

[13]     *Id.* (quotations omitted).

[14]     *Id.*

[15]     *Id.* at 152 (emphasis in original).

[16]     *See* 12/21/07 Report of Craig T. Elson ("Elson Rep."), Ex. 1 to 11/4/11 Declaration of Bryan H. Parr, Esq. in Support of Liberty's Memorandum in Opposition to Defendants' Motion to Exclude the Testimony of Craig T. Elson, at 1.

[17]     *See id.* at 2.

December 31, 2000 and December 16, 2001 under the terms of the Merger Agreement. That opinion is now withdrawn.[18] Plaintiffs still offer Elson's opinion as to (1) the causes of the deterioration of Vivendi's financial condition and (2) that the amount of rescissory damages incurred by Liberty Media potentially ranged from 1.03 to 1.39 billion euros.[19]

### B.    Discussion

#### 1.    Vivendi's Financial Deterioration

Defendants' motion focused on Elson's opinions with respect to MACs and rescissory damages. However, defendants now contend that plaintiffs' recharacterization of Elson's opinion as a liquidity opinion does not cure its defects.[20] I will admit Elson's opinions concerning the causes of the financial deterioration of Vivendi because Elson is qualified to offer an opinion on this subject.[21]

To the extent that defendants challenged these opinions by arguing that Elson's opinion is an impermissible narrative, rehashing the alleged facts of

---

[18]    *See* 3/22/12 plaintiffs' letter to the Court.

[19]    *See id.* at 118.

[20]    *See* 3/26/12 defendants' letter to the Court.

[21]    *See* Defendants' Memorandum of Law in Support of Their Motion to Exclude the Testimony of Plaintiffs' Expert, Craig T. Elson ("Def. Elson Mem.") at 3 ("Mr. Elson is a consultant, whose expertise predominantly relates to matters involving corporate valuation and lost profits analysis.").

the case, Elson will not be permitted to exhaustively recount all of the facts of the

case.  Elson's 120-page report is far in excess of what I would have permitted to be

submitted.  Elson will not be permitted to recount the entire history of Vivendi

through the class period.  Rather, Elson must draw on the facts only as necessary –

and in as concise a manner as possible – to support his opinion that Vivendi's

financial condition was deteriorating, which is based on his experience in corporate

valuations.  I decline to parse Elson's report paragraph-by-paragraph to determine

where the the report turns from expert analysis to factual narrative.  Rather, I trust

plaintiffs' counsel will exercise discretion in allocating trial time and will only

present the facts necessary to support Elson's opinion.  In the event plaintiffs'

counsel fails to exercise appropriate discretion, I will cut off any lengthy factual

narrative.

Defendants also argue that vast portions of Elson's opinion constitutes

inadmissible legal opinion.  Plaintiffs have mooted most of these challenges by

withdrawing the portions of Elson's opinion that concerns MAC clauses.[22]

However, there are still portions of Elson's opinion that remain problematic;

namely, opinions concerning disclosure requirements and the adequacy of

Vivendi's disclosures.[23]  These opinions will not be permitted.  Elson may offer an

---

[22]        *See infra* Part III.B.3.

[23]        *See, e.g.*, Elson Rep. at 40 ( "Vivendi also failed to disclose, or fully
communicate, several important circumstances involving Cegetel, Maroc and
Elektrim . . . ."); *id.* at 42 ("[T]he precarious nature of Vivendi's liquidity portion

opinion what circumstances he considers material in evaluating Vivendi's liquidity and the jury will evaluate whether the events were indeed material and whether Vivendi's disclosures were adequate.

Of course, Elson's opinion on liquidity will be unnecessary if the parties can reach an agreement which would eliminate the need for the jury to resolve whether Vivendi made material misstatements.  In the absence of such an agreement, Elson's opinion on Vivendi's financial condition will be admitted, but only in a concise form.

### 2.   Rescissory Damages

Elson's opinions with respect to rescissory damages will also be admitted.  Defendants' argument that Elson has no experience related to rescissory damages is misplaced.  Elson has expertise in damages analysis.[24]  Any argument that he lacks expertise in a particular field of damages analysis goes to the weight of the evidence rather than admissibility.[25]  Defendants also argue that Elson's

---

[sic] was clearly not adequately disclosed."); *id.* at 66 ("[C]ritically important considerations bearing on Vivendi's financial condition, specifically its liquidity circumstances, remained undisclosed, inaccurately portrayed, or otherwise diminished in significance through reassurances of Vivendi management regarding prospects for the firm.") *id.* at 79, 84, 94-95.

[24]   *See id.* at 9 ("While Mr. Elson has an area of expertise in damages, he is not an expert on MAC clauses.").

[25]   *See In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) ("If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the

methodology is flawed because he calculates damages starting December 16, 2001

rather than May 7, 2002.  For reasons explained later,[26] Elson properly uses

December 16, 2001 as a starting date for calculating damages.

### 3.  MAC Clauses

Plaintiffs represented in their March 22, 2012 letter to the Court that

Elson "will not offer any testimony about the meaning or purpose of the [MAC]

clause, nor will he opine on whether Vivendi violated Section 3.07."[27]

Accordingly, defendants' request to exclude this testimony is denied as moot.

## IV.  LIBERTY MEDIA PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF JOHN COATES

### A.  Background

Coates is the John F. Cogan Professor of Law and Economics at

Harvard Law School.[28]  Before joining the Harvard faculty, Coates was a partner at

Wachtell, Lipton, Rosen & Katz, where he represented large public companies in

M&A and financial transactions.[29]

---

specialized areas that are directly pertinent.").

[26]     *See infra* Part V.B.

[27]     3/22/12 plaintiffs' letter to the Court.

[28]     *See* 3/7/07 Expert Report of Professor John C. Coates IV ("Coates Rep."), Ex. 3 to 10/5/11 Declaration of Bryan H. Parr, Esq., in Support of the Liberty Media Plaintiffs' Motion in Limine to Exclude the Testimony of John Coates, ¶ 5.

[29]     *See id.* ¶ 8.

Coates offers eight opinions – six of which rebut Elson's now withdrawn opinions regarding the Merger Agreement's MAC clause.  The other two opinions are: (1) Elson's report constitutes legal opinion; (2) MAC clauses are meant to protect against unknown risks, not known risks.

**B.     Discussion**

**1.     Legal Opinion**

Plaintiffs argue that Coates's criticisms of Elson do not assist the jury.  To the extent that Coates offers an opinion that Elson's testimony constitutes a legal opinion, plaintiffs are correct.  Such testimony usurps the role of the Court and is excluded.

**2.     Purpose and Meaning of MAC Clause**

Plaintiffs argue that Coates's testimony is inadmissible because he usurps the role of the Court and jury by opining on the purpose and meaning of the MAC clause.  Initially, I note that it is common to allow expert testimony to aid a jury in understanding complex and unfamiliar corporate transactions,[30] and that such testimony is necessary for a jury here given the complexity of the issues.  While the jury may know what the terms "material," "adverse," and "change" mean, an average juror will not understand their use in the context of an M&A agreement.  Although Coates may not offer an opinion on the parties' intention in

---

[30]     *See, e.g.*, *Travelers Indem. Co. v. Scor Reinsurance Co.*, 62 F.3d 74 (2d Cir. 1995).

drafting the MAC clause in the Merger Agreement, he may offer expert opinions on MAC clauses in general, which are probative of the parties' intent.

   *First*, Coates may offer an opinion that MAC clauses are meant to protect against unknown risks. This opinion is supported by his extensive practical experience and academic experience with MAC clauses and M&A transactions.

   Plaintiffs argue that Coates may not present testimony on custom and usage, because such testimony is only permitted where "the language is fixed and invariable in the industry in question"[31] and that the language in MAC clauses is "ambiguous with respect to significant issues."[32] However, it is only because there is ambiguity in the *application* of MAC clauses that there is need to resort to custom and usage testimony. Moreover, the fact that the MAC clause in the Merger Agreement differs from a typical MAC clause is not grounds for excluding custom and usage testimony. Coates may highlight the difference between this MAC clause and a customary MAC clause to assist the jury in interpreting the MAC clause at issue. Although there is some room for variation in how MAC clauses are constructed, one-hundred percent uniformity is not required to admit the testimony; rather, plaintiffs may use these limited variations to cross-examine

---

   [31] *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010).

   [32] Pl. Coates Mem. at 8 (quoting Gilson & Schwartz, *Understanding MACs: Moral Hazard in Acquisitions*, 21 Journal of Law and Economic Organization 333 (2005)).

Coates.

　　　　*Second*, Coates may *not* testify that the specific MAC clause in the Merger Agreement was not intended to protect against changes in Vivendi's liquidity condition.  This is a determination for the jury to make.  Nor may he testify about particular clauses that were omitted from the Merger Agreement, for reasons stated at the March 13, 2012 conference on motions in limine.  However, he can testify, based on his professional and academic experience, that MAC clauses generally are not intended to cover changes in a party's liquidity condition.

　　　　*Third*, Coates may testify, based on his experience and review of similar agreements, that the risk assumed by a party is a relevant consideration as to what is a *material* adverse change.  Although plaintiffs challenge Coates's lack of methodology for weighing the amount of risk assumed by Liberty, his opinion is not subject to the rigid categories of *Daubert*.  The Supreme Court has noted that the reliability inquiry "is a flexible one" because "there are many different kinds of experts, and many different kinds of expertise."[33]  Accordingly, the proper inquiry is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[34]

　　　　As an experienced M&A professional, Coates's testimony is

---

[33]　　*Kumho Tire*, 526 U.S. at 150.

[34]　　*Id.* at 152.

admissible because he applies the same level of rigor in his analysis that an M&A

professional would apply in negotiating or analyzing a MAC clause.  Moreover,

Coates did not rely solely on his experience, but he also analyzed sixty-one

contemporaneous M&A agreements.  Coates may compare the risk assumed by

Liberty Media with the risk assumed in a customary M&A agreement, and offer an

opinion that Liberty Media's decision to assume the *entire* risk of a decline in the

price of Vivendi's share price between signing and closing is riskier than a typical

M&A agreement.  However, Coates may only offer his opinion on the level of risk

Liberty Media assumed generally, based on his experience with M&A agreements,

and without any reference to specific terms that are absent in the Merger

Agreement.

### 2.    Vivendi's Liquidity Condition

Plaintiffs argue that Coates's opinion "on how he would have assessed

Vivendi's liquidity condition during the relevant period,"[35] is beyond his expertise.

Defendants respond by arguing that Coates is not offering an opinion on liquidity,

but is merely basing a portion of his rebuttal report, which argues that Vivendi's

deteriorating liquidity condition did not constitute a MAC, on conclusions made by

Vivendi's liquidity expert, Thomas Fleming.  In any event, I have already

precluded Coates from offering an opinion that Vivendi's liquidity condition did

---

[35]    Liberty Media Plaintiffs' Memorandum of Law in Support of Their Motion in Limine to Exclude the Testimony of John Coates ("Pl. Coates Mem.") at 13.

not constitute a MAC under the terms of the Merger Agreement.[36]  Thus, he may not offer any testimony regarding Vivendi's liquidity condition – a subject to be covered by Fleming.  However, as discussed above, he may offer an opinion as to whether liquidity risks are generally covered by MAC clauses, but not the MAC clause in the Merger Agreement.[37]

### 3.    Factual Overview

Plaintiffs also argue that Coates's lengthy "Factual Overview" is inadmissible.  The ten pages that Coates uses in his Report to review the facts is more than the jury needs to hear, even if it is not as extensive as Elson's.  As previously stated, counsel are warned not to use their experts to rehash a factual narrative and present counsels' theory of the case.[38]  Coates should only describe the facts as necessary to support his expert opinions, and I will not hesitate to cut off any lengthy narrative in front of the jury.  Accordingly, plaintiffs' motion to exclude the testimony of Coates is granted in part and denied in part.

## V.    LIBERTY MEDIA'S MOTION IN LIMINE TO EXCLUDE IN PART THE TESTIMONY OF KENNETH LEHN

### A.    Background

Dr. Lehn is currently the Samuel A. McCullough Professor of Finance

---

[36]    *See supra* Part IV.B.2.

[37]    *See id.*

[38]    *See supra* Part III.B.1.

in the Katz Graduate School of Business at the University of Pittsburgh, where he has been on the faculty since 1991.[39]  Prior to joining the faculty at Katz, Lehn was chief economist of the Securities and Exchange Commission.[40]  Lehn received a B.A. in economics from Waynesburg College, an M.A. in economics from Miami University, and a Ph.D. in economics from Washington University.[41]

Lehn is proffered as an expert by defendants to review and respond to the damages analysis conducted by Elson.  In particular, Lehn criticizes Elson's use of December 2001 rather than May 2002 as the starting point for calculating damages.[42]

### B.    Discussion

Plaintiffs seek to exclude Lehn's testimony that (1) although two closing conditions were not satisfied, Liberty nonetheless chose to proceed with the closing; and (2) May 7, 2002 is the appropriate beginning date for calculating damages.  *First*, Lehn may not testify that the two closing conditions were not satisfied, nor may he testify that Liberty had the option to terminate the Merger

---

[39]    *See* 3/6/08 Expert Report of Professor Kenneth Lehn ("Lehn Rep."), Ex. 1 to 10/5/11 Declaration of Bryan H. Parr, Esq., in Support of the Liberty Media Plaintiffs' Motion in Limine to Exclude in Part the Testimony of Kenneth Lehn, ¶ 1.

[40]    *See id.* ¶ 2.

[41]    *See id.* ¶ 3.

[42]    *See id.* ¶ 29.

Agreement.  The first issue raises a pure question of fact and expert testimony would not be helpful to the jury.  Defendants may establish that the closing conditions were not satisfied by presenting evidence demonstrating that Vivendi failed to obtain the necessary consents, waivers and registrations required in the closing conditions to the Merger Agreement.  Indeed, the parties now agree that one of the two conditions at issue was not met as of May 7, 2002.  Even if one or both of the conditions were not met, whether this would have allowed plaintiffs to cancel the agreement is a question of contract interpretation to be decided by the jury based on the testimony of the fact witnesses, rather than by experts.

*Second*, plaintiffs argue that Lehn's opinion on the starting date for damages is improper and based on his analysis of the case law.  Plaintiffs are correct that it is the province of the Court to instruct the jury on the proper date to start measuring damages.  Accordingly, Lehn's critique of Elson for choosing December 2001 as a starting point is excluded.

Moreover, plaintiffs are correct that rescissory damages should be measured from December 2001.  Initially, I note that –  in the event the jury concludes that Liberty Media had the opportunity to walk away from the Merger Agreement in May 2002 based on Vivendi's failure to satisfy either of the conditions at issue *and* that Liberty Media should have discovered Vivendi's fraud by May 2002 – there would be *no* damages.  However, in the event that the jury concludes (1) that Liberty Media was obligated to close the merger; or (2) that

-16-

Liberty Media closed the merger reasonably relying on Vivendi's misstatements and properly exercising its discretion to proceed with the closing, damages should be measured as of the signing date of the Merger Agreement.  The purpose of rescissory damages is to restore the plaintiff to the position it would have occupied had the transaction not occurred.  This goal cannot be effectuated without considering that the exchange ratio was set in December 2001 and the value of Vivendi's shares declined significantly between December 2001 and May 2002. To measure damages beginning in May 2002 would only succeed in unwinding the Merger Agreement part way.  To fully restore Liberty to its original position, damages must be calculated from December 2001 – when Liberty committed to the exchange ratio in reliance on Vivendi's misrepresentations.  Under defendants' theory if Vivendi's stock had declined to zero euros, Liberty would receive *no* damages even though it would be required to give up its shares in USA Networks for nothing as a result of fraud.  Although defendants have pointed to authority indicating that the closing of a merger agreement is the proper point to measure rescissory damages,[43] I decline to follow the Bankruptcy Court's *WorldCom* decision.  Because measuring damages from the closing of the Merger Agreement would fail to restore Liberty Media to its original position, I do not find the

---

[43]     *See In re WorldCom*, 377 B.R. 77, 93 (Bankr. S.D.N.Y. 2007) ("Under rescission, returning the Claimants to the status quo before the December merger would result in granting them their WorldxChange stock back or, since the stock is now non-existent, the value of that stock on the merger date.").

Bankruptcy Court's decision in *WorldCom* persuasive.  Accordingly, plaintiffs'

motion to exclude in part Lehn's testimony is granted.

## VI.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Exclude the

Testimony of Craig T. Elson is denied, Liberty Media Plaintiffs' Motion in Limine

to Exclude the Testimony of John Coates is granted in part and denied in part, and

Liberty Media Plaintiffs' Motion in Limine to Exclude in Part the Testimony of

Kenneth Lehn is granted.  The Clerk of the Court is directed to close these motions

[Docket Nos. 164, 183, and 184].

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            April 2, 2012

-18-

**- Appearances -**

**For Plaintiffs:**

Maureen Patricia Reid, Esq.
Baker Botts LLP
30 Rockefeller Plaza
New York, New York 10112
(212) 408-2521

Michael Calhoon, Esq.
R. Stan Mortenson, Esq.
Alexandra M. Walsh, Esq.
Bryan Henry Parr, Esq.
Evan J. Werbel, Esq.
Julie B. Rubenstein, Esq.
Richard P. Sobiecki, Esq.
Baker Botts LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 639-7700

**For Defendants:**

Daniel Slifkin, Esq.
Paul C. Saunders, Esq.
Timothy Gray Cameron, Esq.
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, New York 10019
(212) 474-1000

Penny Packard Reid, Esq.
James W. Quinn, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue, 25th Fl.
New York, New York 10153
(212) 310-8000