UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LIBERTY MEDIA CORPORATION, LMC CAPITAL LLC, LIBERTY PROGRAMMING COMPANY LLC, LMC USA VI, INC., LMC USA VII, INC., LMC USA VIII, INC., LMC USA X, INC., LIBERTY HSN LLC HOLDINGS, INC., and LIBERTY MEDIA INTERNATIONAL, INC.<br><br>                    Plaintiffs,<br>     -against-<br><br>VIVENDI UNIVERSAL, S.A., and UNIVERSAL STUDIOS, INC.,<br><br>                    Defendants. | 03 Civ. 2175 (SAS)<br><br>**LIBERTY'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW** |

| | |
|---|---|
| Macey Reasoner Stokes<br>BAKER BOTTS L.L.P.<br>One Shell Plaza<br>910 Louisiana Street<br>Houston, TX 77002-4995<br>Telephone: (713) 229-1234<br>Facsimile: (713) 229-7869 | R. Stan Mortenson<br>Michael L. Calhoon<br>Alexandra M. Walsh<br>Richard P. Sobiecki<br>BAKER BOTTS L.L.P.<br>1299 Pennsylvania Ave, N.W.<br>Washington, D.C. 20004-2400<br>Telephone: (202) 639-7700<br>Facsimile: (202) 639-7890 |

*Attorneys for Plaintiffs Liberty Media Corporation, LMC Capital LLC,
Liberty Programming Company LLC, LMC USA VI, Inc., LMC USA VII, Inc.,
LMC USA VIII, Inc., LMC USA X, Inc., Liberty HSN LLC Holdings, Inc.,
and Liberty Media International, Inc.*

Plaintiffs Liberty Media Corporation et al. (collectively, "Liberty") respectfully submit this Memorandum of Law in Opposition to Defendants' Motion for Judgment As a Matter of Law under Federal Rule of Civil Procedure 50(a).

As set forth below, the evidence admitted during Liberty's case at trial provides a more than sufficient basis for a reasonable juror to find for Liberty on the elements of reliance and causation on its Section 10(b) claim and on the element of causation for its breach of warranty claim. Further, Liberty is legally entitled to seek rescissory damages and has put forward sufficient evidence to support its entitlement to the requested amount of damages.[1] Defendants' motion for judgment as a matter of law should therefore be denied.

## LEGAL STANDARD FOR JUDGMENT AS A MATTER OF LAW

Judgment as a matter of law is appropriate only if a party "has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a). In ruling upon a Rule 50(a) motion,

> [T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (quotation marks and citations omitted). "[A] court may grant a motion for judgment as a matter of law 'only if it can conclude that, with credibility assessments made against the moving party and all inferences

---

[1] Pursuant to the Court's request, Liberty responded to the rescissory damages portion of Defendants' motion in a letter submitted June 18, 2012. Liberty hereby incorporates by reference the arguments in that letter.

1

drawn against the moving party, a reasonable juror would have been compelled to accept the view of the moving party.'" *Zellner v. Summerlin*, 494 F.3d 344, 370–71 (2d Cir. 2007) (quoting *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993)) (emphasis omitted).

## ARGUMENT

I.   **Vivendi has not established its entitlement to judgment as a matter of law on the reliance element of Liberty's Section 10(b) claim.**

Vivendi argues that the Court should grant it judgment as a matter of law on Liberty's Section 10(b) claim because Liberty cannot establish its reliance on Vivendi's false or misleading statements. Vivendi Mem. at 8. First, Vivendi argues that Liberty cannot establish reliance on *any* statement because only Neal Dermer reviewed the relevant statements and he did not personally make the decision to sign or close the Merger Agreement on behalf of Liberty. *Id.* at 9–10. Second, Vivendi argues that Liberty cannot establish reliance on 11 statements that he did not specifically recall reading. *Id.* at 10–11.[2]

---

[2] In an apparent non-sequitur, Vivendi argues in a footnote to its discussion of Section 10(b) reliance that the false or misleading statements contained in Vivendi's 2001 Forms 6-K cannot form the basis of Liberty's *breach of warranty* claims because Section 3.11 of the Merger Agreement is limited to reports *filed* by Vivendi. *See* Vivendi Mem. at 9 n.8. Even if Section 3.11 contained this limitation (and it does not), it would have no bearing on Liberty's ability to establish breach of the 3.11 warranty--which has already been determined as a matter of law to be false. In any event, prior to trial, the Court held that Section 3.11 is ambiguous on this point and raises a fact issue for the jury. *See* Hr'g Tr. (May 22, 2012) at 469:18-20. Moreover, ample evidence at trial established that Section 3.11 was intended to encompass such filings. Mr. Tanabe testified that the warranty in Section 3.11 was intended to include Vivendi's 6-K filings because "6Ks, like the 20F, are documents that are submitted to the SEC, they're publicly available from the SEC website and they're just -- they're there, they're filed." Trial Tr. (June 12, 2012) at 1555:14–21; *see also id.* at 1556:3–10 (Mr. Tanabe: While Liberty "didn't expect that Vivendi would file 6Ks that had false or misleading information in them," Liberty wanted those to be covered if it did.). Vivendi employees consistently, and without exception, used the term "filed" when describing the submission of Form 6-Ks to the SEC. *See, e.g.*, LX-33, LX-57, LX-58, LX-76, LX-80, LX-81, LX-82, LX-145, LX-148, LX-170, LX-200, and LX-682; *see also* Trial Tr. (June 1, 2012) at 567:2–5 (Karen Trickett: "[Filed] is the word that we used when we got something EDGAR-ized and we sent it to the SEC, it was a process that you got a document EDGAR-ized and it went to the SEC. It's just the word we used for that process."). Vivendi's contention therefore does not warrant judgment as a matter of law on this point.

### A. Liberty is not required to establish reliance through a single agent.

Vivendi's first argument is unsupported by any citation to authority, and is directly contrary to both the law of agency and the way corporations function. As an artificial person, a corporation can only act through its officers and other agents. *See Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001). Liberty obviously relies on Vivendi's false or misleading statements through its agents. Like all corporations, Liberty has myriad agents, and Vivendi is unable to cite a single case requiring that the exact same individual who performs the due diligence for a corporation on a transaction must also be the one who signs the agreement on behalf of the corporation. Such a contention is absurd and would serve no public policy; on the contrary, it would bring corporate operations to a standstill. As the Restatement (Second) of Agency explains, "One making a misrepresentation to an agent in order to obtain a contract with the principal is subject to liability if the contract is obtained as a result of it, whether the agent to whom the statement is made, or another agent, or the principal consummates the transaction in reliance upon it." § 315 cmt. b (1958).

Moreover, the uncontroverted evidence establishes that Mr. Dermer shared his assessment of Vivendi with Mr. Robert Bennett—Liberty's CEO who did sign the Merger Agreement on Liberty's behalf—on multiple occasions prior to signing and that this assessment was based on Mr. Dermer's review of relevant statements at issue in this case. *See* Trial Tr. (June 6, 2012) at 1115:16–1116:12; *id.* (June 7, 2012) at 1358:6–14, 1366:13–24. Thus, even assuming that Vivendi's novel contention had any merit, which it does not, Vivendi improperly ignores evidence supporting the submission of the reliance element to the jury.

### B. Liberty has presented sufficient evidence of its reliance on each of the false or misleading statements.

Vivendi tacitly concedes that Liberty read at least 14 of the false or misleading statements.[3] Vivendi argues, however, that because Mr. Dermer had no specific recollection of reading the 11 other false or misleading statements, Liberty cannot establish reliance on those statements. But the evidence is sufficient for the jury to conclude that Mr. Dermer relied on certain statements notwithstanding his lack of specific recollection. Moreover, Vivendi's argument rests on the premise that a plaintiff cannot establish reliance absent a showing that the plaintiff read the specific statement in question. That is incorrect.

In fact, the law permits a plaintiff to establish reliance on statements in multiple ways that do not require proof of reading the statement, several of which are applicable here. Specifically, Liberty relied on the public statements (1) through the warranties in the Merger Agreement, (2) through the *Affiliated Ute* presumption for any statements determined by the jury to be omissions, (3) through its review of different iterations or translations of the exact same statements, and/or (4) through the review of at least some of the false or misleading statements contained within the same document.[4]

---

[3] Vivendi does not seek judgment on Statements #1, 2, 3, 5, 6, 11, 12, 13, 14, 15, 16, 17, 20, and 25 on Table A to Liberty's Proposed Verdict Form.

[4] Another circumstance in which reliance does not require proof of reading is the fraud-on-the-market presumption. *See Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988) ("An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in the market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action."). Although the Court has ruled that the presumption is not directly applicable here, the existence of the fraud-on-the market presumption confirms that Section 10(b)'s reliance requirement does not necessarily require proof that the investor actually read the false or misleading statement.

### 1. Liberty's reliance on all of the false or misleading statements is established through the warranties in the Merger Agreement.

One of Liberty's primary goals in entering into the Merger Agreement was obtaining fair value for the assets it was giving up.[5] Given that the ratio of shares exchanged in the Agreement was based on the market price of the relevant securities, Liberty needed to ensure that the market price for Vivendi's shares—which was based on publicly available information—accurately reflected Vivendi's true financial condition. Liberty did so by negotiating for the warranties in the Merger Agreement, which, among other things, warranted that the public statements at issue in this case were not false or misleading.

Under New York law, the warranties in the Merger Agreement "imposed a duty [on Vivendi] to provide accurate and adequate facts and entitled [Liberty] to rely on them without further investigation or sleuthing." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007). Those warranties were "intended precisely to relieve [Liberty] of any duty to ascertain the facts for [itself]." *Metro. Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946) (L. Hand, J.). Given those warranties, it would make no sense to require Liberty to show that it individually reviewed every warranted statement to establish its Section 10(b) claim; it already had Vivendi's promise that none of these warranted statements was false or misleading, and that the market was thus appropriately integrating these public statements into the value of Vivendi's stock. To require such an extensive review process would defeat the very purpose of obtaining the warranties in this case.[6]

---

[5] *See* Trial Tr. (June 7, 2012) at 1175:1–8 (Mr. Bennett: One of Liberty's principal goals was receiving fair value for its USA shares. "[W]ithout that, you wouldn't do the transaction.").

[6] The Court's prior decision in *Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities, LLC*, 592 F. Supp. 2d 608 (S.D.N.Y. 2009), is not to the contrary. In that case, there was no indication that the plaintiffs relied on statements that were warranted as

The testimony at trial fully supports the position that Liberty was relying on the truth and accuracy of the warranted statements.  Mr. Bennett testified that

> No one can know a company as well as the insiders do.  And you rely on them telling you that what they have told the investing public is true, and that they have been truthful, and they haven't withheld material information, they have not omitted material information.  There's nothing false or misleading in the information they filed that is a critical part of any transaction.  We absolutely rely on it, and in no circumstance would have done the transaction without them.

Trial Tr. (June 6, 2012) at 1126:5–13.  He emphasized that the warranty in Section 3.11 was of particular importance because "we were relying on their public statements in the course of our diligence in trying to determine the health and the status of the company and the fair value of its shares.  We were relying on the fact that what they were telling the market in their public filings, in their press releases, in their investor presentations, whatever, that those were all accurate and complete and not misleading."  *Id*. (June 7, 2012) at 1172:6–12.  Mr. Tanabe similarly testified that because the share ratio in the Agreement was based on the market price, "it was critical that the market had complete information, accurate information, because that obviously affected the prices, the same was true of USA as well as Vivendi."  *Id*. (June 8, 2012) at 1501:6–14.

Contrary to Vivendi's assertion, Vivendi Mem. at 10, this reliance clearly extended to Vivendi's French filings.  As Mr. Tanabe testified, Liberty wanted Section 3.11 to cover both Vivendi's U.S. and French filings because Vivendi's stock was actively traded on various exchanges and investors traded based on information available in both markets; therefore, "the accuracy of the French information was important to us, just as important as the U.S. information."  *Id.* (June 12, 2012) at 1556:19–1557:7; *see id*. at 1557:8–14 (Mr. Tanabe: "[W]e weren't relying just on the U.S. filings; we were relying on the fact that whatever information

---

true by the seller and integrated into the subject security's market price, prior to the buyer's decision to purchase.

6

was disclosed in the French filings was absorbed by that market, and, in turn, affected the price there and affected the price here as well."). Mr. Bennett similarly testified that "people would be looking at the company's public filings, whether they are in English or French, depending on where they are and the language they speak, and using that as the basis for determining the value of the company." *Id*. (June 7, 2012) at 1339:11–18.

      **2.**  **Liberty's reliance on any omissions is established by the *Affiliated Ute* presumption**

With respect to Vivendi's material omissions, Liberty is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), regardless of whether it read the documents at issue. Under *Affiliated Ute*, a plaintiff need only prove that the defendant had a duty to disclose the relevant information and that the omission was material, "in the sense that a reasonable investor might have considered [the facts withheld] important in the making of this decision" to invest. *See id*. at 153–54. Vivendi had a duty to disclose the omitted information because it chose to make public statements regarding its financial condition and was obligated under Section 10(b) and Rule 10b-5 not to omit information necessary to make those public statements not misleading. Vivendi has already stipulated that all of the false or misleading statements at issue were material. Accordingly, the burden shifts to Vivendi to rebut the presumption of reliance by proving "that even if the material facts had been disclosed, plaintiff's decision as to the transaction would not have been different from what it was." *Fogarazzo v. Lehman Bros., Inc*., 263 F.R.D. 90, 100 (S.D.N.Y. 2009) (quoting *DuPont v. Brady*, 828 F.2d 75, 78 (2d Cir. 1987)) (quotation marks omitted).

    Courts in this Circuit have held that where the *Affiliated Ute* presumption applies, a plaintiff need not show that it read the statement in order to establish reliance. Evidence that the statement was not read may rebut the *Affiliated Ute* presumption, though not as a matter of law.

7

*See, e.g.*, *Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc.*, 186 F.3d 157, 173 (2d Cir. 1999) (applying the *Affiliated Ute* presumption where the plaintiff had not seen the share purchase agreements (between defendants and third parties) containing the allegedly inadequate disclosures of inside information); *Competitive Assocs., Inc. v. Laventhol, Krekstein, Horwath & Horwath*, 516 F.2d 811, 814 (2d Cir. 1975) (where plaintiff alleged misrepresentations, omissions, and other fraudulent conduct, "plaintiff need only show causation in fact; in order to do so plaintiff should have the opportunity to prove, but is not required to prove, that it saw, or directly relied upon, the financial statements certified by the accounting defendants").[7] Thus, while Vivendi may argue Liberty's failure to read a particular statement to the jury in support of its attempt to rebut the *Affiliated Ute* presumption, it is not entitled to judgment as a matter of law on this point.

### 3. Liberty's reliance on Statements # 4, 7, 10, 18, 21, 22 is established through Mr. Dermer's physical review of different iterations or translations of those statements.

In addition, Liberty presented evidence of its reliance on Statements # 4, 7, 10, 18, 21, and 22 through Mr. Dermer's review of different iterations or translations of those statements.

Mr. Dermer testified that he read and relied on the language in Statements # 10, 21, and 22, but was not sure that he reviewed the particular iteration of the same language in the particular document he was shown. *See* Trial Tr. (June 8, 2012) at 1389:21–1390:15 (Statement # 10), 1392:21–1393:4 (Statements # 21 and 22). The question is whether Liberty relied on the

---

[7] *See also Seagoing Uniform Corp. v. Texaco, Inc.*, 705 F. Supp. 918, 930–31 (S.D.N.Y. 1989) (holding that plaintiff's failure to allege that it had read Form 13D, which it claimed contained material misrepresentations, did not preclude application of *Affiliated Ute* presumption); *Kitto v. Thrash Oil & Gas Co.*, No. 88-CV-0169E(F), 1995 WL 495043, at *8 (W.D.N.Y. Aug. 1, 1995) (holding that testimony that various plaintiffs did not read, or only cursorily read, defendant's private placement memoranda prior to investing does not rebut *Affiliated Ute* presumption of reliance, where plaintiff testified that had he known the undisclosed information, he would not have engaged in the transaction).

8

statement, not the document.  Vivendi cites no authority requiring Liberty to go through the formalistic exercise of seeking out and reading every potential iteration of the identical statement it has already reviewed.

Similarly, Liberty's reliance on the relevant French filings (Statements # 4, 7, and 18) is established through Mr. Dermer's review of the English translations of these very same statements.  *See, e.g.*, Trial Tr. (June 8, 2012) at 1386:12–23 (Mr. Dermer: "I didn't look at -- I didn't review the French filing, but the language that it translates into in subsequent -- I guess in preparation for this case, I've been shown the translation.  The statements made, that they're translated into, are the same as what they were in the U.S. English filings.").  Given that Mr. Dermer read and relied on the translation of these French statements in Vivendi's U.S. filings, he was entitled to rely on the French statements as accurate translations of Vivendi's U.S. filings.  Vivendi cites no authority to the contrary.

### 4. Liberty has established its reliance on at least some of the statements contained in Statements # 8 and 9.

Finally, Vivendi ignores the evidence that Mr. Dermer testified that he did review some of the statements contained in Statements # 8 (LX-072) and 9 (LX-073).  Therefore, even if a physical review of statements were required to establish reliance, which it is not, Liberty has satisfied this requirement for at least some of the statements in Statements # 8 and # 9.

## II. Liberty has presented sufficient evidence of causation under both its claims.

Vivendi argues that it is entitled to judgment as a matter on both of Liberty's claims because Liberty failed to disaggregate non-fraud-related events and disclosures and failed to establish that the false or misleading statements caused any inflation in Vivendi's share price.  Neither of these contentions warrants withdrawing Liberty's claims from the jury.

9

### A. Dr. Nye's testimony is sufficient to allow the jury to determine whether Liberty has disaggregated non-fraud-related losses.[8]

Vivendi's first argument is inappropriate for disposition on a Rule 50(a) motion because Vivendi only cites to evidence that favors its argument, while ignoring Liberty's evidence supporting the causation element. Dr. Nye clearly testified that he disaggregated any non-fraud related losses on each of the relevant days and determined that the entire loss was attributable to the fraud. *See* Trial Tr. (June 14, 2012) at 1936:4–23. The Court found that such determinations were issues of fact for the jury to determine in the Class trial, finding that Dr. Nye had offered "viable justifications" for his disaggregation analysis on the relevant dates and that the jury had a sufficient basis to reject Vivendi's critiques of his testimony. *See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 560–61 (S.D.N.Y. 2011).

January 7, 2002: Dr. Nye testified that he considered Vivendi's experts' opinion that the decline in the share price was due to a "seasoned equity offering effect" or AOL Time Warner's announcement of negative news, but concluded that the drop in Vivendi's stock price was due to a partial materialization of Vivendi's liquidity risk. *See* Trial Tr. (June 14, 2012) at 1919:10–19, 1921:1–17.

May 3, 2002: On May 3, 2002, Vivendi received a credit rating downgrade from Moody's. Dr. Nye excluded market and industry effects from his analysis and considered

---

[8] While Vivendi asserts that this argument goes to loss causation, it is more appropriately considered as relevant to the measure of Liberty's damages. In its order denying Vivendi's motion for summary judgment on loss causation, the Court specifically distinguished between the showing necessary to establish loss causation versus that necessary to prove damages. *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009) ("While the plaintiffs at all times bear the burden on loss causation, it is important not to confuse causation with damages when comparing competing causes for a stock decline. In theory, plaintiffs need only prove that they suffered some damage from the fraud. Liability obviously does not hinge on how much damage."); *see also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (requiring that plaintiffs "ascribe some rough proportion of the whole loss" to defendants' fraud in order to establish loss causation).

10

Vivendi's alternate explanation that intraday stock price movements accounted for the drop in share price. *See id.* at 1926:8–1927:21, 1928:22–1929:14, 1934:23–1935:12; 1936:6–17.

July 3, 2002: On July 3, 2002, following a downgrade by S&P on July 2, Vivendi's share price dropped again, and Dr. Nye considered all the information in the market in determining the portion of the decline attributable to Vivendi's misconduct. *See id.* at 1960:2–6, 1960:21–1962:23. Dr. Nye analyzed the effect on Vivendi's share price of the announcement of an investigation into Vivendi and a warning by S&P of the potential for future downgrades on July 10, 2002, excluding market and industry effects. *See id.* at 1965:10–13, 1965:25–1967:16.

Finally, Dr. Nye considered various events on August 14, 2002, to determine whether they related to revelations of Vivendi's true liquidity risk. *See id.* at 1971:15–1978:7. The jury is entitled to weigh this evidence and determine whether Liberty has sufficiently disaggregated its losses. That Vivendi may have provided controverting testimony or scored points on cross-examination provides no basis for Rule 50(a) relief under the proper standard of review. *See Reeves*, 530 U.S. at 150–51.

> **B. As this Court has previously held, the law does not require proof that each of Vivendi's false or misleading statements caused a specific amount of inflation in Vivendi's share price.**

The causation element of Liberty's breach of warranty and Section 10(b) claims does not require Liberty to prove that each of Vivendi's false or misleading statements caused a specific amount of inflation in Vivendi's share price. Liberty alleges, and Dr. Nye testified, that Vivendi's false or misleading statements maintained the inflation in Vivendi's share price. *See, e.g.*, Trial Tr. (June 14, 2012) at 2011:11–16 (Dr. Nye: "[T]he inflation, when you just are repeating the same thing, repeating your same targets, your same targets and your same success from the very beginning, you know, of the original merger and say we're going to grow 35 percent, etc., that's the old news. And saying that over and over doesn't change the

perception."); *see also id.* at 2013:21–2014:5 (Dr. Nye: "If you say that wall is brown 40 times, it's brown; if you say it 25 times, it's brown. How many times you lie doesn't affect the lie. . . . I am saying [the statements] are all the same, and they reinforce each other. But, you know, what they lied about was concealed liquidity risk, and that's identical.").[9]

Vivendi argues, however, that Liberty cannot establish causation based on such a maintenance theory of inflation. Vivendi made the same argument—almost verbatim—in its Rule 50(a) motion during the Class trial. The Court soundly rejected this argument. *See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 561 (S.D.N.Y. 2011). Like Liberty here, the Class plaintiffs relied on a maintenance theory of inflation, and the Court expressly held that such a theory of causation was sound and supported by the case law. *See id.* at 561–62 (collecting cases and holding that "a statement can cause inflation by causing the stock price to be artificially maintained at a level that does not reflect its true value").

The Court rejected Vivendi's objections to the "maintenance" theory of inflation as having no support in the case law,[10] and criticized Vivendi for having "los[t] sight of the fact that in securities fraud cases, plaintiffs need not prove the amount of loss caused by each misstatement with complete mathematical precision." *Id.* at 562 (citing *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005); and *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009)). The Court concluded that such a "method of proof makes particular sense in cases involving numerous misstatements over an extended time period on the same general

---

[9] *See also* Trial Tr. (June 14, 2012) at 1925:21–1926:2, 2009:7–19.

[10] In finding no case law to support Vivendi's objections to a "maintenance" theory of inflation, the Court was well aware of the district court's holding in *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351 (S.D.N.Y. 2003). As in its Rule 50(a) motion here, Vivendi's Rule 50(a) motion in the Class trial relied exclusively on this decision.

12

topics." *Id*. In such a situation, the "maintenance" theory of inflation "simply reflects the reality that inflation in a company's stock price is difficult to quantify with mathematical precision in any case, and that in a case where a company repeatedly makes statements that omit information about its liquidity risk, it is reasonable to conclude that each misstatement played a role in causing the inflation in the stock price (whether by adding to the inflation or helping to maintain it), even if it is not possibl[e] to quantify the exact impact that each statement had on the inflation." *Id*.

> In contrast, Vivendi's argument:
>
>> would produce a perverse result: it would make it harder for plaintiffs to prove loss causation when a company makes numerous similar misstatements over a long time period than when a company makes a single, isolated fraudulent statement, even though the former situation involves a more pervasive and widespread fraud. Such a rule could permit a company to avoid Section 10(b) liability by repeating its misstatements so many times that it becomes impossible for an expert to prove that any particular misstatement, viewed in isolation, caused a quantifiable increase in inflation.

*Id*. at 563. Because Vivendi has not provided the Court with any reason to depart from its well-considered holding on the identical argument in the Class trial, the Court should deny Vivendi's motion for judgment as a matter of law on this ground.

## CONCLUSION

For the foregoing reasons, and those stated in Liberty's June 18, 2012, letter on its entitlement to seek rescissory damages, Liberty respectfully requests the Court to deny Vivendi's motion for judgment as a matter of law.

Dated: June 19, 2012

                                                                          /s Michael L. Calhoon

| | |
|---|---|
| Macey Reasoner Stokes | R. Stan Mortenson |
| BAKER BOTTS L.L.P. | Michael L. Calhoon |
| One Shell Plaza | Alexandra M. Walsh |
| 910 Louisiana Street | Richard P. Sobiecki |
| Houston, TX 77002-4995 | BAKER BOTTS L.L.P. |
| Telephone: (713) 229-1234 | 1299 Pennsylvania Ave, N.W. |
| Facsimile: (713) 229-7869 | Washington, D.C. 20004-2400 |
| | Telephone: (202) 639-7700 |
| | Facsimile: (202) 639-7890 |

*Attorneys for Plaintiffs Liberty Media Corporation, LMC Capital LLC, Liberty Programming Company LLC, LMC USA VI, Inc., LMC USA VII, Inc., LMC USA VIII, Inc., LMC USA X, Inc., Liberty HSN LLC Holdings, Inc., and Liberty Media International, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 19, 2012, a copy of the foregoing was served upon the following:

Paul C. Saunders, Esq.
Daniel Slifkin, Esq.
Timothy G. Cameron, Esq.
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

James W. Quinn, Esq.
Jonathan D. Polkes, Esq.
Penny P. Reid, Esq.
WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153

  /s Michael L. Calhoon
Michael L. Calhoon