**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LIBERTY MEDIA CORPORATION, LMC CAPITAL LLC, LIBERTY PROGRAMMING COMPANY LLC, LMC USA VI, INC., LMC USA VII, INC., LMC USA VIII, INC., LMC USA X, INC., LIBERTY HSN LLC HOLDINGS, INC., and LIBERTY MEDIA INTERNATIONAL, INC.<br><br>                 Plaintiffs,<br><br>    v.<br><br>VIVENDI UNIVERSAL, S.A., and UNIVERSAL STUDIOS, INC.<br><br>                 Defendants. | 03 Civ. 2175 (SAS)<br><br>**LIBERTY'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(B), OR, IN THE ALTERNATIVE, FOR A NEW TRIAL PURSUANT TO RULE 59 OF THE FEDERAL RULES OF CIVIL PROCEDURE** |

Macey Reasoner Stokes
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
Telephone: (713) 229-1234
Facsimile: (713) 229-7869

R. Stan Mortenson
Michael L. Calhoon
Alexandra M. Walsh
Richard P. Sobiecki
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave, N.W.
Washington, D.C. 20004-2400
Telephone: (202) 639-7700
Facsimile: (202) 639-7890

*Attorneys for Plaintiffs Liberty Media Corporation, LMC Capital LLC,*
*Liberty Programming Company LLC, LMC USA VI, Inc., LMC USA VII, Inc.,*
*LMC USA VIII, Inc., LMC USA X, Inc., Liberty HSN LLC Holdings, Inc.,*
*and Liberty Media International, Inc.*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

LEGAL STANDARD ........................................................................................3

ARGUMENT ....................................................................................................4

I.   LIBERTY'S EVIDENCE AMPLY SUPPORTED THE JURY'S VERDICT
     ON LOSS CAUSATION AND DAMAGES.........................................................4

     A.   Dr. Nye's Testimony Was Reliable and Reasonably Accepted by the
          Jury ..............................................................................................4

     B.   Liberty's Evidence Satisfies the Requirements for Proving Loss
          Causation in a Section 10(b) Case...............................................15

     C.   The Jury's Damage Award Is Amply Supported by the Evidence............................25

II.  THE JURY'S JUSTIFIABLE RELIANCE FINDING WAS REASONABLE .................27

III. VIVENDI'S MOTION FOR JUDGMENT AS A MATTER OF LAW ON
     ITS CLOSING-CONDITIONS DEFENSE SHOULD BE DENIED................................31

IV.  VIVENDI IS NOT ENTITLED TO A NEW TRIAL.........................................36

     A.   The Challenged Evidence Was Highly Probative of Disputed Issues.........................37

     B.   Liberty's Evidence Did Not Unfairly Prejudice Vivendi ...........................................39

CONCLUSION ................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Absolute Activist Value Master Fund, Ltd. v. Ficeto,*
    677 F.3d 60 (2d Cir. 2012) ................................................... 36

*Accentra Inc. v. Staples, Inc.,*
    No. CV 07-5862 ABC (RZ), 2011 WL 7563039 (C.D. Cal. Dec. 19, 2011) ......................... 11

*Affiliated Ute Citizens of Utah v. United States,*
    406 U.S. 128 (1972) ........................................................... 30

*Bloom v. ProMaxima Mfg. Ltd.,*
    No. 05-CV-6735-CJS, 2010 WL 1533389 (W.D.N.Y. Apr. 15, 2010) ................................. 32

*Caiola v. Citibank, N.A.,*
    295 F.3d 312 (2d Cir. 2002) ................................................. 36

*Caruolo v. John Crane, Inc.,*
    226 F.3d 46 (2d Cir. 2000) ............................................ 4, 40

*Drake v. Delta Air Lines, Inc.,*
    No. 94-cv-5944, 2005 WL 1743816 (E.D.N.Y. July 21, 2005) .............................. 7

*Dura Pharm., Inc. v. Broudo,*
    544 U.S. 336 (2005) ........................................................... 6

*Earl v. Bouchard Transp. Co.,*
    917 F.2d 1320 (2d Cir. 1990) ............................................. 27

*First Nat'l Bank of Kenosha v. United States,*
    763 F.2d 891 (7th Cir. 1985) ............................................. 26

*Floyd v. City of N.Y.,*
    No. 08 Civ. 1034 (SAS), 2012 WL 1344514 (S.D.N.Y. Apr. 16, 2012) .................. 5

*Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.,*
    136 F.3d 276 (2d Cir. 1998) ............................................. 3, 4

*Holmes v. United States,*
    85 F.3d 956 (2d Cir. 1996) ........................................... 16, 36

*In re Joint E. & S. Dist. Asbestos Litig.,*
    52 F.3d 1124 (2d Cir. 1995) ............................................... 5

*In re Omnicom Grp. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2001) ...................................................................................*passim*

*In re Parmalat Sec. Litig.*,
  684 F. Supp. 2d 453 (S.D.N.Y. 2010) .................................................................28

*In re Vivendi Universal, S.A. Sec. Litig.*,
  634 F. Supp. 2d 352 (S.D.N.Y. 2009) ("*Vivendi I*") .......................................*passim*

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011) ("*Vivendi II*") .....................................*passim*

*In re Vivendi Universal, S.A. Sec. Litig.*,
  No. 02 Civ. 5571 (SAS), 2012 WL 3264382 (S.D.N.Y. Aug. 10, 2012)...............6

*Jarvis v. Ford Motor Co.*,
  283 F.3d 33 (2d Cir. 2002) ...................................................................................34

*Lattanzio v. Deloitte & Touche LLP*,
  476 F.3d 147 (2d Cir. 2007) ...................................................................................6

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) .................................................................15, 16, 17

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
  No. 03 Civ. 2175 (SAS), 2012 WL 1203825 (S.D.N.Y. Apr. 11, 2012) ..............36

*Luciano v. Olsten Corp.*,
  110 F.3d 210 (2d Cir. 1997) .................................................................................39

*Morrison v. Nat'l Austl. Bank, Ltd.*,
  130 S. Ct. 2869 (2010) .........................................................................................36

*O'Neill v. Krzeminski*,
  839 F.2d 9 (2d Cir. 1988) .....................................................................................27

*Sharkey v. Lasmo (AUL Ltd.)*,
  55 F. Supp. 2d 279 (S.D.N.Y. 1999) ......................................................................4

*Smith v. Crown Lift Trucks*,
  No. 04 Civ. 2866 (GEL), 2007 WL 1467970 (S.D.N.Y. May 16, 2007)...............37

*Spinelli v. City of N.Y.*,
  No. 02 Civ. 8967, 2011 WL 2802937 (S.D.N.Y. July 12, 2011) ...........................4

*Trademark Research Corp. v. Maxwell Online, Inc.*,
  995 F.2d 326 (2d Cir. 1993) ...........................................................................26, 27

*Zarcone v. Perry*,
  572 F.2d 52 (2d Cir. 1978) .................................................................................27

*Zaro v. Mason*,
  658 F. Supp. 222 (S.D.N.Y. 1987) .......................................................................29

**STATUTES**

N.Y. C.P.L.R. § 4111 .............................................................................................27

N.Y. C.P.L.R. § 5501(c) ........................................................................................27

**OTHER AUTHORITIES**

David D. Siegel, N.Y. Practice § 407 (5th ed. 2012) ................................................27

David D. Siegel, *Practice Commentaries*, MicKinney's Consol. Laws of N.Y.,
  Book 7B, CPLR C5501:10 .................................................................................27

Fed. R. Evid. 702 ....................................................................................................4

Fed. R. Evid. 703 ..................................................................................................12

Plaintiffs Liberty Media Corporation *et al.* (collectively, "Liberty") respectfully submit this memorandum of law in opposition to Defendants' Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b), or, in the Alternative, for a New Trial Pursuant to Rule 59 of the Federal Rules of Civil Procedure ("Vivendi's motion" or "Mot.").

## INTRODUCTION

Vivendi's motion is nothing but an elaborate request for a do-over of a case it decisively lost.  Vivendi asks the Court to redo the jury's job by reweighing evidence and reconsidering evidentiary theories that the jury fully considered and reasonably rejected after a four-week, hotly contested trial.  Vivendi asks the Court to redo its prior rulings by adopting legal arguments the Court has already heard and rightly dismissed—and does so without acknowledging those prior rulings, much less explaining how they could have been wrong.  And Vivendi asks for a chance to redo its own Rule 50(a) motion by making (baseless) sufficiency of the evidence arguments that it was required, but failed, to make before the case went to the jury.  Vivendi's request should be denied.  The evidence was more than sufficient to support the jury's well-considered findings in Liberty's favor.  And Vivendi's losing legal arguments are as wrong as they were the first time Vivendi made them.  Finally, much as Vivendi might like, it cannot undo the verdict by waiting until *after* the jury has deliberated to claim that the evidence was inadequate on certain points; those belated arguments are waived, and meritless in any event.

Regarding causation and damages, Vivendi's challenge consists largely of the same tired attack it has made on Dr. Nye, and the reliability of his testimony, throughout this litigation.  That attack has now been rejected in response to not one, but two, *Daubert* motions, a motion for summary judgment, and a motion for judgment as a matter of law in the Class case (which made virtually the same arguments Vivendi repeats here).  Vivendi's attack has also now been rejected by a second jury, which heard an extensive cross-examination of Dr. Nye as well as a competing

1

opinion from Vivendi's expert.  The jury's decision to accept Dr. Nye's testimony should not be disturbed.  Contrary to Vivendi's assertion, nothing that occurred at trial calls into question the Court's prior conclusion that his opinion passes the test for admissibility under *Daubert*.  Rather, Vivendi's arguments, which read like an outline of its cross-examination, all go to the weight and credibility of Dr. Nye's testimony—matters that lie within the exclusive province of the jury. The jury's decision to credit Dr. Nye's testimony over the unconvincing opinion of Vivendi's expert (rejected now by two juries) was not just reasonable—it was plainly correct.

Vivendi also claims that Liberty's evidence was insufficient, as a matter of law, to link Vivendi's false and misleading statements in 2001 to the events that caused its stock price to drop in 2002.  That claim, which Vivendi raises for the first time in this motion, is not only waived but also utterly unavailing.  It relies on a blatant misreading of Second Circuit law and ignores extensive evidence that was more than sufficient to show that, on each of the "drop" days identified by Dr. Nye, the market reacted to the materialization of the liquidity risk concealed by Vivendi's fraud.  Vivendi's challenge to the jury's damages award should also be rejected.  It misstates the controlling legal standard, mischaracterizes the record, and disregards the authority of the jury to arrive at its own, reasonable estimate of damages.

The other grounds in Vivendi's Rule 50(b) motion also fail.  With respect to reliance, Vivendi is wrong that Section 10(b) requires a corporate plaintiff to show that the same employee who exercised decision-making authority for a security purchase also personally reviewed the defendant's false statements.  The Court rejected that legal argument the first time Vivendi made it and should do so again.  The evidence here easily established that Liberty, acting through its various employees, relied on the information that was (and was not) provided in Vivendi's public statements when it decided to purchase Vivendi's securities.

Nor is Vivendi entitled to judgment on its affirmative defense that Liberty was not obligated to close on the Merger Agreement.  Besides being waived, Vivendi's assertion that it established that defense as a matter of law is refuted by the evidence, which clearly supported a finding that both of the closing conditions Vivendi now conveniently contests were fully satisfied well before Liberty could have walked away from the transaction.  Given that evidence, and the Court's instructions on this issue (which Vivendi has never contested), the jury was completely justified in rejecting Vivendi's defense.

Finally, Vivendi's separate motion for a new trial should be denied.  Vivendi tries once again to convince the Court that the collateral estoppel order and stipulation somehow precluded Liberty from offering *any* evidence concerning Vivendi's earning management, purchase accounting, or its treatment of the Maroc and Telco transactions.  That argument ignores, once again, that evidence concerning the deceptive accounting practices Vivendi used to conceal its true liquidity condition was directly relevant to causation, damages, and the question of Liberty's justifiable reliance—including whether, as Vivendi strenuously argued at trial, Liberty could have avoided its losses simply by calling Messier and asking "what the heck is going on."  Even if the Court did err in admitting this evidence (and clearly it did not), that error does not amount to a miscarriage of justice requiring a new trial.  To the contrary, the notion that Vivendi was unfairly prejudiced by evidence that necessarily referenced the falsity of its public statements, in a case where the *jury was properly instructed that those statements were false*, is absurd.

## LEGAL STANDARD

A renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) may not be granted "unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in her favor." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998).  The court must

conclude that "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Id.* (alterations in original) (citations omitted). The court "must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Id.* (citation omitted).

A new trial under Rule 59 is proper where the jury reached a "seriously erroneous result" or the "verdict is a miscarriage of justice." *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 54 (2d Cir. 2000) (citation omitted). "To sufficiently demonstrate that a new trial is appropriate, the movant bears a heavy burden." *Spinelli v. City of N.Y.*, No. 02 Civ. 8967, 2011 WL 2802937, at *1 (S.D.N.Y. July 12, 2011) (citation and internal quotation marks omitted). The standard is "strenuous." *Sharkey v. Lasmo (AUL Ltd.)*, 55 F. Supp. 2d 279, 283 (S.D.N.Y. 1999).

## ARGUMENT

## I. LIBERTY'S EVIDENCE AMPLY SUPPORTED THE JURY'S VERDICT ON LOSS CAUSATION AND DAMAGES

### A. Dr. Nye's Testimony Was Reliable and Reasonably Accepted by the Jury

As this Court has already found, Dr. Nye's opinion and methodology satisfy Rule 702 and *Daubert*'s threshold test for admissibility. Hr'g Tr. (3/13/12) at 7:18–8:12. The court in the Class Action reached the same conclusion. *See* Order at 3–7 (Dkt. 929) (8/18/09), *In re Vivendi Universal, S.A. Sec. Litig.* (S.D.N.Y.) ("Class *Daubert* Order") (holding that the event study and regression analysis underlying Dr. Nye's opinion "easily pass muster under *Daubert* and *Kumho Tire*," and that all of Vivendi's challenges to his opinion were grist for cross-examination, not a basis to exclude his testimony). Nonetheless, Vivendi now urges the Court to strike Dr. Nye's

4

testimony as unreliable.  Mot. 5–6.  Vivendi's latest attack should be rejected, like all the others.
As detailed below, nothing that occurred at trial calls into question the Court's considered
conclusion that Dr. Nye's testimony met the threshold requirement for admission.  *See Floyd v.
City of N.Y.*, -- F. Supp. 2d --, No. 08 Civ. 1034 (SAS), 2012 WL 1344514, at *8 (S.D.N.Y. Apr.
16, 2012) ("[T]he Federal Rules of Evidence favor the admissibility of expert testimony, and the
court's role as gatekeeper is not intended to serve as a replacement for the adversary system."
(citation omitted)).

Dr. Nye's testimony was also plainly sufficient to support the jury's findings.  This case,
with respect to causation and damages, was a typical battle of the experts.  The Court gave
Vivendi broad leeway to cross-examine Dr. Nye and present testimony from its own expert, Dr.
Silber, on each of the points raised in its motion.  In the end, the jury credited Dr. Nye's
testimony and rejected Dr. Silber's, as was its province.  *See In re Vivendi Universal, S.A. Sec.
Litig.*, 765 F. Supp. 2d 512, 560 (S.D.N.Y. 2011) ("*Vivendi II*") ("It was properly within the
province of the jury to determine, after weighing all the evidence, whether to credit Dr. Nye's
opinions on these issues or not.").  The Court should deny Vivendi's invitation "to arrogate the
jury's role in 'evaluating the evidence and the credibility of expert witnesses' by 'simply
choosing sides in the battle of the experts.'"  *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d
1124, 1135 (2d Cir. 1995) (citation and internal quotation marks omitted).

### 1.    *Dr. Nye Reliably Disaggregated Vivendi-Specific Non-Fraud-Related Events*

Vivendi's first attack on Dr. Nye is that he failed to disaggregate Vivendi-specific events
in performing his event study.  Mot. at 6.  This losing argument is familiar.  Judge Holwell
rejected it as to both Liberty and the Class at the summary judgment stage, and rejected it twice
more in denying Vivendi's *Daubert* motion and motion for judgment as a matter of law in the

Class Trial.[1]  *See In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 369–72 (S.D.N.Y. 2009) ("*Vivendi I*") (holding that Dr. Nye's opinion satisfied the disaggregation requirements set out in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), and rejecting Vivendi's claim that Dr. Nye failed to consider competing causes for its stock price decline).  The Court should do the same here.  A plaintiff's burden under Section 10(b) is to present evidence sufficient to "'ascribe some rough proportion of the whole loss' to defendants' fraud."  *Id.* at 370 (quoting *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007)); *see also* Ex. 1, Jury Charge at 29 (requiring "enough evidence for [the jury] to make a reasonable estimate of damage").[2]  Dr. Nye's testimony easily satisfies that requirement.[3]

Dr. Nye explained in his two reports how he removed market, industry, and other factors unrelated to Vivendi's fraud in reaching his damages estimate.[4]  In his Rebuttal Report, Dr. Nye considered each of the so-called "confounding events" identified by Vivendi and explained why,

---

[1] *See* Defs.' Mot. to Exclude Expert Testimony of Dr. Blaine Nye at 14–18, attached as Ex. 9 to Decl. of Tamir M. Young in Supp. of Defs.' Mot. to Renew Prior *Daubert* and *In Limine* Mots., filed under seal in this case on October 5, 2011 ("Class *Daubert* Mot."); Class *Daubert* Order at 3; Reply in Supp. of Defs.' Mot. for J. as Matter of L. at 17–18 (Dkt. No. 1060) (6/9/10), *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571(RJH/HBP) (S.D.N.Y.).

[2] Defined terms have the meaning specified herein or in the supporting Declaration of Julie B. Rubenstein, Esq. ("Rubenstein Declaration").  Citations to "Ex." refer to the corresponding exhibits attached to the Rubenstein Declaration.

[3] The Court recently observed that the loss causation issues in Liberty's case "are different from those presented in the class action."  *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571 (SAS), 2012 WL 3264382, at *3 n.27 (S.D.N.Y. Aug. 10, 2012).  However, most of the challenges Vivendi now makes related to loss causation are identical to challenges it lost in the Class Action.  Liberty respectfully submits that those challenges should be rejected for the same reasons in this case as well.

[4] *See* Expert Report of Blaine F. Nye, Ph.D (Dec. 21, 2007) ("Nye Rep.") ¶¶ 254–63; Expert Rebuttal Report of Blaine F. Nye, Ph.D (May 15, 2008) ("Nye Reb. Rep.") at 87–218 (attached as Exhibits 2 and 3, respectively, to the Decl. of Bryan H. Parr in Supp. of Liberty's Opp'n to Defs.' Renewed Mot. to Exclude the Testimony of Dr. Blaine Nye, filed under seal in this case on November 4, 2011).  Liberty has not included these reports as exhibits due to their length, but would be pleased to provide courtesy copies if that would assist the Court.

in his opinion, they were either fraud-related or did not cause any of the decline in Vivendi's share price. Nye Reb. Rep. at 87–218.[5] The Court rightly accepted Dr. Nye's analysis and conclusion as sufficiently reliable under *Daubert*. *See* Defs.' Class *Daubert* Mot. at 14–18; Class *Daubert* Order at 3; Hr'g Tr. (3/13/12) at 7:18–8:12.

Vivendi's claim that Dr. Nye's trial testimony revealed that his disaggregation analysis was in fact unreliable and insufficient to support a finding for Liberty, Mot. at 8, is baseless. At trial, Dr. Nye testified, consistent with his reports, that he examined each of the 166 trading days between December 16, 2001, and August 14, 2002, to determine if there was a statistically significant decline in Vivendi's stock price after removing market and industry effects.[6] He then reviewed all available information in the marketplace—including 16,000 news releases and analyst reports—to determine which declines related to the liquidity risk Vivendi fraudulently concealed in 2001.[7] Based on that review, he eliminated 156 of the 166 trading days—several of which included significant Vivendi-specific declines—as showing no decline attributable to the fraud.[8] As to the remaining days, Dr. Nye concluded that the Vivendi-specific declines were fraud-related, and that other information in the marketplace—including the alleged "confounding events"—was either fraud-related or did not cause any of the residual decline in Vivendi's share price.[9] For example, Dr. Nye concluded that negative information about AOL that emerged on January 7, 2002 could not have caused any of Vivendi's price drop because AOL's own shares

---

[5] *See Drake v. Delta Air Lines, Inc.*, No. 94-CV-5944, 2005 WL 1743816, at *8 (E.D.N.Y. July 21, 2005) (noting that on a renewed *Daubert* motion, the Court is entitled to consult the same record that was available to it on the original motion).

[6] Trial Tr. (6/13/12) at 1878:11–19, 1890:16–1891:11; Trial Tr. (6/14/12) at 1911:4–23.

[7] Trial Tr. (6/13/12) at 1878:6–10.

[8] Trial Tr. (6/13/12) at 1878:6–10; Trial Tr. (6/14/12) at 1903:9–1904:23, 1911:5–1912:5; Trial (6/15/12) at 2122:10–20.

[9] Trial Tr. (6/15/12) at 2122:10–20; Trial Tr. (6/14/12) at 1936:4–23.

actually rose, indicating the market anticipated this bad news.[10]

Nor did Dr. Silber's testimony compel a verdict for Vivendi.  Dr. Silber, whose opinion
has now been rejected by a second jury, did not identify any new confounding events that Dr.
Nye failed to consider in his expert reports.  And, while Vivendi claims that Liberty "never
contested . . . that there was competing negative news that could have affected Vivendi's stock
price" on the nine drop days, Mot. at 7, in fact, Liberty cross-examined Dr. Silber about those
"confounding events," including those now identified in Vivendi's motion.  Based on that cross,
and other evidence Liberty introduced, the jury was entirely reasonable in rejecting Dr. Silber's
opinion concerning this "competing negative news."

- June 24, 2002: Dr. Silber identified two "confounding events": news that (1) the sale of Telepiu to News Corp. might be in jeopardy, and (2) British Telecom would not sell its interest in Cegetel to Vivendi.  But Dr. Silber admitted the Telepiu announcement did not cause a drop in Vivendi's stock price.  Trial Tr. (6/20/12) at 2772–74.  And Liberty presented evidence that the market perceived both events as liquidity-related, showing that Vivendi needed to sell assets and needed Cegetel for its high cash flows.  *Id.* at 2842–45; Ex. 2, LX-518; Ex. 3, LX-796; *see also* Nye Rep. ¶ 194; Nye Reb. Rep. ¶ 170–72; *Vivendi I*, 634 F. Supp. 2d at 372 (holding that Dr. Nye accounted for both events).

- July 2, 2002: Dr. Silber testified that Messier's request for additional severance was a confounding event, but Vivendi presented no evidence that Messier's request caused "uncertainty associated with Messier's resignation," much less any decline in the stock price. Ex. 4, Silber Slide 41; Trial Tr. (6/19/12) at 2573:11–2574:3.  Dr. Silber also admitted, on cross, that he did not know whether Messier's resignation was related to Vivendi's concealment of a liquidity crisis.  Trial Tr. (6/20/12) at 2791:14–19.  Further, Dr. Nye concluded that Messier's demands for severance of €12 million were not material to Vivendi.  Nye Reb. Rep. at 180.

- July 3, 2002:  Dr. Silber was cross-examined at length about his identification of "uncertainty" in the market as a confounding event.  Trial Tr. (6/20/2012) at 2797–2808. Liberty also presented evidence that the market was focused not on "uncertainty," but on Vivendi's downgrade to junk status, and that any "uncertainty" was related to liquidity concerns.  *Id.*; Ex. 5, LX-560; Ex. 6, LX-561; *see also* Nye Reb. Rep. at 176–77.

- August 14, 2002:  Dr. Silber testified that a News Corp. conference call identified "concerns" about buying Telepiu from Vivendi.  But the jury saw the call transcript, which described Vivendi and News Corp. as being in "friendly talks."  Trial Tr. (6/20/12)

---

[10] Trial Tr. (6/14/12) at 1921:1–17; Trial Tr. (6/15/12) at 2122:21–2123:13.

at 2820–23 (Silber cross); Ex. 7, LX-613.  Dr. Nye concluded that the call provided no new or significant information and was liquidity-related.  Nye Reb. Rep. at 202–04.[11]

2.      *The Jury Reasonably Accepted Dr. Nye's Reliable Opinions on Market Efficiency*

Next, Vivendi asserts that Dr. Nye's testimony is "fatally flawed" because he used a one-day event window, and "ignored" how Vivendi's stock price moved during the trading day and at market open.  Mot. at 9.  This argument is also recycled from Vivendi's unsuccessful *Daubert* challenge, *see* Defs.' Class *Daubert* Mot. at 14–18; Class *Daubert* Order at 3; Hr'g Tr. (3/13/12) at 7:18–8:12 (denying renewed *Daubert* motion), and is as unavailing now as it was then.  The notion that the market completely absorbs all news virtually instantaneously, including at market open, is far from "established."  Mot. at 9.  To the contrary, as Dr. Nye's Rebuttal Report explains, one-day event windows are *the norm* in both academic studies and securities litigation, Nye Reb. Rep. at 30–45, because they allow market participants to "reach an equilibrium on the day's news" rather than reflecting only the initial reaction of a few traders.  *Id.* at 37.  Tellingly, Vivendi fails to cite a single case in which a court has rejected as unreliable the one-day event window methodology.  Nor was the veracity of Dr. Silber's competing theory "established" at trial.  At best, the question of whether Dr. Silber's 15-minute theory could possibly be correct was an issue for the jury.  And the evidence easily supported a decision to reject that theory.

At trial, Dr. Nye explained that because markets are not efficient within a day, it is essential to consider more than the first trades in response to events—which could be diametrically opposed to the eventual market consensus.[12]  He also explained that it can be impossible to determine, years later, the exact moment that a portion of the market received the

---

[11] Vivendi cites two unrelated cases criticizing or rejecting Dr. Nye's opinion on disaggregation issues.  Mot. at 8 n.6.  The mere fact that his testimony on different facts was successfully challenged in two unrelated cases—out of the myriad cases in which he has testified over the past 30 years—says nothing about the reliability of his testimony here.

[12] Trial Tr. (6/14/12) at 1906:15–1909:9; Trial Tr. (6/15/12) at 2103:22–2104:23.

news—a point that further supports the use of a one-day window.[13]  Dr. Silber, for his part,

admitted on cross that for some of the short time windows he identified, he did not remember

whether he looked at market and industry effects, and, for others, he was unable to do so.  Trial

Tr. (6/19/12) at 2588:11–2589:15, 2608:14–2609:14.  Because the market and industry could

have been going up when bad news about Vivendi came out, Dr. Silber had no way of knowing

if there was a *Vivendi-specific* reaction when news hit the market.

Vivendi claims that Dr. Nye's opinion should be rejected because he "approvingly cited"

an article that contradicts his approach.  Mot. at 11 (relying on Ex. 3 to Vivendi's motion, which

is not in evidence).  In fact, Dr. Nye discussed the article only to explain why the study described

does *not* support Dr. Silber's theory, but instead shows that, while individual market participants

will often begin to trade on news immediately or at opening, the price will often continue to

move or reverse itself throughout the day as more thoughtful investors enter the market.  Trial

Tr. (6/14/12) at 1907:2–1909:9.  As for Dr. Nye's prior testimony that news will normally spark

*some* immediate trading, that does not "prove" that Dr. Silber's theory was correct.  Mot. at 9 &

n.7 (citing Trial Tr. (6/14/12) at 2078–81).  That initial market participants "react" quickly to

news (rightly or wrongly) does not mean that the news is fully incorporated into the stock price

instantaneously, as Vivendi apparently maintains.[14]  As Vivendi itself acknowledged at trial, it

was the jury's right to determine whether Dr. Nye's past statements contradicted his testimony.

*See* Trial Tr. (6/15/12) at 2131:2–7.  The jury could have easily found no contradiction at all.

In sum, the merits of Dr. Nye's and Dr. Silber's competing application of market

efficiency theories was not a threshold question of reliability, but an issue for the jury to decide.

---

[13] *See, e.g.*, Trial Tr. (6/15/12) at 2103:17–21; 2104:21–2105:1; *see also* Trial Tr. (6/14/12) at
1943:22–1945:8; 2059:19–2060:11; 2062:9–21; 2063:11–15.

[14] *See* Trial Tr. (6/14/12) at 2079:9–2080:16, 2081:13–25.

*Vivendi II*, 765 F. Supp. 2d at 560–61; Hr'g Tr. (3/13/12) at 7:18–8:12. And Vivendi has "failed to show that a rational jury could not accept Dr. Nye's analysis on the ground that Dr. Nye allegedly failed to examine intra-day price movement on the nine days he identified." *Vivendi II*, 765 F. Supp. 2d at 560–61.

> 3. *The Evidence Easily Showed that a Materialization of Vivendi's Concealed Liquidity Risk Caused the May 3, 2002 Share Price Drop*

Vivendi also claims, for the first time in the Liberty case, that Dr. Nye's testimony is unreliable because he failed to account for the portion of the May 3 decline that preceded the formal announcement of Moody's downgrade on that day. Mot. at 11–13. Vivendi has waived this reliability challenge by failing to raise it in either of its two prior *Daubert* motions in this case. *See Accentra Inc. v. Staples, Inc.*, No. CV 07-5862 ABC (RZ), 2011 WL 7563039, at *17 (C.D. Cal. Dec. 19, 2011) (denying 50(b) motion that couched a renewed *Daubert* challenge as a sufficiency challenge because defendant failed to raise these particular challenges to reliability at trial). Regardless, it is meritless.

Dr. Nye did not disregard the timing of the announcement relative to the stock price decline. To the contrary, he concluded, based on his expertise concerning markets and information flow, that news of the downgrade had entered the market before that announcement—either through a leak, or because the announcement in a Dow Jones news release at 5:12 Paris time was not the first the market learned of the downgrade. *See* Ex. 8, Nye Slides 34, 35, 37; Trial Tr. (6/14/12) at 2066:7–67:25; Nye Reb. Rep. at 107–10 (noting that a Moody's release could have preceded Dow Jones's coverage). As Dr. Nye testified, a downgrade of a major company "can get out very easily and be almost widespread before it's actually officially announced." Trial Tr. (6/15/12) at 2125:19–20.

A jury could reasonably conclude, based on that expert testimony (and its own common sense), that news of the downgrade made its way to the market before the Dow Jones announcement and that, therefore, the entire stock price decline on May 3 could be attributable to that downgrade. That conclusion is made all the more reasonable by Dr. Silber's inability to identify any other cause for the statistically significant share price drop on that day. Trial Tr. (6/19/12) at 2551:3–8; *see Vivendi II*, 765 F. Supp. 2d at 560–61 (holding Dr. Nye's testimony sufficient to allow jury to conclude that downgrade caused full price drop on May 3, especially given Dr. Silber's failure to point to any other cause).

The reliability of Dr. Nye's opinion was further corroborated by Vivendi e-mails showing that news of the impending downgrade may have leaked to part of the market as early as May 2, beginning to affect Vivendi's share price in a statistically significant way on May 3. Ex. 9, LX-412; Ex. 10, LX-413T; Nye Rep. ¶158 & Ex. 11C. The Court declined to admit these e-mails for their truth. Trial Tr. (6/14/12) at 1931:13–24. But the facts or documents underlying an expert opinion need not themselves "be admissible for the opinion to be admitted." Fed. R. Evid. 703. Vivendi fails to explain how the decision to exclude these emails could retroactively render Dr. Nye's May 3 opinion unreliable under *Daubert*. While not strictly necessary given the other evidence, these e-mails supported Dr. Nye's expert opinion (itself evidence) that the information had made its way to at least part of the market before the formal announcement.

> 4.      *Vivendi's Challenge to Dr. Nye's Maximum Inflation Date Fails*

Vivendi also challenges Dr. Nye's conclusion that the inflation of Vivendi's stock price reached its maximum on or before December 13, 2001. Mot. at 13–14. This conclusion was "not arbitrary," had a "reasonable basis in the record," and could "be adequately tested by cross-examination." Class *Daubert* Order at 4–5; *see Vivendi II*, 765 F. Supp. 2d at 561 (reaffirming

ruling); Hr'g Tr. (3/13/12) at 7:18–8:12 (denying renewed motion).[15]  In rejecting Vivendi's

*Daubert* challenge on this issue, the Court necessarily rejected Vivendi's claim, made in the

Class Action and renewed in this case, that "quantitative data," such as a quantitative risk

analysis, is required to identify a maximum-inflation date.  Defs.' Class *Daubert* Mot. at 13; *see*

Mot. at 14.  Vivendi does not address this prior ruling, much less explain why it was wrong.

Certainly nothing at trial undermined the reliability of Dr. Nye's maximum inflation

opinion.  He identified ample support for his conclusion that Vivendi's concealed liquidity risk,

and thus its stock-price inflation, peaked by December 13, putting all of the elements in place for

the materialization events that occurred in 2002.  This includes the testimony of Anne Brassens

and Jean-Charles Brisard, the Book of Warnings, Hannezo's December 13 letter to the rating

agencies pledging to sell shares and dispose of assets to avoid a downgrade, and Hannezo's later

memorandum describing his "painful and humiliating meetings with the rating agencies" at that

time as a "cannonball . . . a downgrade which would have led to a treasury crisis."  Ex. 8, Nye

Slides 10–11; Trial Tr. (6/13/12) at 1886:2–1888:15; *see also* Class *Daubert* Order at 4–5 (citing,

as a basis for Dr. Nye's maximum inflation opinion, evidence that Vivendi narrowly avoided a

credit downgrade by concealing critical liquidity-related information from rating agencies).  That

evidence clearly permitted the jury to accept Dr. Nye's maximum inflation opinion.

Regarding the period from December 13, 2001 to January 7, 2002, Mot. at 14, Dr. Nye

explained on cross-examination that nothing happened between these two dates to increase

Vivendi's inflation.  Trial Tr. (6/14/12) at 2022:22–2023:13.  Vivendi argued to the jury (as it

does in its motion) that Dr. Nye's conclusions must be incorrect, given the company's ongoing

misrepresentations to the public.  But Vivendi presented no evidence that would compel the jury

---

[15] *See also* Nye Rep. ¶ 265; Nye Reb. Rep. ¶¶ 101–02.

to find that inflation changed substantially (or at all) during this period.  Rather, a reasonable jury could easily agree with Dr. Nye that Vivendi's ongoing fraud simply maintained the existing inflation in its stock price by concealing the same liquidity risk as Vivendi's dozens of prior misrepresentations.  *See* Trial Tr. (6/14/12) at 2011:9–24.

Finally, Vivendi's failure to produce evidence of a substantial change in inflation from December 13 to January 7 belies its assertion that Dr. Nye's December 13 date of maximum inflation was "foundation[al]" to his overall damages calculation, Mot. at 14—yet another reason this argument provides no basis for disturbing the jury's damages award.

5. *Dr. Nye Correctly Calculated the Same Amount of Inflation as in the Class Action Based on an Identical Liquidity Risk*

Finally, Vivendi argues that Dr. Nye's testimony should be stricken because he "arrived at exactly the same per-share inflation number in this trial as the Class trial," even though the actionable misrepresentations differ for the two cases.  Mot. at 15.  As the Court explained the first time Vivendi made this argument, "all of the misrepresentations, both the proven ones and the alleged ones, relate to one single issue; that is, whether it is a truthful disclosure as to Vivendi's liquidity position.  And so it really doesn't matter whether there [are] 25 or 51.  It's all about the same subjects."  Hr'g Tr. (Mar. 13, 2012) at 7:18–8:12.  Indeed, Vivendi itself has agreed that all the statements concealed the same hidden liquidity risk.[16]  The fact that Vivendi concealed the same risk through a somewhat different list of actionable statements does not change either the risk or the damages that resulted when it materialized.  As Dr. Nye explained when cross-examined on this issue, "If you say that wall is brown 40 times, it's brown; if you say it 25 times, it's brown.  How many times you lie doesn't affect the lie."[17]

---

[16] *See* Ex. 11, Letter from Paul C. Saunders to Hon. Shira A. Scheindlin (May 24, 2012).

[17] Trial Tr. (6/14/12) at 2013:5–2014:5; *see also* Nye Reb. Rep. ¶¶ 102–03.

Nor was Dr. Nye required to "deduct" any minimal inflation that existed prior to January 1, 2001, which was maintained by Vivendi's statements throughout 2001.  Mot. at 16.  Because Vivendi's concealed liquidity risk was the same on December 16, 2001 for both Liberty and the Class, the inflation was also the same.  Trial Tr. (6/14/12) at 2015:24–2016:3.

### B.    Liberty's Evidence Satisfies the Requirements for Proving Loss Causation in a Section 10(b) Case

The Court properly instructed the jury that to prove loss causation, Liberty had to show that its losses were "caused by events that revealed information concerning Vivendi's true liquidity risk that previously had been concealed" by the fraud.  Ex. 1, Jury Charge at 27; *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).  As shown above, *supra* at 4–15, the evidence was more than sufficient for the jury to find that Liberty carried that burden.  Vivendi never objected to the Court's instruction on loss causation or claimed (until now) that Liberty had to make any further showing.  In this Motion, however, Vivendi claims for the first time that it is entitled to judgment as a matter of law because Liberty failed to prove that (1) "a reasonable investor misled by the fraud would have perceived the allegedly corrective events as 'remote or highly unlikely,'" and (2) "the allegedly corrective events related to the 'specific misrepresentations alleged.'"  Mot. at 18 (citations omitted).

This argument, which appears nowhere in Vivendi's Rule 50(a) motion, is clearly waived.  *See* Mem. of L. in Supp. of Defs.' Mot. for J. as a Matter of L. at 11–14 (Dkt. No. 252) ("Vivendi's Rule 50(a) Mot.") (with respect to loss causation arguing only that Liberty failed to (i) disaggregate unrelated events, and (ii) calculate inflation as to "each particular alleged misstatement or omission"); Fed. R. Civ. P. 50 Advisory Committee Note (2006) ("Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion."); *Holmes v. United States*, 85 F.3d 956, 963 (2d Cir. 1996)

15

(holding that defendant waived ground in Rule 50(b) motion not raised in Rule 50(a) motion).

It is also meritless.[18]  First, the Second Circuit made clear in *Lentell*, *supra*, and *Castellano v. Young & Rubicam*, 257 F.3d 171, 188–89 (2d Cir. 2001, that the proper inquiry is "whether one who believed in the fraud would perceive a *'zone o[f] risk'* to be highly unlikely, not whether a *specific event* within the zone of risk was unlikely." *Vivendi II*, 765 F. Supp. 2d at 556 (emphases added).  Even if Vivendi were correct that the focus is on the specific event, Liberty's evidence easily demonstrated one who believed Vivendi's fraud in 2001 would have perceived the materialization events that occurred in 2002 as highly unlikely.   The jury was instructed that, in 2001, Vivendi made dozens of false or misleading statements about its financial health and concealed its true liquidity condition from the public.  Ex. 13, Special Verdict Form at Table A; *see also* Trial Tr. (6/8/12) at 1385–92 (Dermer).   The jury also heard testimony that not even senior Vivendi employees and directors knew Vivendi's true liquidity condition in December 2001,[19] and that there was significant surprise in the market when the company's liquidity risk materialized in 2002.  *See, e.g.*, Trial Tr. (6/14/12) at 2067:2–17 (Nye). That evidence easily supported a finding that a reasonable shareholder misled by the fraud would have perceived as "highly unlikely" both Vivendi's true liquidity risk and the "events" that materialized as a result of that risk.  *Vivendi II*, 765 F. Supp. 2d at 556–57.

Second, Vivendi's assertion that a materialization of the risk must "'reveal some then-undisclosed fact with regard to the specific misrepresentations alleged,'" Mot. at 17, relies on a blatant misreading of *In re Omnicom Group Securities Litigation*, 597 F.3d 501 (2d Cir. 2010).

---

[18] Even if Vivendi's challenges to loss causation had merit (and they do not), they would affect the Section 10(b) verdict only, leaving the breach of warranty verdict untouched.  *See* Trial Tr. (6/19/12) at 2679:1–13 (recognizing that loss causation is not required to prove breach of warranty under New York law).

[19] *See* Trial Tr. (5/31/12) at 538:16–18 (Luczycki); Trial Tr. (6/1/12) at 604:21–605:11 (Trickett); Trial Tr. (6/5/12) 840:21–841:8 (Kravis).

*Omnicom* imposed the requirement Vivendi cites when a plaintiff is proceeding under a corrective-disclosure theory, 597 F.3d at 511—which makes sense since a corrective disclosure is, by definition, the revelation that a specific misrepresentation was false. *See Lentell*, 396 F.3d at 175 n.4. But *Omnicom* made unequivocally clear that, where a plaintiff proceeds under a materialization of the risk theory (as Liberty does here), it is sufficient for a plaintiff to prove that its "loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." 597 F.3d at 513. To be sure, the evidence must establish that the materialization event revealed some information concerning the risk that had been concealed by the defendant's fraud, *see Lentell*, 396 F.3d at 173; *see also* Ex. 1, Jury Charge at 27 (proposed by Vivendi), Ex. 12, Joint Proposed Final Jury Instructions—but the evidence need not show that the event revealed "new information about 'the specific misrepresentations alleged in the complaint,'" as Vivendi now claims. Mot. at 18 (citing portion of *Omnicom* that analyzes the plaintiff's corrective disclosure theory, 587 F.3d at 511). Imposing such a requirement would eviscerate the distinction the Second Circuit has recognized between these two separate theories for proving loss causation. *See Vivendi I*, 634 F. Supp. 2d at 367 (The way [Vivendi] describe[s] the law, only a corrective disclosure would prove loss causation"); *Vivendi II*, 765 F. Supp. 2d at 557–60 (rejecting Vivendi's reading of *Omnicom*).

In any event, when Vivendi turns to discussing Dr. Nye's materialization days, it abandons its erroneous claim that the materialization events must reveal information about the "specific misrepresentations alleged" and argues that the events did not reveal information about Vivendi's concealed liquidity risk at all. As shown below, there was ample evidence (largely ignored by Vivendi) to support a conclusion "that the events on the nine days identified by Dr. Nye . . . revealed new information about Vivendi's liquidity condition, that had been concealed

17

by Vivendi's fraud." *Vivendi II*, 765 F. Supp. 2d at 560; *see* Ex. 1, Jury Charge at 27.

**January 7, 2002**:  Vivendi claims that the January 7 treasury sale—which its own rating

agency liaison admitted was liquidity-related, Trial Tr. (6/12/12) at 1702:2–16 (Hebert)—

revealed "nothing new about Vivendi's allegedly undisclosed liquidity risk" because the market

was generally aware that Vivendi intended to reduce its debt through asset sales.  Mot. at 18–19.

> Vivendi seems to be arguing that if a company warns that it might sell assets at
> some point in the future, an investor can never thereafter be surprised by a
> particular asset sale, even if that sale occurs under suspicious circumstances—
> *i.e.*, suddenly, out-of-the-blue, and at prices below the asset's intrinsic or fair
> value.

*Vivendi II*, 765 F. Supp. 2d at 557.  That "cannot be correct."  *Id.*  There was no evidence that the

market knew Vivendi intended to sell 55 million treasury shares it had previously said it would

cancel.  *See* Trial Tr. (6/14/12) at 1918:13–21.  Dr. Nye testified that his analysis, which

included a review of more than 16,000 press releases and analyst reports, Trial Tr. (6/13/12) at

1878:6–10, showed the market viewed the sale as evidence that Vivendi needed cash.  Trial Tr.

(6/14/12) at 1916:12–14; 1918:5–1919:3; Trial Tr. (6/15/12) at 2126:16–21; *see also Vivendi II*,

765 F. Supp. 2d at 557 (finding Dr. Nye's testimony sufficient to support inference that sale

surprised investors).  Vivendi itself sought to convince the jury that the sale *fully* revealed the

*entire fraud*.[20]  It should not be heard to argue now that the sale conveyed no new information to

the market.

**May 3, 2002**:  Vivendi argues that Moody's May 3, 2002 downgrade provided no new

information because "the reasons for the Moody's downgrade were known to the market" before

the downgrade, and the downgrade was merely a "negative characterization of previously known

information" under *Omnicom*.  Mot. at 19.  Its argument is likewise belied by its repeated

---

[20] *See, e.g.*, Trial Tr. (6/14/12) at 1983:25–1986:21 (Nye cross); *see also* Trial Tr. (5/29/12) at
288:14–289:19 (Vivendi opening); Trial Tr. (6/7/12) at 1245:22–48:24 (Bennett cross).

attempts to convince the jury that this downgrade fully revealed the fraud.[21]

Vivendi primarily relies on Dr. Silber's view that, prior to May 3, newspaper articles and analyst reports had already revealed all of the liquidity-related information conveyed to the market by the downgrade itself. Mot. at 19. But the jury was not required to credit Vivendi's expert or his view of the evidence—especially because it also heard that rating agencies have access to nonpublic information, Trial Tr. (6/14/12) at 1927:14–21 (Nye); Trial Tr. 6/7/12) at 1354:22–1355:23 (Dermer), and that the purpose of a credit rating is to allow investors to determine the likelihood that the company will be able to repay its debt. Trial Tr. (6/14/12) at 1927:22–1928:4 (Nye). The jury could easily have concluded that the downgrade conveyed to the market new information about Vivendi's liquidity, beyond the information conveyed in newspaper articles and analyst reports and even beyond the reasons stated in Moody's press release. *See* Trial Tr. (6/21/12) at 2946:15–22 (Vivendi closing); Trial Tr. (6/12/12) at 1710:9–1711:14 (Deslondes). "Considering that credit ratings purport to assess the probability that a company will default on its obligations, there is little question that a downgrade is a sign of deteriorating liquidity." *Vivendi I*, 634 F. Supp. 2d at 367.

The jury was also entitled to consider Dr. Silber's inability to explain why, if the Moody's downgrade revealed no new information, there was a €1.50 Vivendi-specific share price drop on May 3. *See supra* at 12. Finally, equivocal testimony from two fact witnesses that the May 3 downgrade did not signal Vivendi's liquidity problems to *them* is at most conflicting evidence that the jury was entitled to reject. Mot. at 19–20 (citing Kravis and Malone).

**June 21 & 24, 2002**:  Vivendi claims that news on June 21 and June 24, 2002 about its use of a share repurchase agreement ("repo") in connection with its sale of shares of Vivendi

---

[21] *See, e.g.*, Trial Tr. (6/14/12) at 1983:25–1986:5 (Nye cross); Trial Tr. (5/29/12) 270:12–25 (Vivendi opening); Trial Tr. (6/8/12) 1489:14–1490:12 (Dermer cross).

Environnement ("VE") did not reveal any new information because the market knew prior to June 21 that Vivendi intended to sell a substantial portion of VE.  Mot. at 20.  But Dr. Nye testified that the market was spooked not by the sale itself but by its rapid *timing*, and especially by Vivendi's use of the repo to "pawn" those same shares, which signaled that Vivendi's cash needs were so extreme that it could not wait the two weeks until the sale was finalized to receive the sale proceeds.  Trial Tr. (6/14/12) at 1937:4–1939:12; Ex. 8, Nye Slides 39–54.  Multiple newspaper articles reported the market's concern that the repo signaled a short-term cash crunch at Vivendi.[22]  This evidence was more than sufficient to permit the jury to find that the events of June 21–24 revealed new information about Vivendi's liquidity condition to the market.

**July 2 & 3, 2002**:  Vivendi claims that the July 2 downgrade of its stock to "junk" status did not reveal new information about its concealed liquidity condition because the reasons listed in the Moody's press release were either known or unrelated to liquidity.  Mot. at 20–21.  Again, the mere fact that the market knew something about Vivendi's debt levels does not mean that a downgrade could not reflect new information about its concealed liquidity condition.  *See supra* at 19–20.  Liberty introduced evidence that these downgrades did reflect non-public information, including the rating agencies' discovery that Vivendi's loan from Cegetel was repayable on demand by Vivendi's minority shareholders, who had called in the loan.[23]  The agencies successively downgraded Vivendi's rating throughout 2002 as they slowly received new information from Vivendi about the extent of its true liquidity condition.[24]  Evidence confirmed

---

[22] *See, e.g.*, Ex. 14, LX-505 (Dow Jones article noting concern that Vivendi had a "significant need for cash in the short term"); Ex. 15, LX-531 (WSJ article describing concern about Vivendi's liquidity after "a complex series of transactions aimed at raising cash quickly.").

[23] Trial Tr. (6/14/12) at 1958–59 (Nye); Trial Tr. (6/12/12) at 1715:10–1718:6 (Deslondes).

[24] *See* Trial Tr. (6/12/12) at 1711:23–1714:2; Trial Tr. (6/13/12) at 1726:18–1727:24 (Deslondes); Trial Tr. (6/12/12) at 1694:18–1695:4, 1695:18–1699:3 (Hebert).

the market's surprise at the downgrades, which reflected S&P's "strong concerns" about

Vivendi's "near-term financial liquidity," including "new liabilities [that S&P] was not aware of

four weeks ago."  Ex. 16, LX-554; Ex. 17, LX-569.

Liberty also introduced evidence that information continued to enter the market and

affect Vivendi's share price on July 3.  UBS Warburg, for instance, wrote on July 3 that an S&P

conference call late the previous day revealed "significant new information" that "differs from

the guidance provided by the company last week." Ex. 6, LX-561; *see also* Ex. 18, LX-565

(reflecting analyst comments that Vivendi "doesn't have the means to cover debt repayments").

Contrary to Vivendi's suggestion, *Omnicom*, in which a director resigned months after the

alleged fraud was discussed in the press, does not suggest that information cannot be released,

discussed, and internalized into the market price over a two-day period.  *See* 597 F.3d at 511–12.

Finally, the jury could have reasonably concluded that the agencies' other concerns, such

as those about Vivendi's inability to articulate a workable strategy, were either related to the

fraud or unimportant.  The context in which these concerns were voiced—in the midst of a

ratings downgrade—as well as the testimony of both Hebert and Deslondes that the downgrades

were related to liquidity,[25] gave the jury a sufficient basis to conclude that Vivendi's most

important strategic need was to survive its liquidity crisis.  *See infra* at 23–25.

**July 10, 2002**:  On July 10, 2002, Vivendi's stock price fell 7.5% after French COB

regulators "began an investigation of the company's financial reports and Standard & Poor's

Corp. said it may lower Vivendi's credit rating by 'several notches.'"  Ex. 19, LX-581; Trial Tr.

(6/14/12) at 1966–67 (Nye).  Vivendi asserts that the COB investigation into its financial reports

was unrelated to liquidity, Mot. at 21, but Liberty introduced extensive evidence from which the

---

[25] *See* Trial Tr. (6/12/12) at 1694:6–1697:2 (Hebert); *id.* at 1712:6–1715:9 (Deslondes).

jury could conclude that the investigation partially revealed to the market that Vivendi had been concealing its true liquidity condition through improper accounting.  For example, several witnesses testified that Vivendi concealed its true liquidity condition throughout 2001 by using misleading accounting practices.[26]  Press reports on July 10 revealed that Vivendi was being probed to ensure that its financial statements dating from the beginning of 2001 "abide[d] by [COB] rules" and specifically linked the investigation to liquidity by stating that the COB wanted to help "calm French investors" after Fourtou surprised markets by announcing the company faced a "liquidity crisis."  Ex. 19, LX-581.  Thus, the jury could reasonably have concluded that reports of the investigation conveyed new information about Vivendi's true liquidity risk in 2001 by revealing that Vivendi's financial statements in 2001 might have overstated Vivendi's ability to cover its debt.

The S&P announcement was also "new news" about Vivendi's liquidity condition.  Even though Vivendi had just announced a new €1 billion credit line, S&P warned that Vivendi's rating could nonetheless drop several notches absent further improvement in its liquidity situation.  Ex. 20, LX-578; Ex. 19, LX-581.  The jury could have easily viewed this fact as revealing new information about the disturbing extent of Vivendi's liquidity risk.

**July 15, 2002**:  After the market close on July 14, 2002, Dow Jones reported that Edgar Bronfman, Jr., a Vivendi board member, was pressing Vivendi to sell "within a month" Canal Plus, a Vivendi asset that had been a core part of Vivendi's goal to become a media and entertainment giant.  Ex. 21, DX-765.  That announcement clearly conveyed new information

---

[26] *See, e.g.*, Trial Tr. (6/4/12) at 717:13–718:5, 729:24–734:24, 750:7–751:4, 752:7–753:20 (Mintzer testifying regarding improper accounting practices at Vivendi); Trial Tr. (5/30/12) at 394–413 (Luczycki testifying regarding "stretch" goals for EBITDA); *see also* Trial Tr. (6/13/12) at 1884:7–16 (Nye testifying that EBITDA is related to liquidity because it represents the inflows with which a company anticipates it will be able to service its debt).

about Vivendi's concealed liquidity condition, as the jury could have reasonably concluded that a board member's demand for a fire sale of a core Vivendi asset indicated that Vivendi's liquidity needs were more serious than previously known.

The market also learned on this date that Vivendi had used an improper "mask" to take effective control of a Polish telecommunications company, Telco.  Ex. 22, LX-590; Ex. 8, Nye Slide 71; Trial Tr. (6/14/12) at 1967:20–1971:14 (Nye).  The jury, which had heard testimony that Vivendi used improper accounting to avoid consolidating Telco's debt, Trial Tr. (6/4/12) at 741:7–24; 752:13–752:24 (Mintzer), could reasonably conclude that the Telco report revealed that Vivendi's liquidity condition was worse than thought.

**August 14, 2002**:  On August 14, 2002, Vivendi shares lost approximately 25% of their value after: (1) S&P further downgraded Vivendi to "junk" status; (2) Vivendi's new management admitted that there was a "liquidity problem," that Vivendi had "excess debt" of €10 billion beyond what it needed to maintain a BBB credit rating, and that Vivendi needed to sell assets totaling that amount over the next two years; (3) Vivendi failed to offer any strategy to fix its liquidity problems; and (4) Vivendi admitted that its use of EBITDA could be misleading. Ex. 8, Nye Slide 75–85; Trial Tr. (6/14/12) at 1971:19–1978:7.  Although Vivendi's own expert testified that much of the share price drop on August 14 could be fraud-related, *see* Trial Tr. (6/20/12) at 2823:9–2824:24 (Silber), Vivendi now contends that "most" of the information revealed to the market either related to its failure to articulate a strategy unrelated to liquidity or merely recharacterized previous disclosures.  Mot. at 22–23.

Vivendi relies on Dr. Silber's testimony that new management's failure to articulate a strategy in 2002 did not reveal Vivendi's concealed liquidity condition, citing a clause from a Deutsche Bank analyst report.  *See* Ex. 4, Silber Slide 46.  But Liberty showed on cross that the

full sentence quoted by Dr. Silber actually linked Vivendi's failure to articulate a strategy to the liquidity crisis. *See* Trial Tr. (6/19/12) at 2590:16–2591:20; Ex. 23, LX-607 ("We feel it is impossible to present a Buy recommendation on a stock which is *capable of being declared insolvent* within two months and for which we have no clarity on the prospective group structure & strategy.") (emphasis added). Dr. Nye testified that "strategy" referred to a strategy to fix Vivendi's liquidity problems.[27] A reasonable jury could infer that the comment in this report was "directly related to the liquidity concerns and how management would address the problem." *Vivendi I*, 634 F. Supp. 2d at 372.[28]

Vivendi's contention that S&P's downgrade merely recharacterized previously disclosed information ignores that each downgrade revealed more information about the extent of Vivendi's liquidity problems to the market as the ratings agencies themselves slowly received more complete information about Vivendi's liquidity condition. Finally, Vivendi effectively admits that the statements of Vivendi's new management on August 14, 2002 could be liquidity-related, but insists that Dr. Nye did not disaggregate unrelated information. Mot. at 23. But as Dr. Nye explained, there was simply no unrelated information to disaggregate. *See supra* at 5–9.

---

[27] Trial Tr. (6/14/12) at 1977:20–1978:3; Ex. 8, Nye Slide 85.

[28] Vivendi attempted to impeach Dr. Nye with deposition testimony supposedly establishing that he did not view Vivendi's lack of strategy as a corrective disclosure. *See* Trial Tr. (6/15/12) at 2112–2119. Dr. Nye was "baffled" by this testimony because Vivendi read his deposition testimony out of context. At his deposition, he explained that management's lack of strategy was a revelation about the hidden liquidity risk, *id.* at 2117:7–13, but not about new management's performance (which Vivendi had argued was a confounding event). *Id.* at 2117:14–25.

Vivendi also attempts to discredit Dr Nye because he stated (while reading his prior testimony), "I don't know what a corrective disclosure is." But as he made clear immediately afterwards, he was trying to determine whether a distinction was being made between a corrective disclosure and a revelation of the concealed liquidity risk. *Id.* at 2114:14–20. At any rate, he testified that new management's inability to articulate a strategy to solve its liquidity problems was a corrective disclosure. *Id.* at 2112:9–15. Any inconsistency with his past testimony was a question for the jury, as Vivendi later conceded. *Id.* at 2131:2–7.

**C.      The Jury's Damage Award Is Amply Supported by the Evidence**

Vivendi's request that the Court disregard the jury's damages finding because it does not precisely track either Dr. Nye's or Dr. Silber's calculation, Mot. at 24, should be rejected.  For one thing, that sufficiency of the evidence challenge is waived.  Vivendi never previously contended that the jury must accept Dr. Nye's or Dr. Silber's damages calculation analyses wholesale or that any deviation from Dr. Nye's damages calculation must correspond to particular "price drops [he] attributes to corrective disclosures."  *Id.*  Had it done so, and had the Court accepted that (erroneous) argument, the jury could have been instructed accordingly. Vivendi's decision to withhold this argument until after an unfavorable verdict is reason enough to reject it.  *See Vivendi II*, 765 F. Supp. 2d at 575 (noting that Vivendi may have waived *this same argument* by failing to request a jury instruction during the Class Trial).

In any event, Vivendi's request is baseless.  "[I]t is well-established that the computation of damages is a quintessential fact issue for the jury, and that a jury need not accept an expert's damages calculations wholesale."  *Id.* (citations omitted).  Consistent with that principle, the Second Circuit has held that a court should not overturn an award that "arguably shows discrimination in accepting some or parts of the damage claims and rejecting others." *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 335 (2d Cir. 1993); *see also First Nat'l Bank of Kenosha v. United States*, 763 F.2d 891, 896 (7th Cir. 1985) (upholding verdict "within the range of evidence presented" where the "jury was presented . . . with widely divergent opinions" on damages, "apparently did not accept whole-cloth the view of either of the experts, and arrived at its figure independently").  That principle requires that the jury's damage award in this case be respected.  *See Vivendi II*, 765 F. Supp. 2d at 575–77 (rejecting on the merits Vivendi's claim that the jury "had to accept Dr. Nye or Dr. Silber's analysis wholesale if it determined that damages were warranted").

The jury heard hours of testimony by Dr. Nye explaining how he calculated the inflation created and maintained by Vivendi's fraud and, in the end, rendered an award substantially similar to his calculation.  It is true that the difference between Dr. Nye's calculation and the jury's estimate "does not correspond to any of the price drops that Dr. Nye attributes to [materialization events]," but that does not mean "the jury's award is without adequate evidentiary support."  Mot. at 24.  The jury may have decided—based on evidence and argument from *Vivendi* itself—that the price drops identified by Dr. Nye were caused in some small part by other factors, and reduced its damages accordingly.  As Dr. Silber repeatedly stressed, it was the jury's role to determine what effect (if any) various factors had on Vivendi's share price.[29]

As for Vivendi's claim that a new trial or remittitur is required because the verdict was excessive, Mot. at 25, Vivendi fails to acknowledge the standard for excessiveness under federal law—that "the award is so high as to shock the judicial conscience and constitute a denial of justice."  *O'Neill v. Krzeminski*, 839 F.2d 9, 13 (2d Cir. 1988) (quoting *Zarcone v. Perry*, 572 F.2d 52, 56 (2d Cir. 1978)).  Vivendi cannot come close to meeting that standard, given that the damages award fell (i) below the total calculated by Dr. Nye, a qualified damages expert, and (ii) well below the uncontested €1.56 billion decline in the value of Liberty's shares in Vivendi from December 16, 2001 to August 14, 2002.

---

[29] *See, e.g.*, Trial Tr. (6/19/12) at 2594:19–24; 2575:11–18, 2582:22–2583:2, 2587:2–7; Trial Tr. (6/20/12) at 2792:15–19, 2824:20–24, 2845:8–15, 2846:6–11.  The jury found damages of €765 million, €76.94 million less than Dr. Nye's calculation, and €150.59 million less than it could have awarded if it accepted both Dr. Nye's calculation and Dr. Silber's testimony that, contrary to Dr. Nye's conclusion, events on June 26, 2002 did not reduce actionable inflation by €1.97 per share.  Trial Tr. (6/19/12) at 2565:17–2566:15; Nye Slide 86.  The jury's decision to award €150.59 million less than it could have under the evidence presented (corresponding to €4.27 in inflation), might well represent the jury's rejection of one or more of the materialization days, in whole or in part.  *See* Nye Slides 86–87.  While Vivendi's remittitur claim is meritless, any remittitur would need to take that possibility into account.  *See Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328–30 (2d Cir. 1990); *Trademark Research Corp.*, 995 F.2d at 337.

The same shocks-the-conscience standard applies, and is also not met, for Liberty's breach of warranty claim.  Vivendi asks the Court to apply the standard in N.Y. C.P.L.R. § 5501(c), which provides that a court "shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation."  That standard, however, applies only in actions "in which an itemized verdict is required" by N.Y. C.P.L.R. § 4111.  N.Y. C.P.L.R. § 5501(c) (2012).  Section 4111, in turn, requires an itemized verdict only in "medical, dental, or podiatric malpractice actions," *id.* § 4111(d), or actions "brought to recover damages for personal injury, injury to property or wrongful death."  *Id.* § 4111(e).  By its terms, Section 5501(c) has no bearing on the excessiveness determination in the breach of warranty context. *See* David D. Siegel, *Practice Commentaries*, McKinney's Consol. Laws of N.Y., Book 7B, CPLR C5501:10 ("The reference to cases in which an itemized verdict is required by CPLR 4111 appears to restrict the operation of this 5501(c) amendment to the tort case . . . ."); David D. Siegel, N.Y. Practice § 407 (5th ed. 2012) (stating that New York's common-law "shocks the conscience" standard was relaxed only for the tort actions listed in CPLR § 4111).  In short, Vivendi is wrong that New York's "material deviation" standard has any relevance here—much less that it requires overturning a damages award supported by the evidence, based on another award that did not even involve a breach of warranty.

## II.     THE JURY'S JUSTIFIABLE RELIANCE FINDING WAS REASONABLE

Vivendi concedes that Liberty presented sufficient evidence to establish reliance for its breach of warranty claim, but insists that the evidence is inadequate to establish reliance under Section 10(b).  Mot. at 26–29.  As the Court has already recognized, Section 10(b) does not require a corporate plaintiff to show that the same employee who made the security purchase decision also personally reviewed the issuer's fraudulent statements.  *See* Trial Tr. (6/19/12) at 2674:8–2678:6.  Such a requirement would contravene the law of agency and the way

27

corporations necessarily function.  *See generally In re Parmalat Sec. Litig.*, 684 F. Supp. 2d 453, 471 (S.D.N.Y. 2010) (explaining that because "[c]orporations act only through their agents," "[a]cts performed and knowledge acquired by a corporate agent within the scope of his or her employment are imputed to the corporation" (citation omitted)); Ex. 1, Jury Charge at 17. Vivendi does not, and cannot, cite any authority to the contrary.  Accordingly, the fact that Dermer lacked decision-making authority for the Vivendi stock purchase does not mean his review of Vivendi's statements is irrelevant to establishing Liberty's reliance.

Also baseless is Vivendi's assertion that Liberty has not established reliance because its purchase decision was based only on Dermer's "general investment advice" and not his "review and analysis of the specific misstatements or omissions at issue."  Mot. at 28.  As an initial matter, the Court has already rejected the notion that reliance can only be established by evidence that Dermer communicated the specific contents of Vivendi's statements to his superiors,[30] and Vivendi provides no authority that contradicts that conclusion.  *Zaro v. Mason*, 658 F. Supp. 222 (S.D.N.Y. 1987), the only case Vivendi does cite for this reliance argument, is wholly inapposite.  It involved individual (not corporate) plaintiffs who invested based on general advice given by third parties who were not the plaintiffs' agents, and who in fact may have been acting as the *defendants'* agents.  *Id*. at 228–29.  Further, nothing in *Zaro* suggests that the plaintiffs knew that the third parties had reviewed the false statements or believed that the general advice they received was based on these statements.  *Id*.

This case bears zero resemblance to *Zaro*.  Here, the evidence showed that (1) Dermer

---

[30] *See* Trial Tr. (6/19/12) at 2677:25–2678:6 ("If [Bennett] says, I rely on Dermer, that is enough for a jury to infer he relies on Dermer's summary of the material."); *see also id.* at 2677:11–13 ("All [Bennett] has to say is he relied on the information that Dermer imparted.").

reviewed Vivendi's statements in his capacity as an employee of Liberty;[31] (2) Dermer

undertook his review after being charged by Bennett with performing the due diligence and

formulating a recommendation on a Vivendi investment;[32] (3) Bennett as well as Malone

understood and expected that, in formulating his recommendation, Dermer would review public

information about Vivendi, including the company's SEC filings and press releases;[33] (4)

Dermer's review of these statements did, in fact, affect his recommendation that Vivendi's stock

was fairly valued;[34] and (5) Bennett and Malone relied on that recommendation when they

decide to purchase Vivendi's securities.[35]

      The evidence also shows that Dermer incorporated specific information he learned

through his review of Vivendi's statements when presenting his conclusions and

recommendation to his superiors.  For example, contrary to Vivendi's assertion, Mot. at 28, his

---

[31] *See, e.g.*, Trial Tr. (6/8/12) at 1380–1393.  The Court has already ruled that Dermer's testimony supported a finding or inference that he reviewed each of Vivendi's false or misleading statements.  *See* Trial Tr. (6/19/12) at 2662:23–2674:6.  Further, because the verdict form only required the jury to find that Liberty "justifiably relied on *any* of the statements set forth in Table A when it signed the Merger Agreement," Ex. 13, Special Verdict Form at 6, Question No. 8 (emphasis added), the verdict is supportable even if Vivendi were correct that the evidence did not establish Dermer's review of two of the 25 statements.  Mot. at 28 n.12.

[32] *See, e.g.*, Trial Tr. (6/7/12) at 1358:19–1359:3 (Dermer).

[33] *See id.*; *see also* Trial Tr. (6/6/12) at 1006:17–18 (Malone stating that Liberty was "relying on . . . the public filings of" Vivendi).

[34] Trial Tr. (6/8/12) at 1384:2–1385:8 (Dermer).  For example, Dermer testified that, based in part on his review of Vivendi's statements, he "felt comfortable giving [Bennett] the recommendation that it appeared safe or OK to accept [Vivendi's] stock as consideration in the transaction."  *Id.* at 1394:1–3.  These statements also affected his recommendation by causing him to conclude that Vivendi could handle its debt due to its net-debt-to-EBITDA ratio and its credit rating, both of which were artificially inflated by Vivendi's fraud.  *See* Trial Tr. (6/7/12) at 1365:10–1366:9 (Dermer).

[35] *See* Trial Tr. (6/7/12) at 1172:4–22 (Bennett) (testifying that he was relying on Vivendi's public filings and statements through Dermer's review and analysis of these statements in determining the "health and the status of [Vivendi] and the fair value of its shares"); Trial Tr. (6/6/12) at 1005:1–2, 1005:22–1006:6 (Malone).

"Sum of the Parts Analysis," Ex. 24, LX-295, did reflect information obtained from Vivendi's

SEC filings; the document itself shows that Dermer's calculation of Vivendi's "Debt, net @

6/30/01" was taken directly from Vivendi's October 17, 2001 Form 6-K filing, one of Vivendi's

false or misleading statements.[36]  Beyond reviewing the "Sum of the Parts," Bennett received

regular reports from Dermer in which he shared his analysis of Vivendi's SEC filings and press

releases.  *See* Trial Tr. (6/6/12) at 1115:16–21 (Bennett).

Finally, Vivendi's reliance argument disregards the application of *Affiliated Ute Citizens

of Utah v. United States*, 406 U.S. 128 (1972), to this case.  As the Court instructed the jury, in

the case of a material omission, reliance is presumed, and the defendant can only rebut that

presumption by proving that the plaintiff would have purchased the security even if the material

facts had been disclosed.  Ex. 1, Jury Charge at 25; *see id.* at 23 (instructing that all the false or

misleading statements were material).  The jury could have accepted Vivendi's insistence that its

false or misleading statements were only omissions because they failed to "fully disclose a

liquidity risk that [Vivendi] had in 2001."[37]  It could have further concluded that Liberty would

not have purchased Vivendi's shares had Vivendi disclosed a massive liquidity risk.[38]  The

evidence certainly does not compel a contrary conclusion—that Liberty would have gone

forward with the purchase had it known the truth—which is what Vivendi would have to prove

---

[36] *See* Trial Tr. (6/7/12) at 1363:14–17 (Dermer); Trial Tr. (6/8/12) at 1384:2–1385:8, 1394:4–7 (Dermer); Ex. 25, LX-174 at LM 019685; Ex. 24, LX-295 at LM024744.

[37] Trial Tr. (5/29/12) at 264:3–9, 297:5–7 (Vivendi opening); *see also* Hr'g Tr. (5/22/12) at 549:22–550:6 (statement of Mr. Saunders); Trial Tr. (6/21/12) at 3009:18–3010:4 (Liberty's closing argument recognizing that many of these statements were omissions that failed to disclose Vivendi's true liquidity risk).

[38] *See, e.g.*, Trial Tr. (6/12/12) at 1566:12–19 (Tanabe).

30

to defeat the reliance presumption under *Affiliated Ute.*[39]

## III.   VIVENDI'S BELATED MOTION FOR JUDGMENT AS A MATTER OF LAW ON ITS CLOSING-CONDITIONS DEFENSE SHOULD BE DENIED

As part of its deliberations on Liberty's Section 10(b) claim, the jury was asked to answer whether Vivendi had "proven . . . that Liberty was not legally obligated to close the transaction embodied in the Merger Agreement."  Ex. 13, Special Verdict Form at 6, Question 10.  In its motion, Vivendi contends that the only reasonable answer to that question was "yes" because the evidence "indisputably showed that Vivendi had not met . . . two closing conditions as of May 7, 2002, the date on which Liberty decided to close."  Mot. at 30.  Because Vivendi failed to seek judgment as a matter of law on this defense until now, this claim is waived.  *See supra* at 16.  Had Vivendi moved for this relief prior to the jury's deliberations, and had the Court granted it, the Court could have removed this issue from the verdict form, and Vivendi would have avoided the unfair prejudice it now claims to have suffered.  *See* Mot. at 33–34.[40]  The Court should not permit Vivendi to invoke this belated argument now in an attempt to undo the verdict.[41]

In any event, Vivendi's argument is meritless.  First, the evidence did not compel a conclusion that Vivendi failed to fulfill its obligation to obtain Lagardère's waiver for the

---

[39] Vivendi also contends that Dermer's review of Vivendi's Form 6-Ks cannot establish reliance because they fall outside the scope of Section 3.11.  But, as the Court recognized, the term "filed" in Section 3.11 is ambiguous.  *See* Hr'g Tr. (5/22/12) at 475:19–25, 478:12–14.  And Liberty presented a wealth of evidence that this section was meant to encompass 6-Ks, *see, e.g.*, Trial Tr. (6/12/12) at 1555:14–21 (Tanabe), including evidence that Vivendi employees consistently used the term "filed" to describe submitting 6-Ks to the SEC.  *See, e.g.*, Trial Tr. (6/1/12) at 568:23–569:8 (Trickett).

[40] Vivendi did not object at trial to the verdict form's conditioning the jury's consideration of Question No. 11 (the effect of post-signing evidence on Liberty's continued reliance) on an affirmative answer to Question No. 10 (Liberty's obligation to close), nor does it complain of such conditioning now.

[41] *Cf. Bloom v. ProMaxima Mfg. Ltd.*, No. 05-CV-6735-CJS, 2010 WL 1533389, at *3 (W.D.N.Y. Apr. 15, 2010) ("Had [the waived issue] been raised [prior to the jury's dismissal], or prior to the Court's charge to the jury, the Court could have addressed it.").

multiThématiques portion of the transaction (the "MTH condition") by May 7, 2002.  To the contrary, the evidence showed that, on March 19, 2002, Vivendi forwarded Liberty a March 8 letter from Lagardère that, according to Vivendi, "confirm[ed] that Lagardere Active Broadcast will not exercise its right of first refusal under the multiThematiques Cooperation Agreement." Ex. 26, LX-368.  The evidence also showed that, on April 2, Vivendi forwarded Liberty a March 12 letter from Messier to Lagardère "confirming [Lagardère's] waiver of the [Right of First Refusal]."  Ex. 27, LX-376.  Vivendi's position at the time, as opposed to now, was that Lagardère's "original [March 8] letter combined with the fact of Lagardère's cooperation to date in the various EU filings . . . and the absence of a response from them to this letter to date, together satisfy the requirements of obtaining the necessary waivers to permit the [MTH] transfer to proceed."  *Id.*  Vivendi also provided, at closing, an "Officer's Certificate" warranting it had "performed or complied in all respects with" the MTH condition.  Ex. 28, LX-446, at 1, ¶ 4.[42]

Finally, the jury also heard evidence that (as far as Liberty knew) Lagardère never challenged the MTH portion of the transaction or disputed that his initial letter waived his right of first refusal.[43]  Given all this, a reasonable jury could have easily rejected Vivendi's claim—made for the first time in this litigation—that the MTH condition was not satisfied at the time of closing.

It is true that prior to closing Liberty questioned whether the MTH condition was satisfied.  That evidence did not, however, compel a conclusion in Vivendi's favor on this issue—especially since the evidence also showed that, notwithstanding Liberty's eagerness to

---

[42] While Bushnell testified in this trial that he did not believe the MTH condition was satisfied, that testimony was directly contrary to Vivendi's position in 2002, which Bushnell never disputed or questioned at the time.  *See* Trial Tr. (6/15/12) at 2256:21–25, 2260:23–2261:12.

[43] *See* Trial Tr. (6/8/12) at 1529:4–16 (Tanabe).

find an "out,"[44] it ultimately concluded that Lagardère's letter was sufficient and that it could not avoid closing by claiming a failure of the MTH condition.[45]  Moreover, while Vivendi cites the May 7 indemnification agreement as evidence that the MTH condition was not satisfied by that date, Mot. at 32, in fact that agreement specifically states that Vivendi agreed to indemnify Liberty "[i]n order to provide additional assurance to Liberty regarding Vivendi's full and complete performance of the Vivendi MTH Covenants and *its satisfaction of the related condition to Closing under the Merger Agreement*."  Ex. 29, LX-444, at 2 ¶ F (emphasis added). Moreover, as the Court has already recognized, once Vivendi signed the indemnification agreement, the MTH condition was indisputably satisfied.  *See* Hr'g Tr. (5/22/12) at 562:12–18.

Second, Vivendi's failure to register its shares with the SEC (the "registration condition") by May 7 in no way precluded the jury from answering "no" to Question 10.  It is undisputed that Liberty was legally obligated to close as long as the registration condition was satisfied by September 30, 2002.  *See* Trial Tr. (6/8/12) at 1534:18–20 (Tanabe); Trial Tr. (6/15/12) at 2252:14–20 (Bushnell).  It is also undisputed that the registration was obtained on June 3, 2002. *See* Ex. 30, LX-474.  Citing that fact, Liberty submitted evidence at various times during the trial that Liberty was obligated to close the transaction, at the latest, by June 5 or 6[46]—a fact that Bushnell conceded.[47]  The jury could have reasonably answered "no" to Question 10 based on a finding that the registration condition was satisfied long before it would have provided a basis for Liberty to walk away from the transaction.

Contrary to what Vivendi suggests, Question 10 contains no May 7 date restriction.  Mot.

---

[44] *See, e.g.*, Trial Tr. (6/6/12) at 1138:9–1139:20 (Bennett).

[45] *See, e.g.*, Trial Tr. (6/8/12) at 1529:17–25 (Tanabe); Trial Tr. (6/12/12) at 1651:14–22, 1670:12–16 (Tanabe); Trial Tr. (6/6/12) at 1145:2–23 (Bennett).

[46] *See* Trial Tr. (6/8/12) at 1537:9–1538:3 (Tanabe); Trial Tr. (6/12/12) at 1677:17–22 (Tanabe).

[47] *See* Trial Tr. (6/15/12) at 2262:10–23 (Bushnell).

at 30.  Nor did Vivendi request one.  Instead, Vivendi let the verdict form go to the jury without any date restriction.  This allowed the jury to consider whether a legal obligation to close arose after May 7, and to reasonably conclude, based on the evidence, that it had.  Having declined to object to the Court's proposed formulation of Question 10—indeed successfully advocating this formulation over Liberty's objection, Trial Tr. (6/19/12) at 2733:20–2734:4—Vivendi cannot use the jury's answer to that question (interpreted as Vivendi now says it should have been asked) as a basis for undoing the verdict.  *See generally Jarvis v. Ford Motor Co.*, 283 F.3d 33, 57 (2d Cir. 2002) ("emphasiz[ing] that 'failure to object to a jury instruction or the form of an interrogatory prior to the jury retiring results in a waiver of that objection'").

Even if Question 10 could be read to contain an implicit date restriction, both the Court and Vivendi recognized that the question was properly understood in light of the Court's instructions: "If you find that, after signing the Merger Agreement on December 16, 2001 but prior to closing on the Agreement on May 7, 2002, . . . Liberty *could have walked away* from its obligations under the Merger Agreement, then you may find that Liberty has not established that Vivendi's misconduct caused Liberty's loss." Ex. 1, Jury Charge at 28 (emphasis added).[48]  The jury could have reasonably found that, as of May 7, Liberty could not have "walked away" based on a registration condition that it fully believed would be fulfilled by the September 30th deadline.[49]  Bushnell's testimony that there was "no telling when [Vivendi] would get approval"

---

[48] *See, e.g.*, Trial Tr. (6/20/12) at 2851:13–14 (Court noting "it's Vivendi's burden [on Question 10] to show that Liberty could have walked away"); Trial Tr. (6/19/12) at 2731:22–2732:2 (Court referring to Question 10 and stating "it's a given that [Liberty is] going to close unless [Vivendi] prove[s] that they have the right to walk away"); Trial Tr. (6/21/12) at 2948:17–2949:21 (Vivendi closing, connecting this instruction with question of whether Liberty had to close).

[49] *See, e.g.*, Trial Tr. (6/12/12) at 1672:23–1673:3 (Tanabe) ("We had some leverage in terms of being able to delay because of the registration statement.  But, as I said, you know, I think somewhere in the process we concluded that we didn't have a credible way to break the deal

of its registration statement certainly did not compel the jury to conclude otherwise. Mot. at 31. To the contrary, the jury could have reasonably credited the testimony of Liberty's witnesses on this issue, particularly since there was no evidence that Vivendi was concerned at the time about a delayed registration, or that it communicated such a concern to anyone at Liberty.

Finally, Vivendi's claims concerning the impact its post-signing evidence would have had on the verdict are completely unfounded. To the extent Vivendi argues that the evidence conclusively established that Liberty was no longer justifiably relying on Vivendi's statements at the time of closing, Mot. at 33, this argument is both waived (by Vivendi's failure to raise it in its Rule 50(a) motion) and erroneous. Among other things, the jury heard testimony from Vivendi's Chief Accounting Officer, its Director of SEC Reporting, and a member of its audit committee that, prior to May 7, 2002, they had no idea about Vivendi's concealed liquidity risk, even given all of the supposed "red flags" identified by Vivendi.[50] This and other evidence like it was more than sufficient for a reasonable jury to find that Liberty's continued reliance was justifiable and that this reliance resulted in Liberty's damages.[51]

---

permanently."); *id.* at 1673:20–22, 1677:7–22 (Tanabe); Trial Tr. (6/8/12) at 1533:24–1534:17 (Tanabe) (testifying that registration would be easily obtained by an issuer like Vivendi); Trial Tr. (6/6/12) at 1141:22–1142:5 (Bennett).

[50] *See* Trial Tr. (5/31/12) at 538:19–21 (Luczycki); Trial Tr. (6/1/12) at 617:18–619:14 (Trickett); Trial Tr. (6/5/12) at 861:19–863:5, 867:20–868:9 (Kravis).

[51] Vivendi also contends, in a footnote, that it is entitled to judgment on Liberty's entire Section 10(b) claim under *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010). Mot. at 27 n.11. This argument, which significantly expands the claim Vivendi made when it sought *partial* summary judgment on *Morrison* grounds, is plainly waived. *See Holmes*, 85 F.3d at 963 (defendant waived argument made for the first time in a Rule 50(b) motion); *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 328 (2d Cir. 2002) (argument made in a footnote in a brief to the district court was not properly raised there or preserved for appellate review). Even if it were not waived, and even if Vivendi is correct that a plaintiff's payment in domestic securities cannot alone bring a claim within the scope of Section 10(b), Vivendi cites no authority for its new argument that *Morrison* categorically bars *any* Section 10(b) action based on a purchase of a foreign security. This Court's rejection of Vivendi's first *Morrison* challenge is to the contrary, *Liberty Media Corp. v. Vivendi Universal, S.A.*, -- F. Supp. 2d --, No. 03 Civ. 2175 (SAS), 2012

## IV.    VIVENDI IS NOT ENTITLED TO A NEW TRIAL

Vivendi contends that, because of the Court's collateral estoppel order and the parties'
related stipulation, evidence relating to earnings management, purchase accounting, Maroc, and
Telco was irrelevant and served no purpose other than to prejudice Vivendi and confuse and
mislead the jury.  Mot. at 34–39.  Vivendi made the same claim prior to trial.  In response, the
Court spent days in pre-trial hearings, going through Liberty's proposed evidence in minute
detail so that it could decide which evidence Liberty could properly introduce.  *See, e.g.*, Hr'g
Trs. (5/17/12), (5/18/12), (5/21/12), (5/22/12), (5/23/12).  The Court issued detailed rulings,
excluding large portions of Liberty's evidence and explaining why the rest was admissible given
Liberty's remaining burden to prove reliance, causation, and damages.  Vivendi now claims, for
the first time, that the Court's pretrial rulings did not go far enough and that, as a result, it is
entitled to a new trial.

Like so many of Vivendi's other arguments, this one is waived.  Vivendi failed to object
when the Court issued its pretrial rulings limiting Liberty's evidence.  It also failed to object
(with limited exceptions) when Liberty introduced the specific evidence Vivendi now challenges.
Vivendi's generalized objections to broad categories of evidence, made before the Court issued
its pretrial rulings, are not sufficient to preserve the specific objections Vivendi now raises.  *See,
e.g.*, *Smith v. Crown Lift Trucks*, No. 04 Civ. 2866 (GEL), 2007 WL 1467970, at *4–6 (S.D.N.Y.
May 16, 2007) (denying new trial based on admission of evidence where court limited scope of
plaintiff's evidence after defendant's pretrial objections and defendant did not object to ruling or

---

WL 1203825, at *4 (S.D.N.Y. Apr. 11, 2012), as is *Absolute Activist Value Master Fund, Ltd. v.
Ficeto*, in which the Second Circuit explained that "the identity of the security [does not]
necessarily ha[ve] any bearing on whether a purchase or sale is domestic within the meaning of
*Morrison*."  677 F.3d 60, 69 (2d Cir. 2012).  Rather, a transaction is domestic so long as
"irrevocable liability is incurred or title passes within the United States," *id.* at 67, as clearly
occurred here.

36

to evidence as it was admitted).  Moreover, those belated objections are addressed only in a 17-page exhibit to Vivendi's motion.  *See* Ex. 33 to Decl. of Caitlyn M. Campbell in Supp. of Vivendi's Mot. (Dkt. No. 259).  That exhibit directly violates the Court's page limits and, as a result, should be stricken.[52]  Should the Court decide to consider this exhibit, Liberty respectfully requests that the Court consider its responsive exhibit.  *See* Ex. 31, Liberty's Responses to Vivendi's List of Statements Erroneously Admitted at Trial.  Vivendi's new trial motion also fails on the merits for the following reasons.

### A.    The Challenged Evidence Was Highly Probative of Disputed Issues

First, as the Court has already recognized, evidence relating to earnings management, purchase accounting, Maroc, and Telco was directly relevant to the disputed issue of Liberty's reliance.[53]  Take, for example, the testimony of Mr. Mintzer, the forensic accountant who reviewed Vivendi's accounting after this case was brought.  As the Court has already recognized, Mr. Mintzer's testimony—explaining the time and resources spent on his investigation; how he pieced together the Maroc and Telco stories by reviewing internal Vivendi documents; and his discovery that the fraud was hidden even from many Vivendi insiders—was relevant to show that Liberty, which had no access to Vivendi's internal documents, could not possibly have uncovered the fraud through minimal diligence.[54]  Similarly, Luczycki's testimony showed that Vivendi's earnings management scheme was confined to the highest reaches of management,

---

[52] *See* Endorsed Letter (Dkt. No. 257).

[53] *See* Trial Tr. (6/1/12) at 668:21–669:4 (Court accepting argument that Mr. Mintzer's testimony about "what he had to do to discover the accounting violations" was "directly relevant to the remaining issues in this case"); *see also* Ex. 1, Jury Charge, at 26 (instructing the jury that, in determining justifiable reliance, it should consider evidence of "Liberty's access to relevant information," "Vivendi's concealment of the fraud," "Liberty's opportunity to detect the fraud," and Liberty's ability to discover the fraud through "minimal diligence").

[54] *See* Trial Tr. (6/4/12) at 676:14–678:7, 686:6–17, 691:11–692:2, 694:24–696:18, 732:15–734:24.

executed primarily through handwritten, private communications among those managers, and

never disclosed to Vivendi's auditors.[55]  Limited testimony elicited from Kravis, a former

member of Vivendi's board and audit committee, confirmed that information about Vivendi's

earnings manipulation was closely held.  *See* Trial Tr. (6/5/12) at 851:5–852:11.

Vivendi does not acknowledge the Court's prior conclusions that the foregoing evidence

was relevant to justifiable reliance, or explain why those rulings were wrong.  Instead, Vivendi

simply insists that its "deceit" was not at issue in this trial.  Mot. at 36.  But Vivendi's central

defense was that Liberty could have discovered the truth about its liquidity condition had Liberty

conducted sufficient diligence or asked the right questions of Vivendi's management.[56]

Evidence tending to show Vivendi's propensity for deceit, including evidence of the fraudulent

accounting practices the company used to hide its true liquidity condition, was directly relevant

to show that any effort to discover "what the heck is going on" would have been futile.[57]

The evidence Vivendi challenges was also probative concerning causation and damages.

As noted above, to establish loss causation, Liberty had to "prove both that the loss it suffered

was foreseeable and that the loss was caused by events that revealed information concerning

Vivendi's true liquidity risk that previously had been concealed."  Ex. 1, Jury Charge at 27.  The

Court properly ruled that to carry this burden, Liberty should be permitted to show the extent of

Vivendi's liquidity problems in 2001.  *See* Hr'g Tr. (5/2/12) at 5.  It allowed Liberty to present

---

[55] *See, e.g.*, Trial Tr. (5/30/12) at 373:15–386:20, 439:3–16; Trial Tr. (5/31/12) at 551:18–553:1.

[56] *See, e.g.*, Trial Tr. (5/29/12) at 285:4–12 ("[A]ll's they had to do was ask.") (Vivendi opening); *id.* at 266:24–267:2 ("And one would think that if they didn't have other good reasons for closing this deal, they would have called up and said: Hey, Messier, what the heck is going on here?").

[57] Trial Tr. (5/29/12) at 266:24–267:2; *see, e.g.*, Hr'g Tr. (5/8/12) at 53:19–23 (The Court: "This would be relevant to reliance because it would show that the so-called liquidity problems were hidden at even the highest level of Vivendi."); Trial Tr. (6/20/12) at 2848:5–25 (Court allowing testimony of Cattenoz to show hidden nature of Vivendi's fraud).

limited evidence of earnings management and purchase accounting, both of which enabled

Vivendi to portray its EBITDA results and growth as stronger than they actually were, thereby

masking its true liquidity condition.[58]  Liberty also presented evidence that Vivendi concealed its

obligation to purchase an additional stake in Maroc and failed to consolidate Telco, allowing it to

report less debt.[59]  This and other limited evidence about the accounting violations that concealed

Vivendi's true liquidity condition in 2001 allowed Liberty to "put some flesh on the bones," Hr'g

Tr. (5/2/12) at 8:7–10, and thereby demonstrate that the events that caused Vivendi's stock price

decline in 2002 were a foreseeable materialization of the liquidity risk it concealed in 2001.

### B.     The Challenged Evidence Did Not Unfairly Prejudice Vivendi

Vivendi also fails to show that it was unfairly prejudiced by Liberty's limited accounting

evidence—much less that that evidence "was so clearly prejudicial to the outcome of the trial"

that a new trial is required.  *Luciano v. Olsten Corp.*, 110 F.3d 210, 217 (2d Cir. 1997).

First, because the jury was instructed as to the falsity of Vivendi's statements, evidence

that necessarily referenced that falsity could not have been unfairly prejudicial.  *See, e.g.*,

*Caruolo*, 226 F.3d at 54 ("[E]ven if [plaintiff's expert's] testimony was admitted improperly, that

error cannot be said to have resulted in a 'seriously erroneous result' or a 'miscarriage of justice'

because other, unchallenged testimony established the same facts.").  Moreover, contrary to the

complaints Vivendi now makes, Mot. at 35, the Court *did* allow Vivendi to defend the propriety

of its accounting.[60]  It also allowed Vivendi to elicit testimony that the company did not believe

its statements were false and fully intended to appeal the result in the prior proceeding.  *See* Trial

---

[58] *See, e.g.*, Trial Tr. (6/4/12) at 753:6–20 (Mintzer); Trial Tr. (5/30/12) at 418:19–420:21
(Luczycki); Ex. 32, LX-357 at VUS00241086.

[59] *See, e.g.*, Trial Tr. (6/4/12) at 752:7–753:5 (Mintzer).

[60] *See, e.g.*, Trial Tr. (5/31/12) at 549:17–19 (Luczycki cross); Trial Tr. (6/4/12) at 769:10–770:5
(Mintzer cross); Trial Tr. (6/5/12) at 890:18–22 (Kravis cross).

Tr. (6/18/12) at 2303:13–2304:23.  The Court even reminded the jury of Vivendi's intent to appeal in its final instructions.  *See* Ex. 1, Jury Charge at 23.

      The foregoing belies any claim that Vivendi suffered unfair prejudice from, or that the jury was confused or misled by, Liberty's limited evidence concerning Vivendi's accounting violations.  It also refutes Vivendi's complaint that it was prejudiced by counsel's comments during closing.  Mot. at 37–38.  Those complaints recapitulate the objections raised in Vivendi's meritless motion for a mistrial, which the Court properly denied.  *See* Trial Tr. (6/21/12) at 3060:7–3063:25.

**CONCLUSION**

      For the foregoing reasons, the Court should deny Vivendi's motion and enter judgment on the jury's verdict.  Liberty will respond to Vivendi's alternative prayer that the Court delay entry of judgment until entry of judgment in the Class Action and enter judgment in dollars, *see* Mot. at 40 & n.18, in Liberty's Motion for Entry of Judgment, due September 11, 2012.

Dated: August 20, 2012

/s/ Michael L. Calhoon

Macey Reasoner Stokes
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX  77002-4995
Telephone:  (713) 229-1234
Facsimile:  (713) 229-7869

R. Stan Mortenson
Michael L. Calhoon
Alexandra M. Walsh
Richard P. Sobiecki
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave, N.W.
Washington, D.C. 20004-2400
Telephone: (202) 639-7700
Facsimile: (202) 639-7890

*Attorneys for Plaintiffs Liberty Media Corporation, LMC Capital LLC,
Liberty Programming Company LLC, LMC USA VI, Inc., LMC USA VII, Inc.,
LMC USA VIII, Inc., LMC USA X, Inc., Liberty HSN LLC Holdings, Inc.,
and Liberty Media International, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2012, a copy of the foregoing was served upon the

following:

      Paul C. Saunders, Esq.
      Daniel Slifkin, Esq.
      Timothy G. Cameron, Esq.
      CRAVATH, SWAINE & MOORE LLP
      Worldwide Plaza
      825 Eighth Avenue
      New York, NY 10019

      James W. Quinn, Esq.
      Penny P. Reid, Esq.
      WEIL GOTSHAL & MANGES LLP
      767 Fifth Avenue
      New York, NY 10153

       /s/ Michael L. Calhoon
      Michael L. Calhoon