UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

LIBERTY MEDIA CORPORATION, LMC
CAPITAL LLC, LIBERTY
PROGRAMMING COMPANY LLC, LMC
USA VI, INC., LMC USA VII, INC., LMC
USA VIII, INC., LMC USA X, INC.,
LIBERTY HSN LLC HOLDINGS, INC.,
and LIBERTY MEDIA INTERNATIONAL,
INC.,

               Plaintiffs,

      - against -

VIVENDI UNIVERSAL, S.A., and
UNIVERSAL STUDIOS, INC.,

               Defendants.
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/12/13

## OPINION AND ORDER

### 03 Civ. 2175 (SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.   INTRODUCTION

       Plaintiffs, Liberty Media Corporation and certain of its subsidiaries

(collectively, "Liberty"), sued defendants, Vivendi Universal, S.A. and Universal

Studios, Inc. (collectively, "Vivendi"), alleging violations of federal securities law

and breach of express warranty under New York state law.  In particular, Liberty

sued Vivendi for violations of Section 10(b) of the Securities Exchange Act of

1934 and Securities and Exchange Commission ("SEC") Rule 10b-5 (collectively,

"Section 10(b)").  Liberty also sued Vivendi for breach of four different express warranties contained in the Agreement and Plan of Merger and Exchange ("Merger Agreement") that was signed on December 16, 2001.  On June 25, 2012, the jury found Vivendi liable for violating Section 10(b) and for breach of warranty.  The jury awarded Liberty €765 million in damages for each cause of action.[1]

Vivendi now renews its motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), or, in the alternative, for a new trial pursuant to Federal Rule of Civil Procedure 59.  Vivendi argues on various grounds that Liberty's evidence at trial was legally insufficient on both liability and damages.

For the following reasons, Vivendi's motion is denied.

## II.    BACKGROUND

---

[1]    *See Liberty Media Corp. v. Vivendi Universal, S.A.*, No. 03 Civ. 2175, 2013 WL 105776, at *1 (S.D.N.Y. Jan. 9, 2013) (ordering entry of final judgment). The jury was instructed as follows:  "If you determine that Liberty is entitled to damages on both its breach of warranty claims and its Section 10(b) claims, you should award whatever amount of damages you find that Liberty suffered for *each of these claims* even though this may appear to award the same damages twice.  In entering the judgment, the Court will ensure that Liberty does not obtain double recovery for any injury you find that it suffered."  Jury Charge ("Jury Charge"), Exhibit ("Ex.") 1 to 8/20/12 Declaration of Julie B. Rubenstein, Liberty's counsel, in Opposition to Defendants' Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b), or, in the Alternative, for a New Trial Pursuant to Rule 59 of the Federal Rules of Civil Procedure ("Rubenstein Decl."), at 29–30 (emphasis in original).

Familiarity with the facts and procedural background of this case is assumed. Only those facts necessary to the disposition of Vivendi's motion will be noted.

On December 16, 2001, the parties signed the Merger Agreement, which involved, in part, a commitment for Liberty to exchange its multiThématiques ("MTH") shares for Vivendi securities.[2] On May 7, 2002, the merger closed.[3] In March 2003, plaintiffs brought an individual action (the "Liberty Action") asserting various claims against defendants under both federal securities law and state common-law theories.[4] Two months later, Judge Harold Baer, Jr., consolidated the Liberty Action with a separate securities class action (the "Class Action") filed against Vivendi in July 2002.[5] In the Class Action, U.S. and foreign shareholders of Vivendi alleged that they purchased certain shares at artificially inflated prices as a result of defendants' material misrepresentations and

---

[2]    *See Liberty Media Corp. v. Vivendi Universal, S.A.*, 861 F. Supp. 2d 262, 268 (S.D.N.Y. 2012).

[3]    *See id.*

[4]    *See Liberty Media Corp. v. Vivendi Universal, S.A.*, 842 F. Supp. 2d 587, 589–90 (S.D.N.Y. 2012) (citing *Liberty Media Corp. v. Vivendi Universal, S.A.*, No. 03 Civ. 2175).

[5]    *See id.* (citing *In re Vivendi, S.A. Sec. Litig.*, No. 02 Civ. 5571).

omissions regarding a concealed risk of a liquidity crisis at Vivendi.[6]  In 2004, the

consolidated action was transferred to Judge Richard J. Holwell.[7]  On March 2,

2009, Judge Holwell vacated Judge Baer's consolidation order.[8]

       The Class Action was tried before a jury from October 2009 to

January 2010.[9]  On January 29, 2010, the jury returned its verdict, finding that

Vivendi had violated Section 10(b) as to all fifty-seven misstatements alleged by

the Class Action plaintiffs, and that Vivendi acted recklessly with respect to each

statement.[10]  On April 11, 2012, after the deconsolidated Liberty Action had been

reassigned to this Court, I issued an opinion explaining that based on the jury's

finding at the Class Action trial, Vivendi was collaterally estopped from contesting

the falsity, materiality, and scienter elements of Liberty's Section 10(b) claim for

---

[6]    *See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 521 (S.D.N.Y. 2011).  The two types of shares originally at issue were "ordinary shares," which "traded primarily on the Paris Bourse, and did not trade on any U.S exchange," and "American Deposity Receipts" ("ADRs"), which "were listed and traded on the New York Stock Exchange."  *Id.*  After the Supreme Court's decision in *Morrison v. National Austl. Bank Ltd.*, 130 S.Ct. 2869 (2010), Judge Holwell dismissed the claims of purchasers of ordinary shares.  *See In re Vivendi*, 765 F. Supp. 2d at 533–34.

[7]    *See Liberty Media*, 842 F. Supp. 2d at 589.

[8]    *See id.* at 590.

[9]    *See In re Vivendi*, 765 F. Supp. 2d at 520.

[10]    *See id.* at 523–25.

twenty-five statements for which the Class Action jury found Vivendi liable.[11]

The Liberty Action was tried before a jury from May to June 2012. On June 25, 2012, the jury returned its verdict, finding Vivendi liable for violating Section 10(b) and for breach of warranty.[12]

## III.   APPLICABLE LAW

A defendant is entitled to judgment as a matter of law if, after a party has been fully heard on an issue during trial, the Court finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue . . . ."[13]   In ruling on a motion for judgment as a matter of law, the trial court is required to

> consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.  The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.[14]

A jury verdict should not be set aside lightly. A court may not grant

---

[11]    *See Liberty Media*, 861 F. Supp. 2d at 272–74.

[12]    *See Liberty Media*, 2013 WL 105776, at *1.

[13]    Fed. R. Civ. P. 50(a)(1).

[14]    *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001) (quotation marks and citation omitted).  *Accord Caceres v. Port Auth. of N.Y. & N.J.*, 631 F.3d 620, 622 (2d Cir. 2011).

judgment as a matter of law unless: (1) there is such a "'complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture'" or (2) there is "'such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].'"[15]

> Under Federal Rule of Civil Procedure 50(b),
>
> [n]o later than 28 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59 . . . In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct entry of judgment as a matter of law.

The legal test for granting a new trial under Rule 59 is less stringent than for granting judgment as a matter of law. "Unlike a motion for judgment as a matter of law, a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict."[16]  Nevertheless, "'[a] motion for a new trial

---

[15]    *Altria Grp., Inc. v. United States*, 658 F.3d 276, 290 (2d Cir. 2011) (quoting *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 79 (2d Cir. 2006)).  "It is rare that the party having the burden of proof on an issue at trial is entitled to a directed verdict."  *Granite Computer Leasing Corp. v. Travelers Indem. Co.*, 894 F.2d 547, 551 (2d Cir. 1990) (citing *Service Auto Supply Co. of P.R. v. Harte & Co.*, 533 F.2d 23, 24–25 (1st Cir. 1976); *Powers v. Continental Cas. Co.*, 301 F.2d 386, 388 (8th Cir. 1962)).

[16]    *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 54 (2d Cir. 2000) (quotation marks and citation omitted).

ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'"[17]

With regard to the merits of Liberty's claims, under New York law, a breach of warranty claim sounds "essentially in contract."[18]  To prevail, a party must establish the existence of a contract containing a bargained-for express warranty with respect to a material fact, reliance on that warranty, a breach of that warranty, and damages suffered as a result of the breach.[19]

A Section 10(b) claim requires proof by a preponderance of the evidence that, in connection with the purchase or sale of a security: (1) defendants made an untrue statement of material fact, or omitted to state a material fact which made what was said, under the circumstances, misleading; (2) defendants acted with scienter; (3) plaintiffs justifiably relied on the misstatement or omission; and (4) plaintiffs suffered an economic loss as a result of the misstatement or

---

[17]    *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 51 (2d Cir. 2012) (quoting *Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.*, 290 F.3d 98, 106 (2d Cir. 2002)).

[18]    *CBS, Inc. v. Ziff-Davis Publ'g Co.*, 75 N.Y.2d 496, 503 (1990).

[19]    *See Promuto v. Waste Mgmt., Inc.*, 44 F. Supp. 2d 628, 642 (S.D.N.Y. 1999); *Ainger v. Michigan Gen. Corp.*, 476 F. Supp. 1209, 1220–21 (S.D.N.Y. 1979). *See also CBS*, 75 N.Y.2d at 503.

7

omission.[20]   As part of the fourth element, plaintiffs must prove "loss causation,"

which is, in the words of Judge Holwell,

> the required "causal link" between the alleged fraud and the
> subsequent decline in value of the stock when the fraud comes to
> light.  It is typically shown by the reaction of the market to a
> "corrective disclosure" which reveals a prior misleading
> statement.  However, loss causation may also be shown by the
> "materialization of risk" method, whereby a concealed risk —
> here, a liquidity crisis — comes to light in a series of revealing
> events that negatively affect stock price over time. Unlike
> corrective disclosures, these events do not identify prior company
> statements as misleading, but they must reveal new information
> previously concealed and fall within the "zone of risk" concealed
> so that the events were foreseeable consequences of the fraud.  In
> addition, a plaintiff must show that the loss was caused by
> materializations of the concealed risk and not other factors.[21]

## IV.  DISCUSSION

Vivendi offers six arguments for setting aside the jury's verdict and

granting judgment as a matter of law, or in the alternative for a new trial:

(1) Liberty failed to prove causation and damages because the opinion of Liberty's

expert, Dr. Blaine Nye, is legally defective and unreliable; (2) Liberty failed to

prove causation because the alleged events or disclosures that ostensibly caused

Liberty's losses did not reveal a previously undisclosed risk; (3) the jury's

---

[20]    *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005); *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 478 n.1 (2d Cir. 2008).

[21]    *In re Vivendi*, 765 F. Supp. 2d at 555 (citations omitted).

damages award is not supported by any evidence in the record; (4) Liberty failed to

prove Section 10(b) reliance; (5) Vivendi proved that Liberty was not obligated to

close the transaction, thereby establishing an affirmative defense; and (6) Vivendi

was unfairly prejudiced by the admission of evidence regarding falsity and

therefore is entitled to a new trial.[22]

I address each argument in turn.

## A.    Dr. Nye's Opinion

Vivendi argues that it should be granted judgment as a matter of law

because "[n]o jury should have been permitted to base a verdict on Dr. Nye's

inconsistent, unreliable, and inadmissible testimony."[23]  In particular, Vivendi

argues that Dr. Nye's testimony provided a legally insufficient evidentiary basis

---

[22]    *See* Vivendi's Memorandum of Law in Support of Defendants'
Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b), or, in
the Alternative, for a New Trial Pursuant to Rule 59 of the Federal Rules of Civil
Procedure ("Viv. Mem.") at i–ii.  Because Vivendi offers no arguments in support
of its previously rejected contention that "Liberty's breach of warranty claims
should have resulted in dismissal under the Securities Litigation Uniform
Standards Act of 1998 ('SLUSA')," and that "Liberty was not entitled to collateral
estoppel with respect to the falsity, materiality, and scienter elements of Liberty's
Section 10(b) claim and partial summary judgment with respect to section 3.11 of
the Merger Agreement," I will not repeat the Court's reasoning here.  Viv. Mem. at
3 n.2.  *See also Liberty Media*, 861 F. Supp. 2d at 264–66, 269–74.

[23]    Viv. Mem. at 2, 5–6.

for the jury's loss causation and damages findings.[24]  To establish loss causation, Liberty was required to "prove both that the loss it suffered was foreseeable and that the loss was caused by events that revealed information concerning Vivendi's true liquidity risk that previously had been concealed by the false/untrue or misleading statements."[25]

Vivendi challenges Dr. Nye's testimony under five headings.[26]  For the reasons stated below, Vivendi's challenges are without merit.

### 1.   Disaggregation

A number of factors may affect a company's stock price, including fluctuations in the market as a whole, news affecting the industry to which the company belongs, and the release of information specifically related to the company.[27]  Under the principle of loss causation, Liberty is only entitled to damages for declines in Vivendi's stock price that resulted from events that

---

[24]   *See id.* at 5.

[25]   Jury Charge at 27.  *See generally In re Vivendi*, 634 F. Supp. 2d at 360 ("Proving loss causation is prescribed by statute for actions under Section 10(b) and Rule 10b-5." (citing 15 U.S.C. § 78u-4(b)(4))).

[26]   *See* Viv. Mem. at 6.

[27]   *See Dura*, 544 U.S. at 342–43 (noting that a lower stock price "may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events").

represented materializations of Vivendi's previously concealed liquidity risk.[28]

Liberty thus bore the burden of disaggregating the effects of such "materialization"

events on Vivendi's stock price from the effects of other, non-fraud-related

"confounding" events.[29]

      At trial, Dr. Nye testified that he had examined each of the 166 trading

days between December 16, 2001, the day on which the Merger Agreement was

signed, and August 14, 2002, the date of the final alleged materialization event, to

determine if there was a statistically significant decline in Vivendi's stock price on

any of those days after removing market and industry effects.[30]  Dr. Nye also

testified to removing company-specific effects on the stock price that were not

_____

[28]    *See* Jury Charge at 27.

[29]    *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) (quoting *Dura*, 544 U.S. at 342–43).  *Accord In re Vivendi*, 634 F. Supp. 2d at 364–65 (holding that "[t]o demonstrate the connection between the events and the share price declines, plaintiffs must: (1) show a correlation between news of the event and the declines; and (2) disaggregate the declines or some rough percentage of the declines from losses resulting from other, non-fraud-related events." (citing *Dura*, 544 U.S. at 342–43; *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007))).

[30]    *See* Transcript of May-June 2012 Liberty Action Trial ("Tr.") 6/13 at 1878–1891; Tr. 6/14 at 1911; Excerpts from Dr. Blaine Nye's Demonstrative Slides ("Viv. Nye Slides"), Ex. 1 to 7/23/12 Declaration of Caitlyn M. Campbell, Vivendi's counsel, in Support of Defendants' Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b), or, in the Alternative, for a New Trial Pursuant to Rule 59 of the Federal Rules of Civil Procedure ("Campbell Decl."), at 86.

related to the disclosure of Vivendi's concealed liquidity risk.[31]  To perform these analyses, Dr. Nye testified to having reviewed all publicly available information about Vivendi over the period noted above, including sixteen thousand news releases and several thousand analyst reports.[32]

In the end, Dr. Nye identified nine days on which statistically significant negative returns resulted from materializations of Vivendi's concealed liquidity risk.[33]  Dr. Nye testified that he had also identified days on which Vivendi's share price dropped as a result of non-fraud-related company-specific news, but that none of these days were among the nine days of materialization events.[34]  In addition, Dr. Nye testified that he had studied each of the nine materialization days "for other things that happened on that day that you might need to take out that weren't related to the concealed liquidity risk."[35]  When

---

[31]     *See* Tr. 6/14 at 1903:9–1904:23.

[32]     *See* Tr. 6/13 at 1878:6–10.

[33]     *See* Tr. 6/14 at 1911:5–1912:5.

[34]     *See* Tr. 6/15 at 2121:15–2122:6 ("Q. Were there days where there were statistically significant declines of Vivendi stock net of market and industry that you looked at and did not include in the damages calculation? A. Sure. Those were all taken out.").

[35]     Tr. 6/14 at 1936:4– 23.  Liberty provides no citation to Dr. Nye explicitly stating that he found no non-fraud-related company-specific negative events on the nine days of materialization events, but a jury could reasonably have inferred this from the statements above.

challenged on cross-examination, Dr. Nye clarified that he had found no material non-fraud-related company-specific negative news on the nine materialization days: "In those days, . . . everything had to do with the fraud."[36]  Dr. Nye concluded that Liberty suffered roughly €842 million in damages from the net share price declines over the nine materialization days.[37]

By contrast, Vivendi's expert, Dr. William Silber, testified that there was competing negative news on several of the materialization days that could have affected Vivendi's stock price.[38]  For example, Dr. Silber testified that on June 24, 2002, the fourth of the materialization days, "there was an announcement overnight that News Corp. . . . was not going to buy Telepiu," a Vivendi subsidiary.[39]  On cross-examination, Liberty challenged the significance of Dr. Silber's alleged confounding events, either by questioning whether they had any effect on Vivendi's stock price, or by questioning whether the market perceived the events as liquidity-related, or both.  For example, in the case of the news regarding the Telepiu sale, Dr. Silber conceded under cross-examination that "[i]t didn't

---

[36]   *Id.* at 2051:14.

[37]   *See* Tr. 6/13 at 1879:1–8.

[38]   *See* Tr. 6/19 at 2564–2581.

[39]   *Id.* at 2564:20–22.  *See also* Viv. Mem. at 7.

seem to affect the stock price."[40]   In addition, Liberty introduced evidence

suggesting that the market perceived Vivendi's effort to sell Telepiu as liquidity-

related.[41]

The jury was charged with the following instruction regarding

damages under Section 10(b):

> Liberty bears the burden of separating the alleged fraud from any
> other factors that may have affected Vivendi's stock price and
> ascrib[ing] some rough proportion of the whole loss to the alleged
> false or misleading statement.  Vivendi is not liable for any loss
> resulting from those other non-fraud related events.[42]

Having heard the competing testimony of the parties' experts, the jury found that

Liberty's reliance on Vivendi's statements caused Liberty to suffer an economic

loss of €765 million.[43]

Vivendi now argues that Dr. Nye's disaggregation analysis was so

flawed as to be legally insufficient to support the jury's verdict on loss causation

---

[40]    Tr. 6/20 at 2773:3–4.

[41]    *See, e.g.*, *id.* at 2843–2845.  To the extent that the ostensible
confounding events were liquidity-related and revealed Vivendi's concealed
liquidity risk, they would not be confounding events, but materializations of the
risk.

[42]    Jury Charge at 31.

[43]    *See* Special Verdict Form, Ex. 21 to Campbell Decl., at 7.  The
discrepancy between Dr. Nye's damages calculation and the jury's award is
discussed below in Part IV.C.

and damages.[44]   But Vivendi offers no significant arguments beyond what the jury

heard and reasonably rejected at trial.[45]   Vivendi criticizes Dr. Nye for claiming to

have excluded non-fraud-related company-specific events from his damages

calculation, but then failing to "disaggregate a single such event on any one of his

nine disclosure days."[46]   According to Dr. Nye's testimony, however, there simply

were no confounding events during the nine days on which he identified

materialization events.[47]   The credibility of Dr. Nye's testimony was a matter for

the jury, and neither legal precedent nor common sense compels the conclusion

that every set of materialization event windows, no matter how small in number,

must contain at least one confounding event.[48]

   Viewing the evidence in the light most favorable to upholding the

---

[44]  *See* Viv. Mem. at 8.

[45]  *See id.* at 5–8; Vivendi's Reply Memorandum of Law in Further
Support of Defendants' Renewed Motion for Judgment as a Matter of Law
Pursuant to Rule 50(b), or, in the Alternative, for a New Trial Pursuant to Rule 59
of the Federal Rules of Civil Procedure ("Viv. Reply") at 2.

[46]  Viv. Reply at 2.

[47]  *See* Tr. 6/14 at 2051:14.

[48]  The absence of confounding events during the nine materialization
event windows might also be explained by Dr. Nye having excluded days
containing non-fraud related declines prior to selecting the nine materialization
event windows, though Dr. Nye's testimony was unclear on this point.  *See* Tr.
6/15 at 2121:15–2122:6.

jury's verdict, I conclude that a reasonable juror could have found that none of the ostensible confounding events put forth by Vivendi were both non-fraud-related and affected Vivendi's share price.[49]   Dr. Nye's testimony was not inadmissible simply because it took an aggressively skeptical view of the significance of non-fraud-related news on the nine materialization days, any more than Dr. Silber's testimony was inadmissible because of his equally aggressive but opposite interpretation of potential confounding events.   The weighing of the experts' conflicting testimony was a matter for the jury and will not be disturbed by this Court.

### 2.    One-day Event Window

At trial, Dr. Nye testified that he measured the share price declines resulting from the materialization events by using a "one-day event window."[50]

---

[49]    In fact, it is not clear that the jury entirely accepted Dr. Nye's testimony and rejected Dr. Silber's on the issue of confounding events.  As will be discussed in greater detail below, the jury's reduction of Dr. Nye's damages calculation could have been based in whole or in part on the conclusion that some of Dr. Silber's confounding events *should* have been factored into Dr. Nye's analysis.  Thus, even if I were to accept Vivendi's suggestion that Dr. Nye's rejection of all the ostensible confounding events on the nine materialization days fatally undermined his analysis, which I do not, Vivendi would still not necessarily be entitled to judgment as a matter of law or a new trial, because the jury's damages award could be upheld as having incorporated at least some of the confounding events that Dr. Nye rejected.

[50]    Tr. 6/14 at 1908–1909.

That is, for each materialization event, Dr. Nye measured the change in Vivendi's share price in response to the event over the course of one trading day, from market close to market close.[51]  Dr. Nye explained that he chose a one-day event window, rather than a longer window of a month or a shorter window of less than a day, because over a day the market becomes more or less efficient.[52]  That is, over a day of trading any public information relevant to a stock has been "fully absorbed and reflected in the market price."[53]

Dr. Nye testified that the current academic standard for measuring the effect of the release of information on a stock's price "is to extend the event period to the close of . . . trading on the day after the release of the pertinent information."[54]  A reasonable juror could have found that Dr. Nye adopted a similar approach.  For most of the materialization events, Dr. Nye's one-day event window for measuring share decline began at the last close of trade preceding the

---

[51]     *See id.* at 1906, 1908; Viv. Nye Slides at 86.

[52]     *See* Tr. 6/14 at 1905–1906.

[53]     *Id.* at 1905.

[54]     *Id.* (citing Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission*, 49 BUS. LAW. 545, 559 (1994)).

event and ended at the close of trade following the event.[55]  On an occasion when the materialization event arrived after the close of trading in Paris but before the close in New York, Dr. Nye's one-day event window extended from market close on the date of the disclosure to market close on the following day.[56]

Vivendi argues that Dr. Nye's one-day event window analysis is invalid because it fails to take into account the intraday movement of Vivendi's stock price or consider the impact at market opening of overnight disclosures.[57] Vivendi's argument regarding intra-day stock price movements rests on two premises: *first*, that it is an undisputed principle that stock markets have at least some immediate reaction to significant news, including some reaction at the start of trading if the news occurred overnight; and *second*, that Dr. Nye impermissibly violated this principle when he "attributed Vivendi's stock price declines on three dates to events to which the stock market had *no immediate negative price reaction*,"[58] and "attributed Vivendi's stock price decline on certain dates to events

---

[55]     *See, e.g.*, *id.* at 2058:11–16, 2602:2–21 (regarding the May 3, 2002 materialization event).

[56]     *See id.* at 2075:7–2077:20 (regarding the June 21, 2002 materialization event).

[57]     *See* Viv. Mem. at 8.

[58]     *Id.* at 10.

happening overnight that did *not* cause *any* reaction in the stock price at the next day's opening."[59]

It is true, as Vivendi suggests, that Dr. Nye testified approvingly about the theory that the market will make at least some virtually instantaneous reaction to any significant news.[60]  Liberty cites no passage in Dr. Nye's testimony in which Dr. Nye explicitly rejects this principle.[61]  It is also true that Dr. Nye attributed Vivendi's stock price decline on three dates to materialization events that at some

---

[59]    *Id.* at 11.

[60]    *See* Def. Mem. at 10.  Dr. Nye's most direct statement along these lines may have been when he concluded a discussion of how the market acts on news by stating:  "The information starts to hit the market immediately."  Tr. 6/14 at 2081:16–17.  It is less clear that Dr. Nye endorsed the notion that when news arrives overnight, "there is an initial reaction that's impounded into the opening price."  *Id.* at 1907:20–21.  This quotation from Dr. Nye's direct examination, presented by Vivendi as Dr. Nye's acknowledgment of the stated principle, *see* Viv. Mem. at 11, in fact appeared in the context of Dr. Nye's summary of an article.  *See* Tr. 6/14 at 1907:19–20.  To the extent that any conflict exists between the stated principle and Dr. Nye's loss causation and damages analysis, the jury could reasonably have inferred that Dr. Nye did not endorse the stated principle.  Alternately, the jury could reasonably have disregarded the stated principle and still accepted Dr. Nye's loss causation and damages analysis:  the two are logically independent.  That is, one can believe that significant overnight news does not always display an impact at the opening of trading and still believe that the nine materialization events identified by Dr. Nye caused the share declines in Dr. Nye's one-day event windows.

[61]    *See* Liberty's Memorandum of Law in Opposition to Defendants' Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b), or, in the Alternative, for a New Trial Pursuant to Rule 59 of the Federal Rules of Civil Procedure ("Lib. Mem.") at 9–11.

point involved news-related developments that produced no immediate negative price reaction in the stock market.[62]

Vivendi is incorrect to conclude, however, that there is an unavoidable inconsistency between Dr. Nye's theoretical principle that markets make virtually instantaneous responses to significant news and his analysis of the connection between materialization events and stock price changes in this case.  Dr. Nye repeatedly testified at trial that it is difficult to say in retrospect when, precisely, new information first entered the market.[63]  A reasonable juror could have concluded that Dr. Nye was correct about markets making some immediate response to significant news, and could also have concluded that the market did not respond immediately to the developments mentioned by Vivendi, by finding that the developments likely did not contain new information by the time they occurred.

Moreover, even if there were an irreconcilable conflict between Dr. Nye's theory of immediate market reaction and his analysis of the connection between materialization events and stock price changes in this case, the jury could have reasonably disregarded the former theory while accepting the latter results. Dr. Nye's loss causation and damages analysis did not depend on the validity of his

---

[62]     *See* Viv. Mem. at 10.

[63]     *See, e.g.*, Tr. 6/15 at 2103:19–21, 2104:24–2105:1.

beliefs about instantaneous market reactions.  Rather, his analysis depended on the assumption that markets are more or less efficient over a day,[64] an assumption that Vivendi does not meaningfully contest.[65]

Finally, Vivendi's suggestion that Dr. Nye offered inconsistent testimony in prior cases regarding the extent to which markets are efficient is only relevant as an indication of Dr. Nye's credibility.[66]  Credibility determinations lie within the province of the jury, and will not be second-guessed by this Court.[67]

### 3.    May 3, 2002 Moody's Downgrade

Vivendi argues that Dr. Nye impermissibly included in his loss causation and damages analysis a stock decline that *preceded* a materialization event.[68]  Specifically, Dr. Nye attributed the entire company-specific decline in Vivendi's share price on May 3, 2002 to the Moody's downgrade, even though the

---

[64]    6/14 Tr. at 1905.

[65]    *See* Viv. Mem. at 8–11.

[66]    *See id.* at 9–10.  The jury was specifically charged that the prior inconsistent statements of non-party witnesses were introduced "solely for the purpose of attacking the credibility of the witness."  Jury Charge at 11.  In Vivendi's summation, Vivendi's attorney placed the question of Dr. Nye's credibility squarely before the jury.  *See* Tr. 6/21 at 2961:6–15 (Vivendi's argument that based on inconsistent testimony in prior cases, "Dr. Nye is simply not worthy of anybody's belief").

[67]    *See Tolbert*, 242 F.3d at 70.

[68]    *See* Viv. Mem. at 11.

first news release in the record revealing the downgrade did not arrive until

5:12 p.m. Paris time, after Vivendi's stock had already made approximately sixty

percent of the total decline it would experience on May 3.[69]

Liberty counters that Dr. Nye concluded "that news of the downgrade

had entered the market before that announcement — either through a leak, or

because the announcement in a Dow Jones news release at 5:12 Paris time was not

the first the market learned of the downgrade."[70]  Liberty argues that the jury could

reasonably have accepted Dr. Nye's conclusion based on several factors:  *First*, Dr.

Nye explained, based on his general expertise regarding trading, that it is easy and

common for information to leak into the market before an official announcement.[71]

*Second*, Dr. Silber was unable to identify any specific alternative cause for the

decline in Vivendi's stock price on May 3 prior to 5:12 p.m.[72]  *Third*, two internal

Vivendi emails show that news of the downgrade may have leaked to part of the

---

[69]     *See id.* at 11–12 (citing Tr. 6/14 at 2058:8–2059:1; Tr. 6/19 2550:15–21).

[70]     Lib. Mem. at 11 (citing Excerpts of Dr. Blaine Nye's Demonstrative Slides ("Lib. Nye Slides"), Ex. 8 to Rubenstein Decl., at 34–35, 37; Tr. 6/14 at 2066:7–2067:25).

[71]     *See, e.g.*, Tr. 6/15 at 2125:1–20.

[72]     *See* Tr. 6/19 at 2551:3–8.

market as early as May 2.[73]

      The first two factors are together sufficient to support the finding that the pre-5:12 p.m. declines in Vivendi's share price resulted from information concerning Moody's downgrade.  A significant share decline occurred shortly before the first record evidence of the public release of news about Moody's downgrade.  Liberty's expert testified that leaks of such news are common, and explained how such leaks unfold.  The opposing party could provide no alternative cause for the share decline.  In light of this evidence, and considering that direct evidence of trading based on impermissibly leaked information will presumably be difficult to prove in many cases even where such trading took place,[74] the jury could have reasonably inferred that the pre-5:12 p.m. share decline more likely than not resulted from information concerning the Moody's downgrade.[75]

---

[73]    See Lib. Mem. at 12 (citing 5/2/02 Email from Eileen McLaughlin to Guillaume Hannezo ("McLaughlin Email"), Ex. 9 to Rubenstein Decl.; 5/2/02 Email from Laurence Daniel to Guillaume Hannezo ("Daniel Email"), Ex. 10 to Rubenstein Decl.).

[74]    The jury was repeatedly instructed to use its common sense in finding the facts.  See Jury Charge at 8, 12, 13, 15.

[75]    In fact, it is unclear whether the jury made this finding.  The jury may have discounted Dr. Nye's damages award in part based on a rejection of Dr. Nye's theory that the share decline prior to 5:12 p.m. resulted from information about Moody's downgrade.  Drawing all inferences in favor of upholding the jury's verdict, the jury's verdict could be upheld on this basis even if Vivendi's challenge to Dr. Nye's May 3 analysis were successful, which it is not.

23

Because the first two factors are sufficient to support the jury's finding, it is not necessary to determine whether the two Vivendi emails might provide additional support.[76]  It is also unnecessary to address Liberty's argument that Vivendi's challenge is waived.[77]

### 4.    Maximum Inflation Date

Vivendi argues that no evidence supports Dr. Nye's choice of December 13, 2001 as the date of maximum inflation, that is, the date at which the value of Vivendi's shares was most inflated by Vivendi's fraud.[78]  Vivendi's

---

[76]    One of the internal Vivendi emails from May 2 reports a third party's statement that Vivendi stock was being shorted because hedge funds thought Vivendi would soon be downgraded by Moody's.  *See* McLaughlin Email.  The other reports that a third party heard Moody's could downgrade Vivendi.  *See* Daniel Email.  At trial, I sustained Vivendi's hearsay objection to Dr. Nye's reliance on the emails for the truth of the third parties' assertions.  *See* Tr. 6/14 at 1932:9–21.  But I allowed the admission of the emails for the purpose of showing "Vivendi was aware that people were saying this."  *Id.*  The mere fact that on May 2 Vivendi was discussing possible speculation concerning trading based on a looming Moody's downgrade strengthens the plausibility of Dr. Nye's theory that news of the downgrade might have leaked prior to any formal announcement, or at the very least that such a leak would not have been out of the ordinary.

[77]    *See* Lib. Mem. at 11.  Liberty suggests that Vivendi's argument is not a sufficiency challenge but is in fact a renewed *Daubert* challenge to Dr. Nye's reliability, and that Vivendi waived the *Daubert* challenge by failing to raise it in either of its two prior *Daubert* motions in this case.  *See id.*  Vivendi argues that it sufficiently preserved its challenge to Dr. Nye's inclusion of the pre-5:12 p.m. May 3 share decline through general arguments made in prior briefing.  *See* Viv. Reply at 5 n.6.

[78]    *See* Viv. Mem. at 13.

24

argument suggests that Dr. Nye should have taken into account Vivendi's

"multiple misrepresentations" between December 13, 2001 and January 7, 2002,[79]

because Liberty should not recover for inflation resulting from misrepresentations

made after the signing of the Merger Agreement on December 16, 2001.[80]  Vivendi

also criticizes Dr. Nye for failing to conduct a quantitative analysis of Vivendi's

concealed liquidity risk as a basis for arriving at the date of maximum inflation.[81]

        Vivendi's arguments are without merit.  A reasonable juror could have

accepted Dr. Nye's conclusion that the inflation of Vivendi's stock price as a result

of Vivendi's misrepresentations reached its peak on or before December 13, 2001.

Dr. Nye's choice was not arbitrary, but rather based on plausible and sufficiently

supported reasoning that was submitted to the jury for its consideration.  Dr. Nye

claimed that in the period leading up to December 13, there were a series of

indicators that liquidity risk was very high, but these indicators were unknown to

the market and to Liberty.[82]  On December 13, Vivendi CFO Guillaume Hannezo

wrote a private letter of reassurance to ratings agencies, which the jury could

---

[79]     *See id.* at 14.

[80]     *See id.* at 13.

[81]     *See id.* at 13–14.

[82]     *See* Lib. Nye Slides at 10.

reasonably have concluded helped to prevent a downgrade.[83]  Vivendi attempted to suggest at trial, including during the cross-examination of Dr. Nye, that misrepresentations between December 13 and January 7 further inflated Vivendi's share price.[84]  But the jury was entitled to reject Vivendi's counternarrative based on the jury's weighing of the evidence, including the testimony of the parties' experts.

Vivendi is also incorrect to suggest that Dr. Nye had an obligation to derive the maximum inflation date from a quantitative analysis of Vivendi's liquidity risk, a suggestion for which Vivendi provides no legal support.[85]  It was unnecessary to arrive at an absolute quantitative measure of Vivendi's liquidity risk in order to determine when the inflation of Vivendi's stock price reached its highest point, and for the same reason that it is unnecessary to know the height of each mountain in a range in order to identify which is the tallest:  comparative terms like "highest" and "tallest" do not require absolute measures.  It would not have been unreasonable for the jury to have accepted Dr. Nye's maximum inflation date based on his narrative analysis of the growth of the gap between Vivendi's

---

[83]  *See id.* at 11.

[84]  *See, e.g.*, Tr. 6/14 at 2022:22–24.

[85]  *See* Viv. Mem. at 13–14.

actual liquidity risk and the inaccurate perceptions of that risk based on Vivendi's misrepresentations and omissions.

### 5. Inflation Amount

Finally, Vivendi suggests that a reasonable jury could not have relied on Dr. Nye's damages calculation, because Dr. Nye arrived at the same inflation amount based on different sets of misstatements in the Class and Liberty trials.[86] At the Class Action trial, plaintiffs presented fifty-seven misstatements or omissions ranging from October 30, 2000 to June 26, 2002.[87] At the Liberty trial, Liberty relied on a smaller set of twenty-five misstatements or omissions.[88] A small part of the difference resulted from the fact that under the Merger Agreement, Liberty was only entitled to recover for Vivendi's misrepresentations between December 31, 2000 and the signing of the Merger Agreement on December 16, 2001.[89] Liberty's claim thus did not include the two

---

[86]    *See id.* at 14.

[87]    *See* Class Action Verdict Form, Ex. 5 to Campbell Decl., at tbl. A ("Class Action Misstatement or Omission Table").

[88]    *See* Special Verdict Form, Ex. 13 to Rubenstein Decl., at tbl. A ("Liberty Misstatement or Omission Table").

[89]    *See* Viv. Mem. at 15 & n.9 (citing 12/16/01 Agreement and Plan of Merger and Exchange ("Merger Agreement"), Ex. 6 to Campbell Decl., §§ 3.08, 3.11).

misrepresentations from before this period introduced at the Class Action trial, one of which occurred on October 30, 2000, and the other on December 19, 2000.[90] Despite this and other differences, Dr. Nye testified to the same inflation amount (€22.52 per share) in both trials.[91]

If Dr. Nye's analysis were based on the assumption that each of Vivendi's misstatements played a distinct and independently measurable role in inflating Vivendi's share price, then Vivendi's argument might have merit.  At minimum, Liberty would not be entitled to recover for whatever inflation Dr. Nye's analysis would suggest was already built into Vivendi's share price at the start of trading on December 31, 2000 based on Vivendi's two earlier misstatements regarding its liquidity risk.[92]

Vivendi's challenge is without merit, however, because Dr. Nye's damages analysis did not depend on the assumption that every misrepresentation by Vivendi could be independently monetized and subtracted from Liberty's

---

[90]     *See* Class Action Misstatement or Omission Table.

[91]     *See* Viv. Mem. at 15 (citing Tr. 6/14 at 2012:11–23).

[92]     Once again, however, even if I were to accept this conclusion, which I do not, the jury's verdict would not need to be disturbed.  The jury could have corrected for Dr. Nye's hypothetical error on this point by discounting Dr. Nye's damages calculation.

damages.[93]  Again, Dr. Nye presented to the jury a sufficiently supported narrative of the growth of the inflation in Vivendi's share price based on Vivendi's misstatements and omissions from December 31, 2000 to December 16, 2001.  The calculation of damages was not derived from an analysis of the specific effects of individual misrepresentations and omissions.  Dr. Nye calculated the damages Liberty suffered as a result of this inflation by analyzing the declines in Vivendi's stock price on the nine days during which the market responded to the materialization of the hidden liquidity risk.  Vivendi has offered no legal basis for concluding that this was an unacceptable approach.

Vivendi was free to attempt to persuade the jury to reject Dr. Nye's relatively simple method for determining loss causation and damages in favor of a more sophisticated one.  Using a different method, it might in theory have been possible to offer a more precise causal analysis, one that would have arrived at different damages calculations for the fifty-seven misrepresentations at the Class Action trial and the twenty-five at the Liberty trial.  But the law does not require the use of such a fine-grained quantitative method, if one in fact exists that would

---

[93]    As Vivendi itself recognized in its 50(a) motion, "Dr. Nye did not calculate the amount of inflation in Vivendi's share price that was caused by any particular alleged misstatement or omission identified by Liberty."  Vivendi's 6/15/12 Memorandum of Law in Support of Motion for Judgment as a Matter of Law ("Viv. 50(a) Mot.") at 14.

produce reliable rather than spuriously precise results.  The jury in this case was explicitly charged that "[d]amages need not be proven with mathematical certainty, but there must be enough evidence for you to make a reasonable estimate of damage."[94]  Dr. Nye's analysis more than satisfies this standard, even if his method leads to the same result based on the misrepresentations in both the Class and Liberty trials.

Finally, a reasonable juror could have concluded that where losses result from a party's failure to correct a false impression it created that a risk does not exist, the losses may be the same whether the party failed to correct the false impression on twenty-five occasions over one year or fifty-seven occasions over a year and a half.  Either way, plaintiffs may suffer the same losses as a result of the materialization of the risk.[95]

---

[94]     Jury Charge at 29.

[95]     It is true that viewing the liquidity risk in this case in such a binary way — as though investors only considered whether the risk existed, or not, rather than viewing the risk in terms of the likelihoods of various crisis-related events — could gloss over potentially significant differences between the damages suffered by the Class and by Liberty.  For example, if some of the statements or omissions admitted in the Class Action trial but not in the Liberty trial had suggested that there was no more than a five percent chance of a liquidity crisis, while the most positive statements or omissions admitted in the Liberty trial had suggested that there was no more than a twenty-five percent chance of a liquidity crisis, and if the market inflated Vivendi's stock price based on the claims of a five percent or smaller risk, then Liberty would not have been entitled to damages resulting from the fall in Vivendi's stock price from the height it actually reached based on the

B.      **Disclosure of Previously Undisclosed Risk**

The jury was instructed that for Liberty to establish loss causation in

its Section 10(b) claim, it was required to "prove both that the loss it suffered was

foreseeable and that the loss was caused by events that revealed information

concerning Vivendi's true liquidity risk that previously had been concealed by the

false/untrue or misleading statements."[96]  Vivendi now argues, as it did in an

unsuccessful post-verdict motion for judgment as a matter of law in the Class

Action trial,[97] that the materialization events in the present case did not reveal a

previously undisclosed risk, and thus that Liberty failed to prove loss causation.[98]

Specifically, Vivendi argues that it is entitled to judgment as a matter of law

_____

five percent claims to the height it would have reached if the market had only
heard the twenty-five percent claims.  Such speculation, however, hardly compels
the striking of Dr. Nye's testimony, the entry of judgment as a matter of law, or the
granting of a new trial.  Dr. Nye's methods in the present case were adequate to
meet the Second Circuit's standards for the proof of loss causation and damages,
according to which plaintiffs are not "'required to allege the precise loss
attributable' to defendants' fraud."  *In re Vivendi*, 634 F. Supp. 2d at 365 (quoting
*Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177 (2d Cir. 2005)).  *See also
Lattanzio*, 476 F.3d at 158 (suggesting that Section 10(b) obligates plaintiffs to
allege facts "that would allow a factfinder to ascribe some rough proportion of the
whole loss" to defendants' misstatements).

[96]      Jury Charge at 27.

[97]      *See In re Vivendi*, 765 F. Supp. 2d at 555–60.

[98]      *See* Lib. Mem. at 16.

because Liberty failed to prove that (i) "a reasonable investor misled by the fraud
would have perceived the allegedly corrective events as 'remote or highly
unlikely,'" and (ii) "the allegedly corrective events related to the 'specific
misrepresentations alleged.'"[99]   Neither of these elements were included in the
jury's instructions regarding loss causation, but Vivendi purports to derive them
from a reading of Second Circuit case law.[100]   Vivendi argues that because Liberty
produced "no evidence" to satisfy standards (i) and (ii), there was insufficient
evidence for the jury to conclude that Liberty proved loss causation.[101]

      Liberty responds that Vivendi's loss causation argument is waived
under Rule 50(b) because it did not appear in Vivendi's Rule 50(a) Motion.[102]   I
agree.   The Second Circuit has stated:

> [B]ecause the Rule 50(b) motion is only a renewal of the
> preverdict motion, it can be granted only on grounds advanced in
> the preverdict motion.   The earlier motion informs the opposing
> party of the challenge to the sufficiency of the evidence and
> affords a clear opportunity to provide additional evidence that

---

[99]    *Id.* at 18 (quoting *Lentell*, 396 F.3d at 173; *In re Omnicom Grp., Inc.
Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)).

[100]    *See* Jury Charge at 27–28; Lib. Mem. at 16–18 (analyzing *Lentell*, 396
F.3d at 173; *In re Omnicom*, 597 F.3d at 511).

[101]    *See* Lib. Mem. at 16, 23.

[102]    *See id.* at 15.

may be available.[103]

"As to any issue on which proper Rule 50 motions were not made, JMOL may not properly be granted by the district court . . . unless that action is required in order to prevent manifest injustice."[104]  Vivendi did not suggest in its Rule 50(a) motion that Liberty was required to prove, and failed to prove, either element (i) or (ii).[105] Vivendi is thus barred from raising these arguments in its Rule 50(b) motion.

Waiver under Rule 50, however, does not imply waiver under Rule 59.[106]  I thus consider Vivendi's challenge to the jury's answer to Question 10

---

[103]   *Lore v. City of Syracuse*, 670 F.3d 127, 153 (2d Cir. 2012) (quoting Fed. R. Civ. P. 50 Advisory Committee Note (2006) (emphasis omitted)).

[104]   *Id.* (citing *Kirsch v. Fleet St., Ltd.*, 148 F.3d at 164; *Galdieri-Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 287 (2d Cir. 1998)).

[105]   *Compare* Viv. 50(a) Mot. at 11–15; *and* Viv. Mem. at 16–18. Vivendi's Rule 50(a) brief states that "Liberty has failed to prove that Vivendi's false or misleading statements *caused* the losses they suffered."  Viv. 50(a) Mot. at 2.  But the details of Vivendi's Rule 50(a) loss causation argument contain no hint that materialization events need to be perceived as "remote or highly unlikely," or that materialization events must reveal some fact directly traceable to the "specific misrepresentation alleged."  *Id.* at 2, 11–15.  Vivendi suggests in its reply brief that its citation of *Lentell* and *Omnicom* in the Rule 50(a) motion somehow provide a sufficient foundation for the arguments in its renewed motion.  *See* Viv. Reply at 6 n.7.  However, Vivendi cited those cases in the earlier brief for different legal rules.  *See* Viv. 50(a) Mot. at 11, 12.  The citations gave no indication of the arguments Vivendi raises now.

[106]   *See, e.g.*, *Bracey v. Board of Educ. of City of Bridgeport*, 368 F.3d 108, 117–19 (2d Cir. 2004) (denying Rule 50(b) motion based on failure to file Rule 50(a) motion, but granting Rule 59 motion).

33

under Rule 59, and conclude that Vivendi's challenge is without merit.  Vivendi

misinterprets Second Circuit case law to create requirements for Liberty's Section

10(b) claim that do not exist.  *First*, the Second Circuit reaffirmed in *Lentell* the

following principle:

> If the significance of the truth is such as to cause a reasonable
> investor to consider seriously a zone of risk that would be
> perceived as remote or highly unlikely by one believing the fraud,
> and the loss ultimately suffered is within that zone, then a
> misrepresentation or omission as to that information may be
> deemed a foreseeable or proximate cause of the loss.[107]

Vivendi infers from this that "there can be no loss causation unless a reasonable

investor misled by the fraud would have thought it 'remote or highly unlikely' that

the event causing his or her loss would occur."[108]  But *Lentell* asks whether a

reasonable investor who believed the fraud would perceive the *zone of risk* as

remote or highly unlikely, not whether such an investor would perceive any

*specific event* within the zone of risk as unlikely.[109]  What Judge Holwell noted in

response to Vivendi's identical argument in the Class Action is equally true in the

---

[107]     *Lentell*, 396 F.3d at 173 (quoting *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 188 (2d Cir. 2001)).

[108]     Viv. Mem. at 17 (emphasis added).  *See also id.* at 18 ("At trial, Liberty introduced no evidence that . . . a reasonable investor misled by the fraud would have perceived the allegedly corrective events as 'remote or highly unlikely.'").

[109]     *See In re Vivendi*, 765 F. Supp. 2d at 556.

present case:  plaintiffs have "offered substantial evidence that the zone of risk — a liquidity crisis — would have been thought unlikely by shareholders who believed Vivendi's repeated assurances about its financial health."[110]

Second, the Second Circuit distinguished in *Omnicom* between the proof of loss causation based on a theory of corrective disclosure, and proof of loss causation based on a theory of materialization of the risk.[111]  Under the former theory, "loss causation can be established by a 'corrective disclosure to the market' that 'reveal[s] . . . the falsity of prior recommendations.'"[112]  Under the latter theory, loss causation can be established by showing "'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'"[113]  In rejecting the *Omnicom* plaintiffs' corrective disclosure argument, the Second Circuit noted that none of the ostensible disclosures put forth by plaintiffs "even purported to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint."[114]

---

[110]     *Id.*

[111]     *See Omnicom*, 597 F.3d at 511–14.

[112]     *Id.* at 511 (quoting *Lentell*, 396 F.3d at 175 n.4).

[113]     *Id.* at 513 (quoting *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 107 (2d Cir. 2007)).

[114]     *Id.* at 511.

Vivendi infers from *Omnicom* that Liberty had the burden to prove
that "the allegedly corrective events" in the present case "related to the 'specific
misrepresentations alleged'" in the present case.[115]  But what Judge Holwell stated
in the context of the Class Action trial also applies here:  "This is not a corrective
disclosure case.  Rather, plaintiffs are proceeding under a materialization of the
risk theory."[116]  Vivendi's invocation of the Second Circuit's language in analyzing
the *Omnicom* plaintiffs' corrective disclosure argument is misplaced.  It was not
necessary for Liberty "to establish a one-to-one correspondence between concealed
facts and the materialization of the risk."[117]

Even if Vivendi's sufficiency arguments were treated as though they
were independent from its novel legal interpretations,[118] the sufficiency arguments
would also fail on the merits.  Vivendi repeatedly suggests that the materialization
events identified by Liberty were either recharacterizations of previously known

---

[115]   Viv. Mem. at 18 (quoting *Omnicom*, 597 F.3d at 511).

[116]   *In re Vivendi*, 765 F. Supp. 2d at 559.

[117]   *In re Vivendi*, 634 F. Supp. 2d at 367.  As Judge Holwell went on to
explain:  "if a company misrepresents fact A (we have plenty of free cash flow),
which conceals risk X (liquidity), the risk can still materialize by revelation of fact
B (a ratings downgrade), an indication of risk X (liquidity)."  *Id.*

[118]   As even Liberty recognizes, Vivendi's sufficiency arguments do not
seem to depend in any straightforward way on its novel legal arguments for
elements (i) and (ii).  *See* Lib. Mem. at 17.

36

information or unrelated to Vivendi's liquidity risk as it existed at the time the Merger Agreement was signed.[119]   To take one example, Vivendi suggests that the news on June 21 and June 24, 2002 regarding the repurchase agreement ("repo") that Vivendi used in connection with its sale of Vivendi Environnement could not have been understood by a reasonable juror as a revelation of Vivendi's liquidity risk in December 2001, because "it was well known that Vivendi intended to sell Vivendi Environnement in June."[120]   Liberty responds that Dr. Nye testified the market was troubled not by the sale itself but by its rapid timing and the use of the "repo" in the deal.[121]   Vivendi then suggests that even if Liberty succeeded in proving that the June 21 and 24 news revealed a liquidity risk that troubled the market, that liquidity risk "had nothing to do with Vivendi's liquidity condition six months earlier."[122]   Vivendi argues that its asset and share sales in the intervening months "[broke] the chain of causation between the liquidity risk of December

---

[119]   *See* Viv. Mem. at 18–23.

[120]   *Id.* at 20 (citing Martine Orange, *Vivendi Universal Prepared to Sell Its Stake in Vivendi Entertainment*, LE MONDE, June 10, 2002, Ex. 9 to Campbell Decl.).

[121]   *See* Lib. Mem. at 20 (citing Tr. 6/14 at 1937:4–1939:12; Lib. Nye Slides at 39–54).

[122]   Viv. Reply at 7.

2001 and the sale of Vivendi Environnement shares."[123]

Vivendi's attempt to suggest that the liquidity problems revealed in 2002 had "nothing to do" with the liquidity risk concealed in 2001 is unpersuasive. A reasonable juror could have concluded that Vivendi had a need for cash in late June 2002, despite the asset and share sales mentioned by Vivendi, precisely *because of* the sources of liquidity risk it concealed in 2001.  In fact, the intervening asset sales strengthen rather than weaken the chain of causation between the concealed liquidity risk in 2001 and the liquidity problems in 2002.  It would be easier for Vivendi to argue that its liquidity problems in June 2002 were unrelated to its liquidity risk in December 2001 if Vivendi had purchased rather than sold assets in the intervening months.  In that case, Vivendi could have argued that the June 2002 problems were the result of risk created by the new purchases rather than the result of any liquidity risk existing in December 2001.

Vivendi's arguments regarding the other materialization days are equally unpersuasive.  Vivendi repeatedly suggests that the materialization events "revealed nothing,"[124] "revealed no new information,"[125] "were recharacterizations

---

[123]     *Id.*

[124]     Viv. Mem. at 18 (referring to the January 7 treasury share sale).

[125]     *Id.* at 19 (referring to the May 3 Moody's downgrade).

of previously disclosed facts,"[126] or were "unrelated to Vivendi's . . . liquidity risk"

altogether.[127]  With regard to each challenge, Liberty offers persuasive arguments

as to how a reasonable juror could have concluded based on Dr. Nye's testimony

and other evidence that each of the materialization events did, in fact, reveal new

information specifically related to Vivendi's liquidity risk.[128]  For example, in

response to Vivendi's argument that the May 3 Moody's downgrade "revealed no

new information about Vivendi's liquidity risk" because "the reasons for the

Moody's downgrade were known to the market before the downgrade,"[129] Liberty

correctly recounts testimony heard by the jury that could easily have supported the

conclusion that "the downgrade conveyed to the market new information about

Vivendi's liquidity," including Dr. Nye's testimony that ratings agencies have

access to nonpublic information.[130]  The jury could reasonably have rejected Dr.

---

[126]   *Id.* at 20 (referring to July 1–2 downgrades and July 3 analyst and press reports).  *Accord id.* at 21 (referring to July 10 S&P press release); *id.* at 23 (referring to August 14 factors as mostly recharacterization).

[127]   *Id.* at 21 (referring to aspects of July 1 Moody's downgrade).  *Accord id.* (referring to July 10 Bloomberg article); *id.* at 22 (referring to July 15 press articles); *id.* (referring to the August 14 factors).

[128]   *See* Lib. Mem. at 18–23.

[129]   Viv. Mem. at 19.

[130]   Lib. Mem. at 19 (citing Tr. 6/14 at 1927:14–21).  I also note that even if a ratings agency justified its downgrade entirely through information already known to the market, a reasonable juror could have found that the downgrade *itself*

Silber's competing testimony.[131]

### C.   Damages

The jury awarded €765 million in damages.[132]  This was roughly €77 million less than Dr. Nye's damages calculation of roughly €842 million.[133]  Stated in terms of share price, the jury's award was €2.06 per share less than Dr. Nye's calculation of €22.52 inflation per share.[134]  By contrast, Dr. Silber had calculated Liberty's damages as between €0 and €175 million.[135]

Vivendi argues that the jury's damages award is not supported by any

---

represented a materialization of the liquidity risk:  because downgrades involve judgment, they constitute new information beyond the individual facts offered in support of the judgment.  A downgrade is new information for the market even if the stated explanation for the downgrade contains no new facts.  *Cf. In re Vivendi*, 634 F. Supp. 2d at 367 ("[I]f a company misrepresents fact A (we have plenty of free cash flow), which conceals risk X (liquidity), the risk can still materialize by revelation of fact B (a ratings downgrade), an indication of risk X (liquidity).").

[131]      *See, e.g.*, Tr. 6/19 at 2553:8–16 (Dr. Silber testifying that market had already anticipated Moody's downgrade).

[132]      *See* Special Verdict Form at 5, 7.

[133]      *See* Tr. 6/13 at 1879; Tr. 6/21 at 3054 (Liberty summation stating damages as €841,942,539); 12/21/07 Expert Report of Blaine F. Nye (stating damages as €842.2 million).

[134]      *See* Tr. 6/21 at 3054.  Without citation, Liberty's brief states the total decline in the value of Liberty's shares in Vivendi between December 16, 2001 and August 14, 2002 as €1.56 billion.  *See* Lib. Mem. at 26.

[135]      *See* Tr. 6/19 at 2582–2584.

evidence in the record and must be rejected.[136]   Specifically, Vivendi's opening

brief criticizes the jury's damages finding because it "bears no relation to either Dr.

Nye's or Dr. Silber's analyses" and "does not correspond to any of the price drops

that Dr. Nye attributes to corrective disclosures."[137]   Vivendi's reply brief attempts

to clarify that "Vivendi does not argue that the jury's award has to match either

expert witness's damages calculation 'wholesale,' or exactly match the price drops

claimed by Dr. Nye."[138]   If a jury may depart from expert damages calculations,

however, and need not do so in a way that exactly, numerically corresponds to the

rejection of specific elements of those calculations, it is difficult to understand the

basis for Vivendi's criticism of the jury's award.   Vivendi gives no indication of

the nature of the "relation" that the jury's award was required to have, but failed to

have, to Dr. Nye's and Dr. Silber's analyses, if the "relation" was not one of the

two relations disavowed in Vivendi's reply brief.[139]

    In any case, Vivendi's argument is probably waived.[140]   Vivendi failed

to request a jury instruction placing strict numerical constraints on the jury's

---

[136]  Viv. Mem. at 24.

[137]  *Id.*

[138]  Viv. Reply at 9 n.9.

[139]  *See id.*

[140]  *See In re Vivendi*, 765 F. Supp. 2d at 575.

damages award, or requiring the jury to itemize its award based on specific

declines in share price.  To the contrary, the jury was instructed "to make a

reasonable *estimate*" (emphasis added):

> Any damages you award must have a reasonable basis in the evidence and may not be based on speculation.  Damages need not be proven with mathematical certainty, but there must be enough evidence for you to make a reasonable estimate of damage.[141]

The jury heard Dr. Nye's and Dr. Silber's calculations and apparently

found the former largely but not entirely credible.  If the jury discounted Dr. Nye's

calculation by roughly ten percent, the jury acted appropriately and within the

bounds of its instructions.  Even Vivendi seems to acknowledge the

appropriateness of such discounting:  Vivendi approvingly notes that the jury in the

Class Action awarded roughly half the damages calculated by Dr. Nye because the

jury "found Dr. Nye's calculations non-credible by a factor of 50%."[142]  The jury

here has apparently done nothing different, except that it found Dr. Nye's

calculations roughly ninety percent credible rather than roughly fifty percent

credible.  Credibility determinations are the province of the jury, and it is

appropriate for damages awards to reflect credibility determinations regarding the

---

[141]     Jury Charge at 29.

[142]     Viv. Mem. at 25.

damages calculations of experts.[143]  Vivendi has not cited, and I am not aware of,

any precedent for the proposition that juries departing from expert calculations

must themselves reason like experts and perform technical calculations, rather than

arriving at rough estimates based on reasonable but imprecise credibility

determinations.

The question remains, however:  if the jury did find Dr. Nye roughly

ninety percent credible, why did it award €765 million in damages, which is

90.86% of €842 million, rather than a simple, round 90% of €842 million (that is,

€757.8 million)?  One possible answer would be that the jury, recognizing the

many sources of imprecision in the damages calculations in this case, conceived of

Dr. Nye's damages as "roughly €850 million," and then discounted that number by

ten percent.  Ninety percent of €850 million is exactly €765 million.  Another

possible answer would be that the jury subtracted €2.06 per share from Dr. Nye's

€22.52 per share inflation calculation by partially or wholly discounting one or

more of the materialization events, as noted above, or by partially or wholly

incorporating one or more of Dr. Silber's confounding events, also as noted above.

---

[143]    *See First Nat'l Bank of Kenosha v. United States*, 763 F.2d 891, 896
(7th Cir. 1985) (upholding verdict where "the jury was presented . . . with widely
divergent opinions" about quantity of damages, the jury "apparently did not accept
whole-cloth the view of either of the experts," and "very possibly . . . split[] the
difference" between the two).

Liberty invited such discounting in its summations:  "Now, if there are some of

these days you're not persuaded by, like you think, well, one of the days is a close

call or whatever . . . I understand that. . . .  I would understand if you don't do that

exact number . . . ."[144]  This invitation, as well as the jury's instructions, were

appropriate in light of the Second Circuit's repeated emphasis that losses resulting

from securities fraud need not be proved with mathematical precision.[145]

It is hopeless to attempt to determine which specific materialization

events, if any, the jury might have questioned; or which specific confounding

events, if any, it might have incorporated; and what specific degrees of credence it

gave to either or both.  The jury's deliberations cannot be deduced from the

number 77, nor from the number 2.06.  But while I cannot know for sure which

calculations the jury actually made, "'a jury has wide discretion in determining

damages, so long as it has a reasonable basis.'"[146]  There were any number of

reasonable paths for arriving at a damages award of €765 million based on rough

---

[144]   Tr. 6/21 at 3054–3055.

[145]   *See Lattanzio*, 476 F.3d at 158 (requiring plaintiffs to produce
sufficient evidence for the fact finder to "ascribe some rough proportion of the
whole loss" to defendant's fraud); *Lentell*, 396 F.3d at 177 ("We do not suggest
that plaintiffs were required to allege the precise loss attributable to [defendant's]
fraud . . . .").

[146]   *In re Vivendi*, 765 F. Supp. 2d at 576 (quoting *Dresser Indus., Inc. v.
Gradall Co.*, 965 F.2d 1442, 1447 (7th Cir. 1992)).

credibility determinations regarding the experts' calculations.

Finally, Vivendi argues that the Court should grant remittitur and reduce Liberty's award because it "deviates materially" from reasonable compensation as measured by awards in similar cases, in violation of section 5501(c) of New York's Civil Practice Law and Rules ("CPLR").[147]  Section 5501(c) was enacted "as part of a series of tort reform measures,"[148] and states in relevant part:

> In reviewing a money judgment *in an action in which an itemized verdict is required by rule forty-one hundred eleven of this chapter* in which it is contended that the award is excessive or inadequate and that a new trial should have been granted unless a stipulation is entered to a different award, the appellate division shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.[149]

The only subsections of CPLR § 4111 that require an itemized verdict are subsections (d) and (e), which concern, respectively, "medical, dental, or podiatric malpractice actions," and "personal injury, injury to property or wrongful death." Neither Liberty's Section 10(b) claim nor its breach of warranty claim fall within these tort law categories.  Nevertheless, Vivendi points to past decisions in which

---

[147]  *See* Viv. Mem. at 25.

[148]  *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 423 (1996).

[149]  CPLR § 5501(c) (emphasis added).

45

federal courts have applied CPLR § 5501(c) outside of the tort context.[150]

In any case, even if the "deviates materially" standard applied to the jury's €765 million award on Liberty's state-law-based breach of warranty claim, the more difficult "shocks the conscience" standard would continue to apply to the jury's €765 million award on Liberty's federal section 10(b) claim.  "When federal law provides the cause of action, remittitur is appropriate when the jury award

---

[150]       Vivendi cites the following cases as examples:  *Learning Annex Holdings, LLC v. Rich Global, LLC*, No. 09 Civ. 4432, 2012 WL 2878124, at *6 (S.D.N.Y. July 13, 2012) (applying section 5501(c) in unjust enrichment and quantum meruit case); *Uni-Try Corp. v. Guangdong Bldg., Inc.*, No. 95 Civ. 09432, 2012 WL 1901200, at *6 (S.D.N.Y. May 25, 2012) (applying section 5501(c) in breach of contract and fraudulent inducement case); *Health Alliance Network, Inc. v. Continental Cas. Co.*, 245 F.R.D. 121, 131 (S.D.N.Y. 2007) (applying section 5501(c) in breach of confidentiality agreement and misappropriation of trade secrets case).  *See* Viv. Mem. at 10.  The commentary to the statute in McKinney's Consolidated Laws of New York states, inconclusively:  "The reference to cases in which an itemized verdict is required by CPLR 4111 appears to restrict the operation of this 5501(c) amendment to the tort case, but the tort case is of course the traditional context of the excess verdict problem."  David D. Siegel, *Practice Commentaries*, in 7B MCKINNEY'S CONSOL. LAWS OF N.Y. CPLR § 5501(c) (2011).  *See also* DAVID D. SIEGEL, NEW YORK PRACTICE § 407 (5th ed. 2012) (stating that the "shocks the conscience" standard "was relaxed in 1986 *in tort actions*, including the common personal injury and wrongful death actions in which additur and remittitur are most often seen" (emphasis added)).  "[A] federal court in a case governed by state law must apply the state law standard for appropriateness of remittitur."  *Payne v. Jones*, 696 F.3d 189, 200 n.7 (2d Cir. 2012) (citing *Gasperini*, 518 U.S. at 429–30).  However, Vivendi has not cited a case in which a New York state court applied the "deviates materially" standard outside the tort context, nor provided any other clear explanation or justification for the practice of federal courts applying the "deviates materially" standard to New York jury verdicts outside of tort law.

includes an identifiable error of a quantifiable amount or is so high as to 'shock the conscience.'"[151]

Thus, even if I were persuaded by Vivendi's argument that the jury's verdict on the breach of warranty claim is excessive under section 5501(c) — which I am not[152] — and even if I were to reduce the breach-of-warranty award on that basis, Liberty would still be entitled to the full €765 million in damages from the jury's verdict on the section 10(b) claim — unless Vivendi succeeded in establishing that the latter verdict shocked the judicial conscience.  Vivendi has not done so.  The jury faithfully obeyed its instructions, arriving at a reasonable estimate of Liberty's damages that fell between the plausible calculations of the experts.

### D.    Section 10(b) Reliance

---

[151]   *Port Auth. Police Asian Jade Soc'y of N.Y. & N.J. Inc. v. Port Auth. of N.Y. & N.J.*, 681 F. Supp. 2d 456, 469 (S.D.N.Y. 2010) (citing *Kirsch*, 148 F.3d at 165).

[152]   Vivendi emphasizes that the jury's award in the present case "deviates materially" from the jury's award in the Class Action, where the jury considered the same calculations by Dr. Nye but arrived at a much smaller verdict.  *See In re Vivendi*, 765 F. Supp. 2d at 524 ("The jury found the daily inflation in the price of Vivendi's [shares] to be approximately half of the daily inflation amount that Dr. Nye had calculated on most days in the Class Period.").  Yet Vivendi does not explain why this Court should assume the jury in the present case to be unreasonable and the jury in the prior case to be reasonable, rather than vice versa.  One cannot disprove the accuracy of a ruler simply by comparing it to another ruler and observing that one is longer than the other.

Reliance by Liberty upon Vivendi's "deceptive acts is an essential element of the § 10(b) private cause of action."[153]  The Supreme Court has found

> a rebuttable presumption of reliance in two different circumstances.  First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance.  Second, under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public. The public information is reflected in the market price of the security.  Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement.[154]

The jury instructions reflected these principles:

> Liberty must prove by a preponderance of the evidence that it relied upon the statements Vivendi made to the public.  In order to satisfy this element, Liberty must prove that it read or heard the false and misleading statement and relied on it, and that its reliance was reasonable and justified. . . .
>       . . .
>       What Liberty must prove to establish reliance depends on whether the particular statement in question was a misstatement or an omission.  To prove that it relied on a misstatement that Vivendi made, Liberty must prove that, but for the misstatement that Vivendi made, Liberty would not have signed the Merger Agreement.
>       With respect to an omission — that is Vivendi's failure to state a material fact that was necessary to prevent the statements that were made from being misleading under the circumstances — Liberty is entitled to a presumption of reliance.  An omission is material if there is a substantial likelihood that a reasonable

---

[153]     *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159 (2008).

[154]     *Id.* (citations omitted).

investor would have considered the omitted fact to be important
in making investment decisions regarding Vivendi's stock.[155]

The instructions then described how Vivendi could rebut the presumption of

reliance regarding material omissions.  The instructions also reflected my ruling

before trial that the fraud-on-the-market presumption only applied in a very limited

sense.[156]

At trial, Liberty introduced evidence that Robert Bennett, Liberty's

CEO, directed Liberty Vice President Neal Dermer to perform due diligence and

formulate a recommendation on a Vivendi investment; Bennett and John Malone,

Liberty's Chairman, expected Dermer to review public information about Vivendi,

including SEC filings and press releases; during his review, Dermer read all or

---

[155]    Jury Charge at 24–25.

[156]    *See* Tr. 3/13 at 21:3–21.  The Jury Charge incorporated the fraud-on-
the-market presumption only in the following sense:

> In setting the ratio in the Merger Agreement at which Vivendi
> stock was exchanged for USA Networks and [MTH] stock,
> Liberty was entitled to rely on the fact that the market price of
> Vivendi stock at the time it signed the Merger Agreement
> reflected and incorporated all of the information known to the
> market about Vivendi, including the information contained in
> Vivendi's false or misleading public statements.

Jury Charge at 24–25.

nearly all of the twenty-five material misrepresentations presented to the jury;[157] Dermer's review of these misrepresentations affected his conclusion that Vivendi's stock was fairly valued and his recommendation; and Bennett and Malone relied on Dermer's recommendation when they decided to sign the Merger Agreement.[158]

At the conclusion of trial, the jury answered "YES" to the following question on the Special Verdict Form regarding Liberty's Section 10(b) claim: "Has Liberty proven, by a preponderance of the evidence, that it justifiably relied on any of the statements set forth in Table A when it signed the Merger Agreement with Vivendi on December 16, 2001?"[159]  As will be discussed at greater length below, Table A contained the list of Vivendi's twenty-five "False or Misleading Statements That Misstated or Omitted Vivendi's True Liquidity Risk That Were Made Prior to [the] Signing of the Liberty Contract."[160]

---

[157]     Vivendi argues that Dermer did not review two of the twenty-five statements.  *See* Viv. Mem. at 28 n.12.  The issue is immaterial.  Just as fifty-seven misrepresentations can cause the same false impression and harm as twenty-five, so can the same false impression and harm be caused by twenty-three.  Moreover, the jury was not required to find that Vivendi relied on all twenty-five statements. *See* Special Verdict Form at 6 ¶ 8 ("Has Liberty proven . . . that it justifiably relied on *any* of the statements set forth in Table A . . . ?" (emphasis added)).

[158]     *See* Tr. 6/6 at 1005–1006; Tr. 6/7 at 1172, 1358–1366; Tr. 6/8 at 1380–1394.

[159]     Special Verdict Form at 6 ¶ 8.

[160]     Liberty Misstatement or Omission Table.

Vivendi argues that based on the evidence at trial, Liberty "utterly failed" to prove reliance under Section 10(b),[161] and thus that the jury's finding of Section 10(b) reliance lacked a "legally sufficient basis" and must be rejected.[162] Vivendi's argument is factually detailed, but ultimately depends on the false premise that in order to establish reliance, Liberty needed to prove that someone with the authority to sign or close the transaction personally reviewed some or all of the twenty-five misrepresentations, or reviewed an analysis that specifically dealt with the misrepresentations.[163]

The only legal support Vivendi offers for this position is a brief 1987 decision, *Zaro v. Mason*, in which the District Court found that three individual plaintiffs had failed to show Section 10(b) reliance on a misstatement in the offering memo for a limited real estate partnership.[164]  In *Zaro*, however, the three plaintiffs who failed to prove Section 10(b) reliance had neither read the misstatement at issue nor relied on representations from an agent that were based

---

[161]    Viv. Mem. at 27.

[162]    *Id.* at 29.  Vivendi does not challenge Liberty's proof of reliance for the purposes of Liberty's breach of warranty claim.  *See id.* at 26–29.

[163]    *See* Viv. Mem. at 26–29; Viv. Reply at 11–13.

[164]    *See* Viv. Mem. at 28 (citing *Zaro v. Mason*, 658 F. Supp. 222, 228–29 (S.D.N.Y. 1987)).

on a review of the misstatement.[165]  By contrast, Liberty, through its corporate

agent Dermer, actually read all or nearly all of the misrepresentations at issue in

the present case.

It is a general rule "'that a corporation is charged with constructive

knowledge . . . of all material facts of which its officer or agent receives notice or

acquires knowledge while acting in the course of employment within the scope of

his or her authority.'"[166]  As the jury was instructed:  "Vivendi and Liberty are

corporations and thus can only act through their agents.  That is, statements and

actions by Vivendi and Liberty employees acting within the scope of their

employment are imputed to the corporation."[167]  Because Dermer was an employee

of Liberty, and because his analysis of the Vivendi investment took place within

the scope of his employment, a reasonable juror could have found that Liberty read

the misrepresentations that Dermer read.[168]

---

[165]     *See Zaro*, 658 F. Supp. at 228–29.

[166]     *In re Parmalat Sec. Litig.*, 684 F. Supp. 2d 453, 472 n.116 (S.D.N.Y. 2010) (quoting 3 WILLIAM MEADE FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 790 (perm. ed. 2002)).

[167]     Jury Charge at 17.

[168]     Moreover, it would be odd if Section 10(b) required Liberty to prove that Dermer specifically mentioned Vivendi's misrepresentations to his superiors. Precisely because the misrepresentations *concealed* Vivendi's liquidity risk, there may have been no reason for Dermer to mention them specifically.

The reliance requirement of Section 10(b) ultimately aims to ensure "that, for liability to arise, the 'requisite causal connection between a defendant's misrepresentation and a plaintiff's injury' exists."[169]  Even if the jury viewed all twenty-five of Vivendi's misrepresentations as misstatements rather than omissions,[170] Liberty provided sufficient evidence of the requisite causal connection between Vivendi's misrepresentations and Liberty's injuries.  A reasonable juror could have inferred that if Vivendi had accurately stated its liquidity risks — or remained entirely, conspicuously silent regarding its financial health — Dermer's analysis would have been materially different, and the Merger

---

[169]   *Stoneridge*, 552 U.S. at 159 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988)).

[170]   The jury was instructed that "[a]s a result of the prior proceeding, it has already been determined that the statements on which Liberty bases its Section 10(b) claim were materially false/untrue or misleading statements that misstated or omitted Vivendi's true liquidity risk in 2001." Jury Charge at 23.  The jury was not asked to determine which of the misrepresentations were misstatements, and which omissions.  *See* Special Verdict Form at 6–7.  In general, the line between the two is not always clear.  For example, misrepresentations 21 and 22 in Table A are the following statement, delivered separately in a press release and a Form 6-K: "VU is in a very strong position, with solid performance in virtually every business." Jury Charge at 26.  This statement could be described either as omitting the truth about Vivendi's liquidity risk (that is, failing to state the material fact that the liquidity risk existed, which was necessary to prevent the statement from being misleading under the circumstances), or as misstating Vivendi's financial health. A reasonable juror could have identified this and other, similar misrepresentations either as omissions or misstatements, and on that basis could either have applied the rebuttable presumption of reliance to those misrepresentations or not.

Agreement, at least in the form it ultimately took, would not have been signed.[171]

### E.   Vivendi's Obligation to Close the Transaction

Even if Liberty justifiably relied on Vivendi's fraud in signing the Merger Agreement on December 16, 2001, Vivendi could have broken the chain of causation between this justifiable reliance and Liberty's losses by showing that before Liberty *closed* the transaction, on May 7, 2002, Liberty knew or should

---

[171]   Finally, Vivendi argues that it is entitled to judgment on Liberty's entire Section 10(b) claim as a result of *Morrison*, 130 S.Ct. 2869, where the Supreme Court held that "Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States."  *Id.* at 2888.  To the extent that this argument is not newly raised and thus waived, I already addressed it in my ruling on Vivendi's motion for partial summary judgment:

> Having established that the operative date for irrevocable liability is December 16, 2001, . . . the multiThematiques transaction was a domestic transaction such that it falls within the scope of [Section 10(b)] under *Morrison* . . . . Liberty Media's CEO signed the Agreement in Colorado and faxed his signature page to New York.  Messier, Vivendi's CEO, was in New York the morning of December 17, 2001 to announce the agreement, and there is no evidence indicating that he was anywhere else on December 16.

*Liberty*, 861 F. Supp. 2d at 268–69.  *See also Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 62 (2d Cir. 2012) ("[T]o sufficiently allege the existence of a 'domestic transaction in other securities,' plaintiffs must allege facts indicating that irrevocable liability was incurred or that title was transferred within the United States.").  Vivendi has provided no basis for revisiting my earlier conclusion that the Merger Agreement falls under *Morrison* as interpreted by the Second Circuit.

have known of Vivendi's fraud and was free to walk away.  The jury was thus

instructed that Vivendi could defend itself against Liberty's proof of Section 10(b)

causation by showing the following:

> after signing the Merger Agreement on December 16, 2001 but
> prior to closing on the Agreement on May 7, 2002, (1) Liberty
> knew or should have known of Vivendi's fraud, such that
> Liberty's continued reliance on the statements made on or before
> December 16, 2001, was utterly unreasonable, foolish, or
> knowingly blind, and . . . (2) Liberty could have walked away
> from its obligations under the Merger Agreement.[172]

Questions 10 and 11 on the Special Verdict Form addressed this

defense.  Question 10 asked:  "Has Vivendi proven . . . that Liberty was not legally

obligated to close the transaction embodied in the Merger Agreement?"  If the jury

answered "NO," the form told the jury to proceed to Question 12, the calculation of

Section 10(b) damages.  If the jury answered "YES," the form told the jury to

proceed to Question 11, which asked:  "Has Liberty proven . . . that Liberty's

decision to close the Merger Agreement, on May 7, 2002, in reliance on any of the

statements set forth in Table A caused Liberty to suffer an economic loss?"[173]  If

the jury answered "YES," it was directed to proceed to the damages calculation in

---

[172]    Jury Charge at 28.

[173]    One of the key elements in Question 11 is "in reliance."  If Liberty
knew or should have known of Vivendi's fraud by May 7, then it did not close the
Merger Agreement in justifiable reliance on the statements in Table A.  In any
case, as described below, the jury did not reach this question.

Question 12; if "NO," to sign the verdict sheet without calculating damages.[174]

After deliberation, the jury answered "NO" to Question 10, and — as instructed — proceeded to the calculation of damages in Question 12 without addressing the issue of post-signing reliance in Question 11.[175]  Vivendi now argues that no reasonable juror could have answered "NO" to Question 10 based on the evidence at trial.[176]  In Vivendi's view, Liberty was not legally obligated to close the Merger Agreement when Liberty did so on May 7, because under the terms of the Merger Agreement, Liberty was only obligated to close if certain conditions were met.[177]  Vivendi argues that no reasonable juror could have found that the following two conditions were met: (i) Vivendi's "Registration Statement shall have been declared effective by the SEC under the Securities Act,"[178] and (ii) Vivendi "shall have performed or complied in all respects" with its obligation to

_____

[174]    *See* Special Verdict Form at 6–7.

[175]    *See id.*

[176]    *See* Viv. Mem. at 29.  Vivendi does not challenge the jury's instructions or the Special Verdict Form.

[177]    *See id.* at 30 (citing Merger Agreement § 6.03(b)–(c)).  Section 6.03 of the Merger Agreement begins by stating:  "The obligation of the Liberty Parties to consummate the Transactions is subject to the satisfaction on the Closing Date of the following conditions . . . ."

[178]    Merger Agreement § 6.03(c).

obtain a waiver of the right of first refusal held by other holders of MTH shares.[179]

Vivendi further argues that the jury's erroneous finding in Question 10

significantly impacted the verdict, because if the jury had answered "YES" to

Question 10, it would have proceeded to Question 11 and could have answered

"NO" there, which would have resulted in no Section 10(b) damage award against

Vivendi.[180]

Liberty does not dispute that (i) and (ii) were conditions for Liberty's

obligation to close.  But Liberty argues that a reasonable juror could have found

that both conditions were satisfied.[181]  Liberty also argues that Vivendi waived its

challenge to the jury's verdict on Question 10, because Vivendi failed to move for

the exclusion of Question 10 from the verdict form before deliberations began.[182]

Vivendi concedes that its Rule 50(a) motion did not argue for judgment as a matter

of law on the issue of whether closing conditions (i) and (ii) had been met before

May 7.  Vivendi argues, however, that it was not required to make such an

---

[179]    *Id.* §§ 5.01(e), 6.03(b).

[180]    *See* Viv. Mem. at 33.  As this statement makes clear, the argument in this section concerns only Section 10(b) damages, and not damages for breach of warranty.

[181]    *See* Lib. Mem. at 31–35.

[182]    *See id.* at 31.

argument in its Rule 50(a) motion, because it filed the motion before having the opportunity to present evidence in support of its closing-conditions defense.[183]

It is true that Vivendi filed its Rule 50(a) motion at the close of plaintiffs' case.  But Vivendi could have moved under Rule 50(a) again at the close of evidence, before the jury began deliberations.[184]  Thus, Vivendi could have raised its closing-conditions challenge in a Rule 50(a) motion after it had been fully heard on its affirmative defense and before the case was submitted to the jury.  By failing to do so, Vivendi waived its ability to bring the challenge under Rule 50(b).  As noted above, however, waiver under Rule 50 does not imply waiver under Rule 59.[185]  I thus consider Vivendi's challenge to the jury's answer to Question 10 under Rule 59.

*First*, with regard to the Registration Statement condition, a reasonable juror could have found the following facts:  (1) Under the Merger Agreement, the parties agreed that if Vivendi had not met the closing conditions by

---

[183]    *See* Viv. Mem. at 14–15.

[184]    *See* Rule 50(a)(2) ("A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury."); *Weisgram v. Marley Co.*, 528 U.S. 440, 445 (2000) (example of defendant moving under Rule 50(a) at the close of plaintiff's evidence and again at the close of all evidence).

[185]    *See Bracey*, 368 F.3d at 117–19.

the end of September 2002, either party could walk away from the deal.[186]  As

Vivendi's lead lawyer for the United States testified, "[W]e had until the end of

September [2002] effectively to satisfy both of those closing conditions," that is,

conditions (i) and (ii) above.  Until then, "Liberty could not walk away because of

those conditions not being satisfied."[187]  (2) On May 7, 2002, Liberty closed on the

Merger Agreement and signed a Letter Agreement waiving the Registration

Statement condition in exchange for a modification in another provision of the

Merger Agreement.[188]  (3) On June 3, 2002, Vivendi's Registration Statement was

declared effective by the SEC.[189]

       Vivendi does not dispute that a reasonable jury could have found

these facts.[190]  Rather, Vivendi suggests that no inferences can be reasonably drawn

---

[186]     *See* Tr. 6/15 at 2158, 2165, 2252 (testimony of Vivendi Senior Vice President and Deputy General Counsel George Bushnell); Merger Agreement § 7.01(iv) (stating that Merger Agreement may be terminated "by any party . . . if the Closing does not occur on or prior to September 30, 2002").

[187]     Tr. 6/15 at 2252.

[188]     *See* 5/7/02 Letter Agreement ("Letter Agreement"), Ex. 22 to Campbell Decl., at (f)(i); 6/12 Tr. at 1624–1629 (testimony of Liberty General Counsel Charles Tanabe).

[189]     *See* 6/3/02 SEC Pre-effective Amendment No. 1 to Form F-3 Registration Statement under the Securities Act of 1933 Vivendi Universal, Ex. 30 to Rubenstein Decl.

[190]     *See* Viv. Reply at 16.

from these facts that would support the jury's verdict.[191]  I disagree.  It is true that

there is a narrow, trivial sense in which the jury's response to Question 10 could be

viewed as erroneous.  But there is a far more relevant and significant sense in

which the jury's response to Question 10 was reasonable — and indeed, may have

been the only reasonable inference from the evidence introduced at trial.[192]

> Setting aside for a moment the issues raised by the May 7 Letter
Agreement, discussed below, and assuming provisionally that none of the other
closing conditions were unmet when Liberty closed, I turn to the language of
Section 6.03 of the Merger Agreement.  This section states in relevant part:  "The
obligation of the Liberty Parties to consummate the Transactions is subject to the
satisfaction *on the Closing Date* of the following conditions, any one or more of
which conditions may be waived . . ."[193]  One of the conditions is:  "The
Registration Statement shall have been declared effective by the SEC under the
Securities Act."[194]  In the event, the SEC had not declared the Registration

---

[191]     *See* Viv. Mem. at 30–31.

[192]     The logic supporting this conclusion is unavoidably complex.
However, because it is necessary to explain my conclusion, I have no choice but to
present this reasoning despite its complexity.

[193]     Merger Agreement at § 6.03 (emphasis added).

[194]     *Id.* at § 6.03(c).

Statement effective by the closing date of May 7, 2002.  As a result, the

Registration Statement condition was not satisfied on the closing date.  Because

Liberty's obligation to close was, strictly speaking, subject to the satisfaction on

the closing date of the Registration Statement condition, there is a literalistic sense

in which Liberty never incurred an obligation under Section 6.03 to close.  That is,

under a literal application of Section 6.03 to the chronology of Liberty's closing,

by closing before the registration statement became effective, Liberty ensured that

the legal obligation to close under Section 6.03 would never come into effect.

As this chain of reasoning already suggests, however, there is another,

more significant sense in which Liberty's decision to close on May 7, prior to the

effective date of the registration statement, had no effect on its obligation to close

on the Merger Agreement.  Section 6.03 does not state that Liberty was free to

walk away from the Merger Agreement until the moment when the SEC declared

the Registration Statement effective.  To the contrary, as the parties understood,[195]

and as the Merger Agreement stated,[196] the parties had until September 30 to satisfy

the conditions.  If Liberty had attempted to walk away from the Merger Agreement

---

[195]    *See* Tr. 6/15 at 2158, 2165, 2252 (Bushnell testimony).

[196]    *See* Merger Agreement § 7.01(iv) (stating that Merger Agreement
may be terminated "by any party . . . if the Closing does not occur on or prior to
September 30, 2002").

on May 7, rather than closing, the Merger Agreement made clear that Liberty's

attempt to walk away could prove futile: Vivendi's satisfaction of the Registration

Statement condition at any time before September 30 would have obligated Liberty

to close despite any attempt to walk away.[197]  In other words, it was only *by closing*

that Liberty avoided the risk of being *obligated to close* under Section 6.03.[198]

Because Liberty was neither free to walk away after it closed nor before it closed,

the Registration Statement condition never provided a basis for Liberty to escape

---

[197]     Indeed, in the event, the registration statement became effective on June 3.  If Liberty had not already closed, it would have been obligated to close on June 3 or in the following days.  *See* Tr. 6/12 at 1677:19–22 (Tanabe testimony). Strictly speaking, the fact that the registration statement became effective before September 30 is irrelevant.  As Vivendi correctly notes, the jury was instructed not to consider information that only became available after May 7, 2002 in its answer to Questions 10 and 11.  *See* Viv. Reply at 16.  The Jury Charge states that in making the determination of whether Liberty (1) knew or should have known of Vivendi's fraud, and (2) could have walked away from its obligations under the Merger Agreement, "you will only consider information available as of May 7, 2002." Jury Charge at 28.  Nevertheless, the fact that the registration statement did, in fact, become effective before September 30, and would have obligated Liberty to close if it had not done so by then, makes clear the *risk* that would have prevented Liberty from walking away at any time before September 30.

[198]     Liberty was like an employee faced with the choice between voluntarily resigning and involuntarily being fired at some later date based on a condition that might or might not come to pass.  Because the relevant condition in this case — the SEC's declaration of the registration statement's effectiveness — did in fact come to pass, Vivendi's argument that Liberty was not legally obligated to close the Merger Agreement has no more validity than an employer arguing that because an employee voluntarily resigned before being fired, she was never required to lose her job.

its legal obligation to close the Merger Agreement.

A reasonable juror could thus have found that Vivendi did not prove the Registration Statement condition provided Liberty with an avenue for avoiding its legal obligation to close the Merger Agreement. Vivendi's challenge to the jury's rejection of Vivendi's closing-conditions defense is without merit to the extent that the challenge is based on the Registration Statement condition.[199]

---

[199]     Another way of presenting the preceding analysis would be to say that Question 10 on the Special Verdict Form contains an ambiguity when applied to the Registration Statement condition. The question can either be interpreted as asking, in line with the jury's instructions: Was Liberty free to walk away from the Merger Agreement, despite the registration statement having become effective after the closing date? Or the question can be interpreted as asking, abstractly and for no apparent reason: Does the word "obligation" in Section 6.03 mean that if Liberty closed on the Merger Agreement before the registration statement became effective, it had no legal obligation to close? I have concluded that the jury adopted the former interpretation, and was correct to do so. Vivendi offers no basis for questioning that conclusion. In the context of the trial as a whole, where Liberty's freedom to walk away from the Merger Agreement was a major issue, the former interpretation is the only natural one.

Even if Vivendi were to offer support for the latter interpretation, however, there would be a further reason to reject it. Vivendi successfully argued against Liberty's attempt to rephrase Question 10 in such a way that the ambiguity discussed here would not have arisen. *See* Tr. 6/19 at 2730–2734 (Liberty's counsel arguing that the question "should track the language used in the charge," and should thus ask: "Has Vivendi proven by a preponderance of the evidence that Liberty could have walked away from its obligation under the Merger Agreement on May 7?"). Because Vivendi was thus to some extent responsible for the ambiguity in Question 10, and did not bring the ambiguity to the Court's or the other party's attention, it would arguably be unfair to allow Vivendi to benefit from the ambiguity. *Cf. C&L Enters. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 423 (2001) (noting "'the common-law rule of contract interpretation that a court should construe ambiguous language against the interest

I now turn to the effect of the May 7 Letter Agreement, which was excluded from the foregoing analysis. As noted above, in the Letter Agreement, signed on the day of closing, Liberty waived the Registration Statement condition in exchange for a modification in another provision of the Merger Agreement.[200] Vivendi cites the Letter Agreement in its brief, apparently as further evidence that the Registration Statement had not been declared effective by May 7.[201] There is no dispute, however, that the Registration Statement was not declared effective until June 3. The Letter Agreement would only be relevant to the present analysis if it had freed Liberty to walk away from the Merger Agreement. In fact, the Letter Agreement did the opposite: it removed what still appeared (incorrectly, as it turned out) to be a potential avenue for walking away. By signing the Letter Agreement and thereby waiving the Registration Statement condition, Liberty imposed a legal obligation on itself to close even if the Registration Statement was never declared effective.

Second, as noted above, another closing condition in the Merger

---

of the party that drafted it'" (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995)).

[200]    *See* Letter Agreement at (f)(i); Tr. 6/12 at 1624–1629 (Tanabe testimony).

[201]    *See* Viv. Mem. at 30.

Agreement required Vivendi to obtain a waiver of the right of first refusal held by other holders of MTH shares.[202]  Vivendi argues that no reasonable juror could have found based on the evidence at trial that Vivendi satisfied the MTH waiver condition.[203]  As a result, Vivendi argues, no reasonable juror could have found that Liberty was obligated to close on the Merger Agreement, and the jury's answer to Question 10 requires a new trial under Rule 59.[204]

The jury heard conflicting evidence regarding the satisfaction of the MTH waiver condition.  The dispute between the parties turns in large part on a letter that Vivendi forwarded to Liberty on March 19, 2002.  At the time, Vivendi presented the letter as "confirming that Lagardere Active Broadcast will not exercise its right of first refusal under the Multithematique Cooperation Agreement."[205]  The crux of Vivendi's post-trial argument is that the March 8 letter from Lagardère (the "Lagardère Letter") did *not* in fact satisfy the MTH waiver condition, and thus that Liberty was free to walk away from the Merger Agreement on this basis.

---

[202]    *See* Merger Agreement §§ 5.01(e), 6.03(b).

[203]    *See* Viv. Mem. at 31–33.

[204]    *See id.*; Viv. Reply at 15.

[205]    3/19/02 Letter from Faiza J. Saeed to Frederick H. McGrath, Ex. 26 to Rubenstein Decl.

On the one hand, Vivendi notes that prior to closing, Liberty itself questioned whether the Lagardère Letter satisfied the MTH waiver condition.[206] For example, when Liberty received the letter, it responded by writing that it did not "quite see how this letter meets the requirements of the merger agreement," and noted language in the letter that "casts doubt in our minds as to the validity of this letter as a waiver of the [right of first refusal] rights."[207]  Liberty concluded: "Therefore, we consider it imperative that Vivendi obtain a clear, irrevocable waiver from Lagardere . . . ."[208]  Later, Vivendi notes, Liberty proposed and the parties entered into an Indemnification Agreement that required Vivendi to indemnify Liberty for any losses "directly or indirectly related to, based upon, arising out of or otherwise in respect of (i) Vivendi's failure to satisfy in full its obligations pursuant to and in accordance with Section 5.01(e) of the Merger Agreement," which contains the MTH waiver condition.[209]

On the other hand, Liberty notes that Vivendi forwarded Liberty a

---

[206]    *See* Viv. Mem. at 31–32.

[207]    3/19/02 Email from Frederick McGrath to Faiza Saeed, Ex. 23 to Campbell Decl.

[208]    *Id.*

[209]    *See* Viv. Mem. at 32 (quoting 5/7/02 Waiver and Indemnification Agreement, Ex. 25 to Campbell Decl., at § 2(a)).

March 12 letter from Messier to Lagardère confirming Lagardère's waiver of the

right of first refusal.[210]  At the time, Vivendi argued "that the original [March 8]

letter, combined with the fact of Lagardere's cooperation to date . . . and the

absence of a response from them to [Messier's letter] to date, together satisfy the

requirements of obtaining the necessary waivers."[211]  Vivendi also provided, at

closing, an "Officer's Certificate" warranting that it had "performed or complied in

all respects with" the MTH waiver condition.[212]

Based on the evidence introduced at trial, a reasonable juror could

have found that Liberty was not free to walk away from the Merger Agreement

based on the MTH waiver condition having not been satisfied.  While the evidence

suggested *uncertainty* as to whether the Lagardère Letter satisfied the MTH waiver

condition, none of the evidence established that the Letter *in fact* failed to satisfy

the condition.  A reasonable juror could have found that Liberty insisted on the

Indemnification Agreement in order to protect itself against the risk created by the

uncertainty around the Lagardère Letter, not because it had been definitively

---

[210]   *See* Lib. Mem. at 32 (citing 4/2/02 Email from Faiza Saeed to Frederick McGrath ("4/2/02 Saeed Email"), Ex. 27 to Rubenstein Decl.).

[211]   4/2/02 Saeed Email.

[212]   5/7/02 Officer's Certificate of Universal Studios, Inc., Ex. 28 to Rubenstein Decl.

established that the Letter failed to satisfy the waiver condition.  The fact that Liberty questioned the validity of the Letter before, and now defends it — while Vivendi defended its validity before, and now questions it — illustrates the lack of clarity regarding the effect of the Letter on the waiver condition.[213]

In the face of such uncertainty, it is appropriate to defer to the jury's findings.  Because a reasonable juror could have found that the MTH waiver condition was adequately satisfied despite the lack of certainty regarding the legal effect of the Lagardère Letter, the waiver condition does not provide a basis for concluding that the jury's answer to Question 10 was seriously erroneous.

Viewing the evidence concerning both the Registration Statement condition and the waiver condition together, a reasonable juror could have found that Liberty was never free to walk away from the Merger Agreement based on unsatisfied closing conditions.  The jury's answer to Question 10 was thus not seriously erroneous, and there was no need for the jury to answer Question 11.

---

[213]   Moreover, if Liberty *had* walked away from the Merger Agreement based on the Lagardère Letter having not satisfied the MTH waiver condition, and if it had been in Vivendi's interest to enforce the Agreement, Vivendi could plausibly have argued, in court, that the waiver condition was fully satisfied. Liberty's "freedom" to walk away from the Merger Agreement as a result of the Lagardère Letter was, at best, a freedom to walk into a costly lawsuit for breach of contract — with no guarantees that it would prevail.  It would be a manifest injustice to free Vivendi from all liability under Section 10(b) simply because Liberty declined to take such a risky course.

Vivendi is not entitled to a new trial under Rule 59.

### F.    Challenges to Admitted Evidence

Vivendi argues that at trial Liberty introduced "highly prejudicial evidence that was not relevant to any issue before the jury," and that as a result Vivendi should be granted a new trial under Rule 59, which permits the granting of a new trial "'if substantial errors were made in admitting or excluding evidence.'"[214] Specifically, Vivendi argues that the Court allowed the introduction of evidence "related solely to falsity — an element of Liberty's Section 10(b) claim that was not before the jury" because of the Court's collateral estoppel order.[215]

The evidence challenged by Vivendi related to: (1) Vivendi having engaged in "earnings management" to boost its reported earnings; (2) Vivendi having failed to disclose the role of one-time "purchase accounting benefits" in its reported EBITDA growth; (3) Vivendi having concealed its obligation to purchase an additional stake in a Moroccan telephone company, Maroc Telecom; and (4) Vivendi having failed to consolidate earnings with an affiliate, Telco, which

---

[214]    Viv. Mem. at 34 (quoting Rule 59).

[215]    *Id.* (citing *Liberty Media*, 861 F. Supp. 2d 262).

allowed Vivendi to report less debt.[216]  Vivendi suggests that Liberty used these categories of evidence only "to show that Vivendi had made false statements and had lied regarding the true nature of its liquidity risk."[217]

Liberty argues that Vivendi's evidentiary challenges are waived because Vivendi failed to object when the Court issued its pretrial rulings limiting Liberty's evidence and, for the most part, failed to object during trial to the introduction of the evidence it now contests.[218]  But before trial Vivendi challenged the evidence it challenges now, using many of the same arguments it uses now.[219]  Given the rapid pace of the pretrial proceedings, the definitive nature of the Court's rulings, and Vivendi's clearly stated disagreement with those rulings, it would have been a formalism to have required Vivendi to explicitly repeat, after each ruling with which it obviously disagreed, that it continued to disagree and thus preserved its objection.[220]

---

[216]    See id.; Lib. Mem. at 39.  For further factual background on these issues, see In re Vivendi, 765 F. Supp. at 512, 535–43.

[217]    Viv. Mem. at 36.  See also id. at 37 (earnings management evidence "was used only to reinforce that Vivendi had lied and acted deceitfully" (emphasis added)).

[218]    See Lib. Mem. at 36.

[219]    See, e.g., Tr. 5/18 at 190–195, 204–209; Tr. 5/21 at 244–247.

[220]    See Fed. R. Evid. 103(b) ("Once the court rules definitively on the record — either before or at trial — a party need not renew an objection or offer of

Thus, Vivendi's challenges to the evidence introduced at trial were not waived.  They are, however, without merit.  *First*, some discussion of the four categories of evidence challenged by Vivendi was obviously necessary for the jury to have a basic understanding of the facts of the case.  Vivendi is incorrect to the extent that it argues the jury should have determined — or indeed could have determined — whether Liberty suffered damages caused by its justifiable reliance on Vivendi's fraud, without being exposed to relatively detailed evidence concerning the nature of that fraud and how the fraud was causally related to Liberty's losses.

In addition, the jury was instructed that Liberty was required to "show that its reliance was reasonable or justified":

> [I]f through minimal diligence Liberty should have discovered the statements were false or misleading, Liberty's reliance would not be justified.  In deciding whether Liberty justifiably relied on the misstatements, you may consider evidence of:
> . . .
> 3.     Liberty's access to relevant information;
> 4.     Vivendi's concealment of the fraud;
> 5.     Liberty's opportunity to detect the fraud; and

---

proof to preserve a claim of error for appeal."); *United States v. McDermott*, 245 F.3d 133, 140 n.3 (2d Cir. 2001) ("*in limine* objections are covered under Rule 103" (citing Fed. R. Evid. 103, notes, 2000 Amendment)).  *See also* Fed. R. Civ. P. 46 ("A formal exception to a ruling or order is unnecessary.  . . .  Failing to object does not prejudice a party who had no opportunity to do so when the ruling or order was made.").

6.   the generality or specificity of the misrepresentation.[221]

Much of the evidence that Vivendi now challenges was relevant to showing how difficult it would have been for Liberty to uncover Vivendi's fraud, and thus that Liberty's reliance on the fraud was justified.[222]  Indeed, one of Vivendi's primary defenses at trial was that Liberty's reliance on Vivendi's fraud was unjustified because Liberty failed to take adequate steps to uncover the fraud.[223]  It would have been unfair to Liberty to preclude it from introducing evidence of the difficulties of investigating Vivendi's fraud and the extent to which the fraud was concealed even within Vivendi.

*Second*, the evidence challenged by Vivendi was not unfairly prejudicial, and certainly was not "so clearly prejudicial to the outcome of the trial"[224] that a new trial is warranted.  The jury was instructed of the falsity of Vivendi's statements, so evidence related to that falsity would have been unlikely to prejudice the jury unless it were presented in an inflammatory or otherwise inappropriate way.  Vivendi provides no persuasive examples of Liberty exploiting

---

[221]   Jury Charge at 26.

[222]   *See, e.g.*, Tr. 6/4 at 676–707 (Mintzer testimony).

[223]   *See, e.g.*, Tr. 6/21 at 2929–2933 (Quinn summation).

[224]   *Luciano v. Olsten Corp.*, 110 F.3d 210, 217 (2d Cir. 1997).

the evidence related to Vivendi's fraud in such a way.[225]   To the contrary, Liberty's

counsel made efforts during the trial to prevent witnesses from offering prejudicial

testimony, in accordance with my pretrial rulings.[226]

      In sum, Vivendi has neither provided grounds for revisiting my

pretrial evidentiary rulings, nor provided persuasive evidence that Liberty departed

from those rulings at trial in such a way as to warrant a new trial.

## V.   CONCLUSION

      For the foregoing reasons, Vivendi's renewed motion for judgment as

a matter of law pursuant to Rule 50(b), or, in the alternative, for a new trial

pursuant to Rule 59, is DENIED.   The Clerk of Court is not required to take any

action, as there is no open docket entry corresponding to plaintiffs' motion.

---

[225]   *See* Viv. Mem. at 34–39.   Vivendi's strongest evidence in support of its speculation that Liberty harbored improper, unspoken motives in its use of fraud-related evidence may be the fact that Liberty's counsel "uttered the words 'false' and/or 'falsity' *sixty* times in his summation alone." *Id.* at 36 n.15.   There is nothing sinister, however, in the frequent use of the terms "false" or "falsity" during summation in a complex case concerned with the consequences of a stipulated series of falsities.   Likewise, Vivendi's suggestion that Liberty's counsel "[a]mazingly . . . explicitly acknowledged in a post-trial interview that the evidence pertaining to the falsity of Vivendi's statements did not concern reliance, causation, or damages, but rather served to show that Vivendi lied to the market," is a blatant misrepresentation of Liberty's counsel's words, which clearly conveyed the opposite of what Vivendi suggests. *Id.* at 39.

[226]   *See, e.g.*, Tr. 6/4 at 695:22–25.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        February 12, 2013
              New York, New York

**- Appearances -**

**For Plaintiffs:**

Macey R. Stokes, Esq.                     R. Stan Mortenson, Esq.
Baker Botts LLP                           Michael L. Calhoon, Esq.
One Shell Plaza                           Alexander M. Walsh, Esq.
910 Louisiana Street                      Baker Botts LLP
Houston, TX 77002                         1299 Pennsylvania Avenue, N.W.
(713) 229-1234                            Washington, D.C. 20004
                                          (202) 639-7700


**For Defendants:**

Daniel Slifkin, Esq.                      James P. Quinn, Esq.
Cravath Swaine & Moore LLP                Penny P. Reid, Esq.
Worldwide Plaza                           Weil, Gotshal & Manges LLP
825 Eighth Avenue                         767 Fifth Avenue
New York, NY 10019                        New York, NY 10153
(212) 474-1000                            (212) 310-8000